## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

| | | |
|---|---|---|
| JOSEPH R. KARSNER, IV, | * | |
| Petitioner, | * | NASD Case No.: 04-06007 |
| | | Civil Action No.: 1:2008-cv-00291-RJL |
| v. | * | |
| TERRESSA HATCHETT and | * | |
| FINRA (formerly known as National | | |
| Association of Securities Dealers (NASD)) | * | |
| Respondents. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MARYLAND SECURITIES COMMISSIONER'S
### MOTION TO INTERVENE

Pursuant to Rules 24(a) and (b) of the Federal Rules of Civil Procedure, the Maryland Securities Commissioner, Melanie Senter Lubin, by and through undersigned counsel, moves for leave to intervene in this proceeding seeking an order to confirm an arbitration panel's recommendation of expungement. The Securities Commissioner attaches hereto a motion to dismiss or deny petitioner's request for confirmation setting forth her reasons for opposing confirmation based upon public policy and procedural grounds.[1]  As reasons for intervening, the Securities Commissioner states:

1.     The Maryland Securities Commissioner (the "Securities Commissioner") is the

---

[1]  The New York Attorney General's motion to intervene for purposes of opposing a request for expungement of CRD records was granted by the State of New York Supreme Court, County of Erie, in the matter of *Parker, et al. v. Salzberg, et al.*, Case No. I-2007-01942. Recognizing the strong public policy interest against expunging CRD records based upon negotiated settlements, the Court recently issued a decision ordering a rehearing by the arbitrators on the issue of expungement.  *See* Parker decision attached as Exh. 1 hereto.

administrator of the Securities Division of the Office of the Attorney General of Maryland, and as such is responsible for the regulation of the securities industry in Maryland pursuant to the Maryland Securities Act. *See* Title 11, Md. Code Ann., Corps. and Ass'ns (2007 Repl. Vol.) (the "Securities Act").

2.      The Securities Commissioner is charged with protecting the investing citizens of Maryland by ensuring compliance with the Securities Act by all those who offer or sell securities in or from Maryland, and by investigating complaints of fraud or improper practices in connection with the offer or sale of securities or the providing of investment advice.

3.      The Securities Commissioner registers securities offerings and the persons who sell them, and provides information to the public regarding a company's or individual's registration status and disciplinary history as those facts are contained on the Central Registration Depository ("CRD") system, a computerized registration database for the securities industry. That information also is used by the Securities Commissioner as a factor in registration and enforcement decisions.

4.       The records of petitioner Karsner's (the "petitioner") registration and disciplinary history, like those of almost all registered industry participants, is maintained by the National Association of Securities Dealers ("NASD")[2] on the CRD system. Furthermore, because petitioner was a Maryland resident, doing business in Maryland, he was required to be registered by the Securities Commissioner, via the CRD, to conduct business in Maryland.

5.      Petitioner also was required by Maryland law to disclose in his CRD records certain disciplinary information, including customer complaints and arbitrations, and to update that

---

[2]    In July 2007, the NASD changed its name to FINRA. For ease of recognition, the term NASD is used throughout this filing.

information as needed.

6.    Although the CRD system is maintained by NASD, the records contained on CRD are the joint property of all securities regulators, including all U.S. state securities administrators.[3] Those administrators rely on its contents not only to decide on requests from persons who apply for registration or seek to renew their registration status, but also as a factor in decisions pertaining to disciplinary actions taken against the registrants by the regulators.  Moreover, information on the CRD is made available to citizens who seek information from their state regulator about industry personnel with whom they are considering entrusting their investment funds.

7.    Petitioner Karsner seeks to expunge the facts of an arbitration based upon the arbitration panel's recommendation that all references to the arbitration be expunged from his registration records maintained on CRD.

    a.    The petitioner, together with his former employer Legacy Financial Services, Inc. ("Legacy"), was the subject of an arbitration proceeding brought by Terressa Hatchett, a Maryland resident, who alleged that unsuitable investment recommendations by Karsner caused losses of $264,000 in her account.

---

[3]  The State of Maryland's joint property rights to the information contained in the CRD system has been recognized under the contract between NASAA and the NASD:

> The data on CRD Uniform Forms filed with the CRD shall be deemed to have been filed with each CRD State in which the applicant seeks to be licensed and with the NASD and shall be the joint property of the applicant, NASD, and those CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange Commission).  The compilation constituting the CRD database as a whole shall be the property of NASD.

Paragraph 3(e) of the CRD Agreement Amendment, dated December 13, 1996, attached as Exh. 2 to Memorandum in Support of Maryland Securities Commissioner's Motion to Intervene.

b.    The parties to the arbitration proceeding entered into a confidential agreement to settle the matter based upon terms and conditions that were not disclosed to the arbitration panel.

c.    As part of the agreement, the parties agreed that petitioner and Legacy were not liable for the counts listed in the Statement (and Amended Statement) of Claim, that the investments were suitable, and that all references to the arbitration should be removed from Karsner's CRD records.  In exchange, Karsner and Legacy agreed to pay $92,500 to Hatchett.

d.    Upon a motion of both parties, and without a hearing or the review of any substantive evidence by the arbitration panel, the arbitration panel entered a Stipulated Award dismissing with prejudice all claims against petitioner Karsner and Legacy, and recommending that the facts of the arbitration case be expunged from petitioner's CRD records.

8.    Karsner has also filed fourteen additional petitions with this Court to expunge records of other arbitration cases.

9.    In a notice adopting changes to NASD's expungement rule, Rule 2130, the SEC noted that state regulators, including the Maryland Securities Commissioner, would be able to intervene in expungement matters handled by the courts as a means of ensuring that the court is made aware of the investor protection and regulatory implications of expungement.  Federal Register, Vol. 68, No. 247, p. 74671 (12/24/03), reading in pertinent part:

As a further means to ensure that the court is made aware of the investor protection and regulatory implications of an expungement, NASD noted that states will be able to intervene if they have concerns regarding whether investor protection or regulatory

issues have been fairly considered by the NASD. [. . .] To the extent that the state(s) wishes to intervene, it could so petition the court.

10.    The CRD records of an individual registered, or previously registered, with a state securities agency are the records of the state agency, in this case the Maryland Division of Securities. The Securities Commissioner has an interest in the preservation of those state records and is thus concerned that the expungement of the CRD records will negatively impact her ability to fulfill her statutory duties.

11.    The Securities Commissioner therefore seeks to intervene in this proceeding.

12.    The Securities Commissioner may intervene as of right, as provided in Rule 24(a)(2), Fed. R. Civ. P., because she has an interest in the property (CRD records) or transaction (expungement) in question as having an impact on her duties. Furthermore, she may intervene as of right because judgment for petitioner may impair or impede the Securities Commissioner's ability to protect that interest, in that expungement of these records will remove information required by Maryland law that is relevant to her ability to fulfill her state-law-mandated responsibilities.  There is no other party that can or will adequately represent that interest.

13.    Alternatively, the Securities Commissioner should be permitted to intervene under Rule 24(b)(2) because her interest in opposing petitioner's request for expungement of records arises from common facts forming the basis of petitioner's claim against the NASD.  Intervention by the Securities Commissioner will not unduly delay or prejudice the adjudication of the rights of the original parties.

14.    The NASD does not oppose the Securities Commissioner's motion to intervene.

WHEREFORE, the Securities Commissioner requests that this motion be granted, that she be allowed to intervene in this proceeding, and that a hearing be set in this matter.

Respectfully submitted,

Douglas F. Gansler
Attorney General of Maryland


_____/s/_____
Kelvin M. Blake
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-7783


_____/s/_____
Lucy Cardwell
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-6337


March 10, 2008

CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March, 2008, a copy of the foregoing Motion To

Intervene, memorandum in support thereof, and proposed Order, were filed with the Court's

electronic filing system and were mailed, via first-class mail, postage prepaid, to:

George S. Mahaffey, Jr., Esq.
Goodell, DeVries, Leech & Dann, LLP
One South St., 20th Floor
Baltimore, MD 21202
*Counsel for Petitioner Joseph Karsner*

Richard J. Magid, Esq.
Whiteford, Taylor & Preston, LLP
7 Saint Paul Street, 15th Floor
Baltimore, MD 21202
*Counsel for Petitioner Joseph Karsner*

Betty Brooks, Esq.
Terri Reicher, Esq.
FINRA
1735 K Street, N.W.
Washington, D.C. 20006
*Counsel for FINRA, Respondent*

William B. Young, Jr., Esq.
Colling, Gilbert, Wright & Carter
801 N. Orange Avenue, Ste 830
Orlando, FL 32801
*Counsel for Terressa Hatchett, Respondent*

_____
/s/
Kelvin M. Blake

## EXHIBIT 1

Catherine Grantier Cooley, Esq.    R. Verle Johnson, Esq.
Hodgson Russ, LLP    Assistant Attorney General
Attorney for Petitioners    Attorney for Third-Party Intervenor
140 Pearl Street, Suite 100    120 Broadway, 23rd Floor
Buffalo, NY 14202    New York, NY 10271

---

The Court has considered the following papers: Verified Petition dated February 26, 2007; Notice of Motion to Intervene dated April 11, 2007; Affirmation of R. Verle Johnson, Esq. dated April 11, 2007; Affirmation of Catherine Grantier Cooley, Esq. dated April 17, 2007; Affirmation of R. Verle Johnson, Esq. dated May 7, 2007; Supplemental Affirmation of Catherine Grantier Cooley, Esq. dated May 14, 2007; Answer of Third-Party Intervenor dated May 21, 2007; letters to the Court by Alice Salzberg dated March 9, 2007 and April 9, 2007.

Petitioners Sage, Rutty & Co., Inc. and Douglas Parker commenced this special proceeding pursuant to Article 75 of the CPLR and the National Association of Securities Dealers, Inc. ("NASD") Rule 2130 to confirm a Stipulated Award from an NASD arbitration panel issued on December 22, 2006. Respondent Alice C. Salzberg claims that the entire award should be vacated because she entered into an agreement to settle her claims against Petitioners under duress from her attorney at the time, Douglas Foss, Esq. Third-Party Intervenor Attorney General opposes confirmation of the portion of the Stipulated Award recommending expungement of Ms. Salzberg's claims, and asks the Court to vacate that portion of the award under CPLR 7511.

On July 25, 2005, Respondent Salzberg filed a Statement of Claim with the NASD, contending that Petitioners pursued financially unsuitable investments and breached their fiduciary duties. In their Answer, Petitioners denied all of Ms. Salzberg's claims. An NASD arbitration panel was set to hear evidence, but at the first scheduled

2

hearing on September 25, 2006, the parties, through their counsel, verbally entered into a settlement agreement. Respondent Salzberg contends that at the time she was under duress from her attorney to settle her claims. However, Salzberg signed the Stipulated Award drafted by the NASD arbitration panel on October 27, 2006. A portion of the Stipulated Award recommends that the Salzberg complaint be expunged from Douglas Parker's registration records maintained by the Central Registration Depository ("CRD") because the panel found that "the claim, allegation, or information is factually impossible or clearly erroneous" (*see* Verified Petition Ex. C). Pursuant to Rule 2130 of NASD procedures, Petitioners then requested that the Court direct expungement of the records, and Petitioners notified the NASD of the proceeding. The NASD declined to oppose the petition, but the Court granted the Attorney General's motion to intervene to oppose that portion of the award which recommends expungement.

The purpose of the CRD system is have a centralized database where complete and accurate information on securities dealers is available to the public. Investors want access to accurate and meaningful information when they choose a broker. Brokers want their reputations to remain intact, and they want inaccurate complaints expunged from public record. The NASD and the States want to fulfill their regulatory responsibilities to both brokers and investors. Rule 2130 is an attempt to strike a balance between all these competing interests by retaining factually accurate claims and expunging false claims. The rule seeks to protect all interests by allowing for judicial review of arbitration awards that recommend expungement.

In 2004, the Securities and Exchange Commission ("SEC") approved Rule 2130, which outlines the instances in which expungement of CRD records is appropriate. Rule 2130 requires NASD arbitrators to make an affirmative finding that expungement is appropriate because an investor's claims were factually impossible, clearly erroneous, or false. Arbitration panels and courts should ensure that at least one of these standards

3

is met before recommending or directing expungement (*see* Notice 04-16, Johnson Aff. 4/11/07 Ex. 5). In a case in which parties settle an arbitration proceeding, the arbitration panel still must make affirmative findings based on one of the standards in Rule 2130, and the panel can require the submission of documents or a brief evidentiary hearing in order to make such findings (*see id.*).

Rule 2130 promotes a type of judicial review of arbitration awards, but judicial review of arbitration awards under the CPLR is limited. New York embraces a policy supporting arbitration and discouraging judicial interference with the arbitration process and arbitration awards (*see Matter of New York City Tr. Auth. v Transport Workers Union of Am.*, 99 NY2d 1, 6 [2002]). An award should only be vacated under the narrow circumstances listed in CPLR 7511(b)(1), including corruption, fraud or misconduct by arbitrators, partiality of arbitrators, or instances where arbitrators exceeded their power. Arbitrators exceed their power if their awards are totally irrational or violative of a strong public policy (*see Matter of Silverman v Benmor Coats, Inc.*, 61 NY2d 299 [1984]). Stipulated awards based on a settlement should "not be set aside on facts less than needed to avoid a contract, e.g., fraud, overreaching, mistake, duress, or some other ground of similar nature" (*see Matter of Goldstein v Preisler*, 24 AD3d 441 [2005]).

In order to reconcile Rule 2130 with New York's policies supporting settlement and arbitration, courts must analyze these proceedings on a case-by-case basis, and courts should only disrupt awards or stipulated awards if there is something uniquely troubling about the dispute.

In this case, there are aspects of the Stipulated Award which trouble the Court. The arbitrators found that Ms. Salzberg's claims were factually impossible or clearly erroneous, but there is not a single fact or circumstance described upon which the arbitrators base this conclusion (*see* Stipulated Award, Verified Petition Ex. C). A

4

hearing was never conducted, no written settlement agreement was ever drafted, and no other documents were submitted. In that sense, the arbitrators' decision on expungement is irrational because it was made without any evidentiary support. There is nothing in the award which the Court can rely upon in order to fulfill its responsibility under Rule 2130.

Furthermore, the Court must be mindful of a strong public policy interest. There is a threat that in NASD disputes such as these, brokers will entice aggrieved investors to settle factually accurate claims if they agree to sign a Stipulated Award recommending expungement. This threat, similar to the threat of a strike suit in corporate matters, promotes private interests at the expense of states, potential investors, and the public generally. The judicial review mechanisms in Rule 2130 were put in place to specifically protect the public interest from this kind of threat. The lack of a discussion of the factual inaccuracies of Ms. Salzberg's claims in the Stipulated Award prevents the Court from assuring that this threat is not present.

The Court is not persuaded by Petitioners' argument that similar awards and stipulated awards have been confirmed by other courts without incident. First, many of the cases which Petitioners cite occurred before adoption of Rule 2130. Additionally, the cases which Petitioners cite involve awards or stipulated awards based on hearings or some other type of fact-gathering conducted by the arbitrators. For example, petitioners cite a recent order from this District by Judge John Curran (*see* Cooley Supp. Aff. Ex. 1). In that case, arbitrators recommended expungement in their stipulated award because they determined that the accused broker did not even participate in the transactions alleged, making it impossible for him to be involved. Judge Curran directed for expungement of these records because there was ample evidence that the arbitrators had a rational basis for their decision, unlike the situation before this Court.

Due to the uncertainty regarding the veracity of Ms. Salzberg's claim, strong

public policy interests, and the unique circumstances of this proceeding, the Court is unable to direct expungement of the claims from Petitioners' CRD records. However, the Court is also unable to permanently vacate the portion of the award recommending expungement because expungement could very well be appropriate under Rule 2130. At this time, there are simply no facts before the Court necessary to make a reasonable determination that one of the standards for expungement in Rule 2130 was met. Therefore, pursuant to CPLR 7511(d), the Court orders a rehearing by the arbitrators to clarify the facts and circumstances which led them to conclude that "the claim, allegation, or information is factually impossible or clearly erroneous."

The rehearing will be limited to the issue of expungement alone. The Court will not entertain Ms. Salzberg's claim that the entire award be vacated. Petitioners are correct that Ms. Salzberg is not entitled to her defense of duress because she had over a month from the alleged date of duress to sign the Stipulated Award. There is no evidence that on October 27, 2006, Ms. Salzberg signed the Stipulated Award against her free will.

Submit Order accordingly.

**Hon. Diane Y. Devlin**
Justice of the Supreme Court

DATED:    May 30, 2007
          Buffalo, New York

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

| | | |
|---|---|---|
| JOSEPH R. KARSNER, IV, | * | |
| Petitioner, | * | NASD Case No.: 04-06007 |
| | | Civil Action No.: 1:2008-cv-00291-RJL |
| v. | * | |
| TERRESSA HATCHETT and | * | |
| FINRA (formerly known as National | | |
| Association of Securities Dealers (NASD)) | * | |
| Respondents. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM IN SUPPORT OF THE
MARYLAND SECURITIES COMMISSIONER'S
MOTION TO INTERVENE

INTRODUCTION

Maryland Securities Commissioner Melanie Senter Lubin (the "Securities Commissioner")
seeks leave to intervene in this proceeding as of right and, alternatively, permissively, pursuant to
Rule 24, Federal Rules of Civil Procedure. The Securities Commissioner seeks to intervene in order
to oppose petitioner's request for expungement of facts about an arbitration proceeding from his
records on the Central Registration Depository ("CRD") system. The Securities Commissioner urges
that expungement of the arbitration from petitioner's records is not in the public's interest. The
Securities Commissioner's intervention is necessary in order to ensure that her authority and
responsibility to enforce the Maryland Securities Act, Title 11, Md. Code Ann., Corps. & Ass'ns
(2007 Repl. Vol.) (the "Securities Act") for the protection of Maryland investors and others is not
hampered by the expungement of records that the Securities Commissioner requires, relies upon, and

co-owns with the National Association of Securities Dealers ("NASD").[1]  Furthermore, subject matter jurisdiction does not properly lie with this Court such that the petition for confirmation should be dismissed.

BACKGROUND

A.    The Maryland Securities Commissioner

The Securities Commissioner is authorized to enforce the Maryland Securities Act in order to protect Maryland and other investors.  Securities Act, section 11-101 *et seq., passim*.  That responsibility includes reviewing the applications (including the full registration and disciplinary history) of those who seek to be licensed in Maryland to transact securities business.  It also includes making available to investors information regarding the registration and disciplinary history of a company or individual with whom the investors are considering entrusting their investment funds.  Furthermore, it includes evaluating the history of registered or non-registered individuals when deciding whether to investigate and/or take enforcement action against an individual.

The Securities Commissioner determines who may hold a license to offer and sell securities in Maryland, and acts in the public interest to protect the investing public.  Access to timely, accurate, and complete information about a securities professional's conduct and status is thus vital to the meaningful exercise of the Securities Commissioner's responsibilities.  No area of that registration history may be more important than an applicant's or registrant's disciplinary history of customer complaints or arbitrations.  These records are necessary for the Securities Commissioner to fulfill her statutory duties.

---

[1]  In July 2007, the NASD changed its name to FINRA.  For ease of recognition, the term NASD is used throughout this filing.

B.    NASD and the "CRD"

The record of the petitioner's registration and disciplinary history, like that of almost all registered industry participants, is maintained by the NASD on the CRD, a computerized registration database for the securities industry. The CRD serves as an information-gathering/ organizing/ retrieval system for the state (including Maryland) and federal securities regulators – a single uniform form (Form U4), rather than duplicative filings in each state, may be filed with the CRD by a current or potential registrant. Because each state independently requires, evaluates, and draws conclusions based on the facts contained on the form, all original uniform forms filed with the CRD are deemed to be filed in each state in which the person seeks to be registered as a securities professional. Expungement from the CRD will alter a record required and maintained in each state in which the individual is or was registered.

The North American Securities Administrators Association, Inc. ("NASAA")[2], on behalf of its members including the Maryland Division of Securities, and the NASD have entered into a contractual relationship whereby the NASD has agreed to maintain and administer a database of information pertaining to securities professionals on the CRD so that state and federal securities administrators, including the Securities Commissioner, can use that information to evaluate current and potential registrants. The CRD is maintained by the NASD, but the information filed with the system is the joint property of all state securities regulators. The State of Maryland's joint property rights to the information contained in the CRD system, as a third party beneficiary to the NASAA/NASD contract, is recognized in the contract:

---

[2] NASAA is the oldest international organization devoted to investor protection. NASAA's membership consists of 67 state, provincial, and territorial securities administrators in the 50 states, the District of Columbia, Puerto Rico, the U. S. Virgin Islands, Canada, and Mexico.

The data on CRD Uniform Forms filed with the CRD shall be deemed to have been filed with each CRD State in which the applicant seeks to be licensed and with the NASD and shall be the joint property of the applicant, NASD, and those CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange Commission). The compilation constituting the CRD database as a whole shall be the property of NASD.[3]

Paragraph 3(e) of the CRD Agreement Amendment, dated December 13, 1996, attached as Exh. 2 hereto.

As joint owner of CRD records, the Securities Commissioner has an interest in ensuring completeness and accuracy of the CRD records. The Securities Commissioner relies on its contents not only to decide on requests from persons who apply for registration or seek to renew their registration status, but also as a factor in decisions pertaining to disciplinary actions taken against the registrants. Moreover, information on the CRD is made available to those calling their state regulators seeking information about industry personnel. Furthermore, as records of and held in each state securities administrator's control, the CRD records are subject to relevant state public records laws.

To conduct securities business in Maryland, an individual is required to apply for registration with the Maryland Securities Division as an agent by filing a Form U4 through the CRD. Securities Act, §§11-401 and 11-405. Form U4 requires the disclosure of certain information including customer complaints and arbitrations. Based upon information contained in an applicant's Form U4, the Securities Commissioner makes a decision whether to register that individual. The Securities Commissioner's decision is independent of the NASD's decision to register an individual, and at

---

[3]     A "CRD State" is defined at section 2.07 of the CRD Agreement as a U.S. state, territory or possession, or the District of Columbia or Puerto Rico, or Mexico, or a province or territory of Canada that elects to implement its Licensing function through the CRD. . ." *See* pages 1 and 4 of CRD Agreement, dated January 1993, attached as Exh. 1 hereto.

- 4 -

times may differ.

Under Maryland law, an individual has an obligation to keep the information contained in his/her Form U4 accurate and complete. If any information contained in an individual's Form U4 becomes inaccurate or incomplete, the individual is required to file an amended Form U4, through the CRD, updating or correcting the incorrect or incomplete information. *Id.*, §11-411.

Petitioner Karsner was registered with NASD and with the State of Maryland. Those registrations were required in order to transact business in securities in accordance with relevant state and federal securities laws. Karsner's CRD records reflect a significant number of customer complaints and/or arbitrations. Karsner now seeks to expunge any record of the arbitration in the case at hand, and that of eleven other cases also before this Court.[4] *Karsner v. Catalano, et al.*, Civil Action No.: 1:07-cv-507; *Karsner v. Pattee, et al.*, Civil Action No.: 1:07-cv-00920; *Karsner v. Padgett, et al.*, Civil Action No.: 1:07-cv-00966; *Karsner v. Carey, et al.*, Civil Action No.: 1:07-cv-01580; *Karsner v. Drinks, et al.*, Civil Action No.: 1:07-cv-01581, *Karsner v. Harnage, et al.*, Civil Action No.: 1:07-cv-01579, *Karsner v. Blanchard, et al.,* Civil Action No.: 1:07-cv-01751, *Karsner v. Wood, et al.*, Civil Action No.: 1:07-cv-01840; *Karsner v. Jenkins, et al.*, Civil Action No.: 1:07-

---

[4] Two additional petitions for confirmation filed by Karsner have already been granted by this Court. *See Karsner v. Simpson, et al.*, Civil Action No.: 1:07-cv-00378 and *Karsner v. Lothian, et al*, Civil Action No.: 1:07-cv-00334. In *Karsner v. Simpson*, the Securities Commissioner's motion to intervene was filed by e-mail before, but on the same day that, the Court's order of confirmation was issued. Because of the delay associated with e-mail filings, it is believed that the motion to intervene was not received by the Judge until after the Court's order was issued. In *Karsner v. Lothian*, this Court, in confirming the arbitration panel's recommendation of expungement, denied both the Securities Commissioner's motion to intervene and motion for reconsideration but gave no reason for its decisions. The Securities Commissioner appealed the Court's denial of her motion to intervene. Oral argument was heard by the U.S. Court of Appeals for the District of Columbia on the 22nd of February, 2008. A third petition was voluntarily dismissed by Karsner. *See Karsner v. Hinks, et al.*, Civil Action No.: 1:07-cv-00965.

cv-02007; *Karsner v. Taylor, et al.*, Civil Action No.: 1:07-cv-02008, and *Karsner v. Barnhart, et al.,* Civil Action No.: 1:07-cv-02011. As indicated in Karsner's petition for confirmation, he intends to file a number of additional petitions asking the Court to expunge other complaints/arbitrations filed against him. Additionally, Karsner is the subject of an Order to Show Cause issued by the Securities Commissioner, and an on-going investigation of his securities activities. The Securities Commissioner, because of her concerns that Karsner is attempting to use the expungement process as a way of cleansing his CRD record and, thus, distorting his disciplinary history, opposes his request of expungement.

C.    Procedural events leading to this Motion

Petitioner Karsner, together with his former employer Legacy Financial Services, Inc. ("Legacy"), was the subject of an arbitration proceeding brought by a complaining investor, Terressa Hatchett. Hatchett alleged that unsuitable investment recommendations by petitioner Karsner caused significant losses in her account. Prior to a hearing, the parties to the arbitration proceeding entered into a confidential agreement to settle the matter, based upon terms and conditions that were not disclosed to the arbitration panel. As part of the agreement, the parties stipulated that petitioner Karsner and Legacy were not liable for the counts listed in the Statement of Claim (and Amended Statement of Claim), and that the investments were suitable. Hatchett also agreed to never file a lawsuit asserting any claim or demand within the scope of the settlement agreement, and to file a stipulated award requesting expungement of the arbitration from Karsner's CRD records. In exchange, Hatchett received a payment of $92,500.[5]

Upon a motion of both parties, and without a hearing or the review of any substantive

---

[5]    Payment of the $92,500 was made by Legacy who is not a party to this proceeding.

evidence by the arbitration panel, the panel entered a Stipulated Award dismissing with prejudice all claims against petitioner Karsner and Legacy, and a recommendation that the facts of the arbitration case be expunged from Karsner's CRD records.

Karsner then petitioned this Court for an order of expungement, which would result in the removal from his CRD records of all mention of the customer complaint and the arbitration.

The Securities Commissioner now seeks to intervene.

ARGUMENT

Under controlling law, the intervention of the Securities Commissioner may occur as of right or by permission. The Securities Commissioner meets the standards for both types of intervention.

I.     THE SECURITIES COMMISSIONER HAS A RIGHT TO INTERVENE

Rule 24(a)(2), Fed. R. Civ. P., sets forth the requirements for intervention as of right. A party moving for intervention as of right must: (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action. *SEC v. Prudential Securities Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998).

a.     The Securities Commissioner's application is timely.

The Maryland Securities Commissioner's motion to intervene is timely. Timeliness, under Rule 24, is not specifically defined but instead is to be determined by the court in its sound discretion based upon all the circumstances. *National Association for the Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973). The Court of Appeals for the District of Columbia has stated that a court should be more reluctant to deny a motion to intervene on grounds of timeliness when intervention is sought as of right. *United States v. American Telephone & Telegraph Co.*, 642 F.2d

1285, 1295 (D.C. Cir. 1980). The Court of Appeals has further stated that timeliness "is to be judged in consideration of all the circumstances especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *U.S. v. British American Tobacco Australia Services, Ltd*, 437 F.3d 1235, 1238 (D.C. Cir. 2006).

The Securities Commissioner's Motion to Intervene is timely filed as it is filed prior to the Court's decision on any pertinent issues or substantive matters, and within the time prescribed for the filing of a response by Respondents.

Further, whatever minor delay may result in allowing the Securities Commissioner to intervene in this case would be outweighed by the Securities Commissioner's interests in this case, which would be severely impaired were intervention denied.

In *Karsner v. Lothian*, Case No. 1:07-cv-00334, the related case referenced in Karsner's petition, Karsner argued that the Securities Commissioner's Motion to Intervene in the expungement confirmation was untimely because it was not filed within the 90-day period set forth under §12 of the Federal Arbitration Act ("FAA") for filing notices to modify or vacate. This argument, however, fails for two reasons. First, Karsner's petition for confirmation is not governed by the FAA. The arbitration panel's award only recommended the expungement of the arbitration from Karsner's CRD records; it did not order expungement. In fact, an arbitration panel does not have the authority to order the expungement of a record from CRD, and FINRA will expunge a CRD record only upon an order of expungement issued by a court of competent jurisdiction. The arbitration panel's <u>recommendation</u> of expungement is not the equivalent of an award of expungement. The mere

- 8 -

recommendation of expungement does not qualify as a final award under the FAA and, therefore, is not ripe for confirmation under §9 of the FAA. Consequently, the Securities Commissioner's motion to intervene is not barred by the 90 day statute of limitations under §12 of the FAA.

Second, even assuming arguendo that the FAA governs Karsner's petition for confirmation, the 90-day statute of limitations under §12 of the FAA does not apply in this situation. Section 12, like other sections of the FAA, applies only to parties to the arbitration proceeding. Sections 9 - 11 of the FAA explicitly refer to the "part[ies] to the arbitration" and the parties' right to seek judicial confirmation, vacation or modification of an arbitration award.[6] In the context of these sections, it is clear that §12 of the FAA applies only to parties to the underlying arbitration proceeding.[7] The Securities Commissioner was not a party to the underlying arbitration.

---

[6] §9 of the FAA, in part, provides:

"If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration . . . any party to the arbitration may apply to the court so specified for an order confirming the award." 9 U.S.C. §9.

§10 of the FAA, in part, provides:

"In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration– . . ." 9 U.S.C. §10.

§11 of the FAA, in part, provides:

"In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration– . . ."

[7] §12 of the FAA, in part, provides:

"Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."

Moreover, the statute of limitations set forth under §12 of the FAA is also inapplicable because the Securities Commissioner has set forth non-statutory grounds for opposing the confirmation of the arbitrators' recommendation of expungement and she is, therefore, not bound by the FAA limitations period. *See* 94 AMJUR TRIALS 211 §30, Non-statutory vacatur or clarification ("A party may challenge an arbitration award under a contract that is subject to the FAA and may base vacatur on common law or other judicial-recognized bases. These include an attack on an award for such reasons as the award is irrational, arbitrary and capricious; or is in manifest disregard of the law; or the relief contravenes public policy; or there is no contract to arbitrate. These are all challenges that do not rely on the FAA and, thus, are not bound by the FAA limitations period."). This Court has recognized that vacatur of an arbitration award may be based on such non-statutory grounds. *See Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 816 (D.C. Cir. 2007) (In addition to the grounds under the Federal Arbitration Act, an award may be vacated if it is "in 'manifest disregard of the law' or is contrary to an 'explicit public policy.'"). *See also Scott v. Prudential Securities, Inc.*, 141 F.3d 1007, 1017 (11th Cir. 1998) (a party may challenge an arbitration award without reliance on the FAA if, for example, the award is: (1) arbitrary and capricious, (2) in contravention of public policy, or (3) entered in manifest disregard of the law).

Accordingly, even if the plain language of the FAA did not clearly indicate that the statute of limitations provision in §12 applies only to parties to the arbitration and does not bar the Securities Commissioner's motion, this application to intervene would still be timely because the Securities Commissioner has raised non-statutory grounds, such as her explicit responsibility to protect investors by ensuring they have information material to their selection of investment professionals.

The timeliness prong is satisfied.

b.  <u>The Securities Commissioner has a substantial interest in this matter, which may be impaired by the Court's decision.</u>

The Securities Commissioner's motion to intervene satisfies the second and third requirements for intervention as of right.  The records at stake are jointly owned by the Commissioner, and their threatened erasure impairs her ability to fulfill her duties under Maryland law.

Indeed, expunging the record of the complaint and arbitration from the CRD will remove the information not only from the Securities Commissioner's consideration, but also from the consideration of every other state securities administrator.  An award issued in an arbitration proceeding involving private parties should not negatively affect a property right held by a state agency without that agency's input.

The Securities Commissioner, like every state regulator, needs to be able to identify licensees who are subjects of customer complaints or arbitrations in order to determine any patterns of improper conduct and allegations of customer losses or dissatisfaction.  The Securities Commissioner also needs to be able to identify the broker-dealer firms that regularly hire brokers with histories of customer complaints or arbitrations, as perhaps warranting closer review or examination of the sufficiency of supervision.  The Securities Commissioner may base an investigation on a pattern of customer arbitration filings, or use that information as a factor in determining sanctions.  Expunging the record of such filings will remove them from the Securities Commissioner's consideration and greatly impair her ability to carry out her regulatory, investigatory, and enforcement duties.

- 11 -

As the principal executive officer of the Maryland Securities Division, the Securities Commissioner is the "official custodian" of the Division's records and, as such, is responsible for maintaining the records of the Division.  Md. Code Ann., State Gov't, §10-611 (2004); Securities Act, §11-201.  Under Maryland law, a public record is defined to include any documentary material that is received by the unit or instrumentality in connection with the transaction of public business. State Gov't, §10-611.  That record may take any form including, but not limited to, a computerized record such as the records maintained on the CRD system.  Expungement of the arbitration from the CRD system will make it impossible for the Securities Commissioner to comply with Maryland's public records laws.

For these reasons, the Securities Commissioner needs and is required by law to maintain the complete disciplinary and other records of her registrants; expungement will prevent that.  The Securities Commissioner should be granted leave to intervene to more fully present these facts to the Court in opposition to the petition for confirmation.

     c.    <u>The Securities Commissioner's interests are not adequately represented by any other party</u>.

The Securities Commissioner's interest is to protect the investing citizens of the State of Maryland, by ensuring compliance with the Maryland Securities Act and investigating complaints of fraud or improper practices.  The NASD is not a "state actor" and, thus, its interests differ from those of the Securities Commissioner.  *See Desiderio v. National Association of Securities Dealers, Inc.*, 2 F.Supp.2d 516, 518 (S.D.N.Y. 1998); *see also First Jersey Securities Inc. v. Bergen*, 605 F.2d 690, 699 n.5 (3d. Cir. 1979).  The NASD is concerned with maintaining the registration and licensing information of its member firms and representatives in accordance with NASD rules and

federal law, not state law.  The NASD's reasons for maintaining the completeness and accuracy of

the CRD system are not identical to those of state regulators, including the Maryland Securities

Commissioner, who is governed by state mandates, including public records laws.  Therefore, the

Securities Commissioner's interests would not be adequately represented by the existing parties.

II.    THIS COURT SHOULD, ALTERNATIVELY, PERMIT THE SECURITIES
        COMMISSIONER TO INTERVENE

Under Rule 24(b)(2), an applicant may be permitted to intervene in an action "when an

applicant's claim or defense and the main action have a question of law or fact in common."

Fed.R.Civ.Proc. 24(b)(2).

The Securities Commissioner's motion to intervene satisfies that requirement.  The Securities

Commissioner's interest in opposing petitioner's request for expungement arises from the same

common facts as petitioner's claim against the NASD.  In addition, permitting the Securities

Commissioner to intervene would be an appropriate exercise of discretion because the Securities

Commissioner is in the best position to present the State of Maryland's investor protection and

regulatory concerns arising from the expungement request.

Furthermore, because this application has been timely filed, and because the Securities

Commissioner's pleadings in opposition to the expungement of records are attached hereto, granting

of the Securities Commissioner's motion will not delay or prejudice the adjudication of the rights

of the other parties.

CONCLUSION

WHEREFORE, for the reasons set forth above, the Securities Commissioner requests that she be allowed to intervene in this proceeding.

Respectfully submitted,

Douglas F. Gansler
Attorney General of Maryland


_____/s/_____
Kelvin M. Blake
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-7783


_____/s/_____
Lucy Cardwell
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
March 10, 2008                              410/576-6337

# CRD AGREEMENT

THIS AGREEMENT is made and entered into as of the second day of January, 1993, by and between the National Association of Securities Dealers, Inc. ("NASD"), 1735 K Street, N.W., Washington, D.C. 20006, and the North American Securities Administrators Association, Inc. ("NASAA"), One Massachusetts Avenue, N.W., Washington, D.C. 20001.

## WITNESSETH:

**WHEREAS,** state securities regulators have the regulatory authority under the laws of the United States and the state governments to license Broker-dealers, Agents and other securities professionals who operate within or from their jurisdictions; and

**WHEREAS,** NASAA and NASD (the "parties") entered into an agreement to create the Central Registration Depository (the "CRD"), which began operations in 1981, for the purpose of converting multiple paper-based Licensing and regulatory processes onto a single national computer system that facilitates state, self-regulatory organization and federal regulation of securities professionals (the "1980 Agreement"); and

**WHEREAS,** the parties wish to restate and replace that 1980 Agreement, as amended from time to time, with a new agreement to reflect the new relationship between the parties and the redevelopment of the CRD as specified in this agreement together with all Exhibits to be agreed upon by the parties and attached hereto and incorporated herein (the "CRD Agreement"); and

**WHEREAS,** through the development of the CRD, the parties have established a facility for the timely collection of Licensing fees required to be paid to state governments for the Licensing of Broker-dealers, Agents and other securities professionals and established a process to account for and distribute state Licensing fees to each participating government agency; and

**WHEREAS,** the parties acknowledge that, by virtue of the process established by the CRD for the sharing of Licensing information and the collection of Licensing fees to be paid to the state governments and the proper accounting for and distribution of those fees, state governments are third party beneficiaries of this CRD Agreement; and

**WHEREAS,** the parties are committed to the establishment of uniform procedures, definitions, and interpretations through cooperative efforts to promote observance of federal and

## Exhibit 1

4

investment adviser or investment adviser representative license, at such time, if any, when investment advisers and/or investment adviser representatives are included on the CRD.

2.04 *CRD Access Configuration (or CAC)* means the computer processors, software, firmware, leased lines facilities, network access ports, network routing facilities and such other data communications equipment as may be installed and maintained by the NASD for the purpose of connecting CRD Workstations and Printers to the central CRD system. The CAC permits connected CRD Workstations to transmit CRD transactions and receive responses and disseminated data and report files from the central CRD system.

2.05 *CRD Data* means the data filed with and maintained by CRD.

2.06 *CRD Printer* means an output device used by state staff to print out central CRD system-generated activity reports, rosters and database query responses. CRD printers are connected to the central CRD system via the CAC.

2.07 *CRD State* means any of the states of the United States, the District of Columbia, Puerto Rico and any of the United States territories and possessions, Mexico, and any of the provinces and territories of Canada that elects to implement its Licensing function through the CRD, provided that access to the central CRD system and software and hardware maintenance can be made available at reasonable cost, as determined by the parties, and is permissible pursuant to applicable government regulations.

2.08 *CRD Workstation* means a computer display device used by state staff to interactively access the central CRD system application. CRD workstations are connected to the central CRD system via the CAC.

# CRD AGREEMENT AMENDMENT

THIS AMENDMENT is made and entered into as of the *13th* day of *December* 1996, by and between the National Association of Securities Dealers, Inc. ("NASD"), 1735 K Street, N.W., Washington, D.C. 20006, and the North American Securities Administrators Association, Inc. ("NASAA"), One Massachusetts Avenue, N.W., Washington, D.C. 20001.

In consideration of the mutual promises of the parties, and the mutual agreements, covenants, and conditions hereinafter contained, it is hereby agreed as follows:

1.    The CRD Agreement entered into as of the second day of January, 1993, which terminated June 30, 1994, is hereby reinstated as of June 30, 1994, in all respects.

2.    The Initial Exhibits described at *Section 2.12* of the Agreement, and attached to this Amendment, are hereby accepted by the parties.

3.    The Agreement is further amended as follows:

a.    The text of Section 2.04 is amended by the addition of the following sentence:

Initial CAC specifications and material changes to CAC specifications shall be approved by the Steering Committee.

b.    The following two sentences are added to Section 2.11:

In the event of any conflict among the Exhibits between any two state-ments, the more specific statement shall prevail. Any disagreement in identifying the more specific statement shall be resolved by the Steering Committee.

c.    The text of Section 2.16 is amended to replace the word "Kansas" with the words "Washington, D.C."

d.    The text of Section 3.05(b) is deleted in its entirety and replaced by the following:

The Steering Committee shall comprise persons appointed by NASAA and by NASD. Each party may name designees of the appointed persons. Each party shall designate one Steering Committee member as the party's delegate, who will, in voting matters, cast that party's vote.

e.    The text of Section 3.10 (a) is deleted in its entirety and replaced by the following:

**Exhibit 2**

The data on CRD Uniform Forms filed with the CRD shall be deemed to have been filed with each CRD State in which the applicant seeks to be licensed and with the NASD and shall be the joint property of the applicant, NASD, and those CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange Commission). The compilation constituting the CRD database as a whole shall be the property of NASD.

f.    The first sentence of Section 3.10(b) is deleted in its entirety and replaced by the following:

With the exception of paper forms sent to NASD for processing through the NASD's Internal Processing or Emergency Services Units, NASD shall maintain the original of any form not required to be filed electronically for a minimum of three (3) years from the date of filing.

g.    The second sentence of Section 3.14 is deleted in its entirety. The last sentence of the Section is deleted in its entirety and replaced by the following:

The Steering Committee shall approve all applications for substitute CACs and CAC attachments. NASD shall have sole authority for giving operational approval, which will not be withheld unreasonably.

h.    A new section 3.17 is added as follows:

NASD shall provide to NASAA access to CRD documentation related to this Agreement, provided reasonable advance notice has been given.

4.    In the event of a conflict between any term of the CRD Agreement and any term in this Amendment, the term in this Amendment shall prevail.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their duly authorized representatives.

NATIONAL ASSOCIATION OF
SECURITIES DEALERS, INC.

BY: _Chml J Bonneu_
      (signature)
NAME: _Frank J Formica_
      (print or type)
TITLE: _Vice-President_
      (print or type)
DATE: _12/18/96_
      (print or type)

NORTH AMERICAN SECURITIES
ADMINISTRATORS ASSOCIATION, INC.

BY: _M. Griffin_
      (signature)
NAME: _MARK GRIFFIN_
      (print or type)
TITLE: _President & Chair_
      (print or type)
DATE: _12/13/96_

NASD OGC
NAME: _Rom_
DATE: _12/10/96_

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## CIVIL DIVISION

| | | |
|---|---|---|
| **JOSEPH R. KARSNER, IV,** | * | |
| **Petitioner**, | * | NASD Case No.: 04-06007 |
| | | Civil Action No.: 1:2008-cv-00291-RJL |
| **v.** | * | |
| **TERRESSA HATCHETT and** | * | |
| **FINRA (formerly known as National** | | |
| **Association of Securities Dealers (NASD))** | * | |
| **Respondents**. | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## ORDER GRANTING
## MARYLAND SECURITIES COMMISSIONER'S
## MOTION TO INTERVENE

Upon consideration of the Maryland Securities Commissioner's Motion To Intervene in this proceeding, the Court being fully apprised in the premises and good cause for granting that Motion having been shown, it is this _____ day of _____ , 2008,

ORDERED, that the motion be and hereby is granted; and it is further

ORDERED, that the Maryland Securities Commissioner be added as a Respondent in this case.

_____
Judge of the U.S. District Court
   for the District of Columbia

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CIVIL DIVISION**

| | | |
|---|---|---|
| **JOSEPH R. KARSNER, IV,** | * | |
| **Petitioner**, | * | NASD Case No.: 04-06007 |
| | | Civil Action No.: 1:2008-cv-00291-RJL |
| **v.** | * | |
| **TERRESSA HATCHETT and** | * | |
| **FINRA (formerly known as National** | | |
| **Association of Securities Dealers (NASD))** | * | |
| **Respondents**. | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**MARYLAND SECURITIES COMMISSIONER'S**
**MOTION TO DISMISS OR DENY**
**PETITION TO CONFIRM ARBITRATION AWARD**

The Maryland Securities Commissioner, Melanie Senter Lubin, intervening in this matter by and through undersigned counsel, moves the Court to dismiss or deny Joseph Karsner's Petition to Confirm Arbitration Award. As a preliminary matter, petitioner has failed to establish that subject matter jurisdiction lies with this Court, and the petition should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. Alternatively, the Securities Commissioner moves this Court to deny Karsner's request on grounds that expungement would be in contravention of public policy. As reasons therefor, the Securities Commissioner states:

1.      On February 19, 2008, petitioner Karsner filed with this Court a petition to confirm an arbitration award resulting from an arbitration filed against him by his former client Terressa Hatchett. Hatchett named as respondents both Karsner and Legacy Financial Services, Inc. ("Legacy"), Karsner's employer at the time of the actions alleged in the arbitration complaint. Hatchett alleged, among other things, that she was induced by petitioner to invest her account in unsuitable investments that caused significant losses in her account.

2.      Before any hearing in the matter, the parties to the arbitration proceeding entered into a confidential agreement to settle the matter, based upon terms and conditions that were not disclosed to the arbitration panel.  The parties stipulated that petitioner and Legacy were not liable for the counts listed in the Statement (and Amended Statement) of Claim, and that the investments were suitable.  In exchange, Karsner and Legacy agreed to pay $92,500 to Hatchett.[1]  In or about March 2007, upon a motion of both parties, the arbitration panel entered a Stipulated Award dismissing with prejudice all claims against petitioner Karsner and Legacy, and recommending that the facts of the arbitration case be expunged from petitioner's records on the Central Registration Depository ("CRD") system.

3.      As a preliminary matter, the Securities Commissioner moves for dismissal of this action on grounds that petitioner has failed to establish that subject matter jurisdiction properly lies with this Court.  There is no claim that this Court has federal question jurisdiction.  Moreover, there is no monetary award at stake, and hence no diversity jurisdiction.

4.      Alternatively, the Securities Commissioner opposes expungement because granting Karsner's petition will impair or impede her ability to fulfill her duty to protect investors in furtherance of the public interest.

5.      The Securities Commissioner is responsible for protecting the investing citizens of Maryland by ensuring compliance with the Maryland Securities Act, Title 11, Md. Code Ann., Corps. & Ass'ns (2007 Repl. Vol.) ("Securities Act") by all who offer or sell securities in or from Maryland, and by investigating complaints of fraud or improper practices related to such transactions.

---

[1]      Karsner's CRD records reflect that Legacy, not Karsner, paid the $92,500 to Hatchett.

6.    The Securities Commissioner registers securities offerings and the persons who sell them, and provides information to the public regarding a company's or individual's registration status and disciplinary history, as contained on the CRD system.  That information is used by the investing public in deciding with whom to entrust their investment funds.  That information also is used by the Securities Commissioner as a factor in registration and enforcement decisions.

7.    Expungement of the facts of this arbitration from petitioner's records, as well as the other arbitrations that petitioner is seeking to expunge, will delete information required by the Securities Commissioner in order to fulfill her state-law-mandated responsibilities.

WHEREFORE, the Securities Commissioner respectfully requests this Court to enter an order dismissing Karsner's Petition to Confirm Arbitration Award or, alternatively, denying the petition.  The Securities Commissioner also requests that a hearing be set in this matter.

Respectfully submitted,

Douglas F. Gansler
Attorney General of Maryland

_____/s/_____
Kelvin M. Blake
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-7783

_____/s/_____
Lucy Cardwell
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202

March 10, 2008                         410/576-6337

CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March, 2008, a copy of the foregoing Maryland Securities Commissioner's Motion To Dismiss or Deny Petition To Confirm Arbitration Award, memorandum in support thereof, and proposed Order, were filed with the Court's electronic case filing system and were mailed, via first-class mail, postage prepaid, to:

George S. Mahaffey, Jr., Esq.
Goodell, DeVries, Leech & Dann, LLP
One South St., 20th Floor
Baltimore, MD 21202
*Counsel for Petitioner Joseph Karsner*

Richard J. Magid, Esq.
Whiteford, Taylor & Preston, LLP
7 Saint Paul Street, 15th Floor
Baltimore, MD 21202
*Counsel for Petitioner Joseph Karsner*

Betty Brooks, Esq.
Terri Reicher, Esq.
FINRA
1735 K Street, N.W.
Washington, D.C. 20006
*Counsel for FINRA, Respondent*

William B. Young, Jr., Esq.
Colling, Gilbert, Wright & Carter
801 N. Orange Avenue, Ste 830
Orlando, FL 32801
*Counsel for Terressa Hatchett, Respondent*

_____
/s/
Kelvin M. Blake

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

| | | |
|---|---|---|
| **JOSEPH R. KARSNER, IV,** | * | |
| **Petitioner**, | * | NASD Case No.: 04-06007 |
| | | Civil Action No.: 1:2008-cv-00291-RJL |
| **v.** | * | |
| **TERRESSA HATCHETT and** | * | |
| **FINRA (formerly known as National** | | |
| **Association of Securities Dealers (NASD))** | * | |
| **Respondents**. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF THE
## MARYLAND SECURITIES COMMISSIONER'S
## MOTION TO DISMISS OR DENY
## PETITION TO CONFIRM ARBITRATION AWARD

### INTRODUCTION

Maryland Securities Commissioner, Melanie Senter Lubin, (the "Securities Commissioner"), respectfully moves this Court to dismiss or deny Joseph Karsner's Petition to Confirm Arbitration Award. As grounds for her motion, the Securities Commissioner urges that petitioner has failed to establish that subject matter jurisdiction lies with this Court, and the petition should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. Alternatively, the Securities Commissioner moves this Court to deny Joseph Karsner's request to expunge from the Central Registration Depository ("CRD") system all references to an arbitration involving Karsner on grounds that expungement would be in contravention of public policy.

BACKGROUND

A.    The Maryland Securities Commissioner

The Securities Commissioner is charged with enforcing the Maryland Securities Act with the goal of protecting Maryland residents and other investors.  *See* Title 11, Md. Code Ann., Corps. & Associations (2007 Repl. Vol.) (the "Securities Act").  That responsibility includes reviewing the applications (including the full registration and disciplinary history) of those who seek to be licensed in Maryland to transact securities business.  It also includes providing to inquiring investors information regarding the registration and disciplinary history of a company or individual with whom the investors are considering entrusting their investment funds.  Furthermore, it includes evaluating the history of registered or non-registered individuals when deciding whether to investigate and/or take enforcement action against an individual.

The Securities Commissioner determines who may hold a license to offer and sell securities in Maryland, and therefore acts to protect the investing public, which has a direct and substantial interest in the records relied upon by the Securities Commissioner.  Access to timely, accurate, and complete information about a securities professional's conduct and status, both within Maryland and in other jurisdictions with similar securities laws and registration requirements, is thus vital to the meaningful exercise of the Securities Commissioner's authority.  No area of that registration history may be more important than any disciplinary history of customer complaints, including resulting arbitrations or regulatory actions.

B.    NASD and the "CRD"

The records of the petitioner's registration and disciplinary history, like that of almost all registered industry participants, is maintained by the National Association of Securities Dealers (NASD)[1] on the CRD, a computerized registration database for the securities industry. The CRD serves as an information-gathering/organizing/ retrieval system for the state (including Maryland) and federal securities regulators – a single uniform form (Form U4), rather than duplicative filings in each state, may be filed with the CRD by a current or potential registrant. Because each state independently requires, evaluates, and draws conclusions based on the facts contained on the form, all original CRD uniform forms filed with NASD are deemed to be filed in each state in which the person seeks to be registered as a securities professional. Expungement from the CRD will alter a record actually required and maintained in each state in which the individual is or was registered.

The North American Securities Administrators Association ("NASAA"),[2] on behalf of its members including the Maryland Division of Securities, and the NASD have entered into a contractual relationship whereby the NASD has agreed to maintain and administer a database of information pertaining to securities professionals on the CRD so that the Securities Commissioner can use that information to evaluate current and potential registrants. The CRD is created and maintained by NASD, but the records contained on CRD are the joint property of all state securities

---

[1]  In July 2007, the NASD changed its name to FINRA. For ease of recognition, the term NASD is used throughout this filing.

[2]  NASAA is the nonprofit corporate association of state, provincial, and territorial securities regulators in the United States, Canada, and Mexico. It has 67 members, including the securities regulators of Maryland, the District of Columbia, and all other states, and is devoted to protecting investors from fraud and abuse in the offer and sale of securities.

regulators.  The State of Maryland's joint property rights to the information contained in the CRD

system, as a third party beneficiary to the NASAA/NASD contract, has been recognized under the

contract:

> The data on CRD Uniform Forms filed with the CRD shall be deemed to have been
> filed with each CRD State in which the applicant seeks to be licensed and with the
> NASD and shall be the joint property of the applicant, NASD, and those CRD States
> (and, in the case of Forms BD and BDW, the Securities and Exchange Commission).
> The compilation constituting the CRD database as a whole shall be the property of
> NASD.[3]

Paragraph 3(e) of the CRD Agreement Amendment, dated December 13, 1996, attached as Exh. 2.

As a joint owner, the Securities Commissioner has an interest in ensuring completeness and

accuracy of the CRD records.  The Securities Commissioner relies on its contents not only to decide

on requests from persons who apply for registration or seek to renew their registration status, but also

as a factor in decisions pertaining to disciplinary actions taken against the registrants.  Moreover,

information on the CRD is made available to those calling their state regulators seeking information

about industry personnel.  Furthermore, as records of and held in each administrator's control, the

CRD records are subject to relevant state public records laws.

Petitioner Karsner was registered with NASD and with the State of Maryland at the time of

the complaint and resulting arbitration, which registration is required in order to transact securities

business in Maryland, in accordance with relevant state and federal securities laws.[4]  Karsner's CRD

---

[3]    A "CRD State" is defined at section 2.07 of the CRD Agreement as a U.S. state, territory
or possession, or the District of Columbia or Puerto Rico, or Mexico, or a province or territory of
Canada that elects to implement its Licensing function through the CRD. . ."  *See* pages 1 and 4
of CRD Agreement, dated January 1993, attached as Exh. 1.

[4]    Karsner's registration in Maryland was voluntarily terminated on January 5, 2006.

records reflect a significant number of customer complaints and/or arbitrations.  Karsner now seeks
to expunge any record of the arbitration in the case at hand, and that of eleven other cases also before
this Court.[5]  *Karsner v. Catalano, et al.*, Civil Action No.: 1:07-cv-507; *Karsner v. Pattee, et al.*,
Civil Action No.: 1:07-cv-00920; *Karsner v. Padgett, et al.*, Civil Action No.: 1:07-cv-00966;
*Karsner v. Carey, et al.*, Civil Action No.: 1:07-cv-01580; *Karsner v. Drinks, et al.*, Civil Action
No.: 1:07-cv-01581, *Karsner v. Harnage, et al.*, Civil Action No.: 1:07-cv-01579, *Karsner v.
Blanchard, et al.,* Civil Action No.: 1:07-cv-01751, *Karsner v. Wood, et al.*, Civil Action No.: 1:07-
cv-01840; *Karsner v. Jenkins, et al.*, Civil Action No.: 1:07-cv-02007; *Karsner v. Taylor, et al.*,
Civil Action No.: 1:07-cv-02008, and *Karsner v. Barnhart, et al.,* Civil Action No.: 1:07-cv-02011.
As indicated in Karsner's petition for confirmation, he intends to file a number of additional petitions
asking the Court to expunge other complaints/arbitrations filed against him.  The Securities
Commissioner has concerns that Karsner is attempting to use the expungement process as a way of
cleansing his CRD record and, thus, distorting his disciplinary record.  It is because of her use of and
reliance on the information in the CRD that the Securities Commissioner opposes expungement here.

---

[5] Two additional petitions for confirmation filed by Karsner have already been granted by this
Court.  *See Karsner v. Simpson, et al.*, Civil Action No.: 1:07-cv-00378 and *Karsner v. Lothian,
et al*, Civil Action No.: 1:07-cv-00334.  In *Karsner v. Simpson*, the Securities Commissioner's
motion to intervene was filed by e-mail before, but on the same day that, the Court's order of
confirmation was issued.  Because of the delay associated with e-mail filings, it is believed that
the motion to intervene was not received by the Judge until after the Court's order was issued.  In
*Karsner v. Lothian*, this Court, in confirming the arbitration panel's recommendation of
expungement, denied both the Securities Commissioner's motion to intervene and motion for
reconsideration but gave no reason for its decisions.  A third petition was voluntarily dismissed
by Karsner.  *See Karsner v. Hinks, et al.*, Civil Action No.: 1:07-cv-00965.

C.    Procedural Events

Terressa Hatchett filed a Statement of Claim on or about August 24, 2004, and subsequently an Amended Statement of Claim, alleging that Karsner fraudulently induced her to invest in unsuitable investments, and otherwise managed her account in an unsuitable and negligent manner causing losses in the approximate amount of $264,000.  *See* Amended Statement of Claim, Exh. 3. Karsner and Legacy Financial Services, Inc., the brokerage firm that employed Karsner at the time of the alleged events, denied the allegations.  The matter moved to arbitration.

The parties entered into a confidential settlement agreement whereby they agreed that neither Legacy nor Karsner is liable for the counts in the claims, that the investments were suitable, that Hatchett would be paid $92,500, and that the parties would present a stipulated award to the arbitration panel by which the panel would dismiss the claims and recommend expungement of all CRD records relating to this arbitration.  *See* Confidential Agreement, Exh. 4.  Without a hearing on the merits or on the issue of expungement, the panel approved the stipulated award in or about March 2007.  On February 19, 2008, Karsner petitioned this Court for an order to confirm the stipulated arbitration award recommending expungement of the arbitration records.  A copy of the records that Karsner seeks to have expunged is Exh. A to the affidavit of Frank Barlow, attached as Exh. 5 hereto.

ARGUMENT

I.    Petitioner fails to establish that subject matter jurisdiction lies with this Court and the petition for confirmation should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

This Court has held that a motion to dismiss for lack of subject matter jurisdiction will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief." *Gutch v. Federal Republic of Germany*, 444 F.Supp.2d 1,

5 (D.D.C. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 US 555, 561 (1992)).  The burden of

establishing that the Court has subject matter jurisdiction lies with the party seeking to invoke the

jurisdiction of the federal court; that burden must be met by a preponderance of the evidence.

*Isenbarger v. Farmer*, 463 F.Supp.2d 13, 18 (D.D.C. 2006); *see also Nurse v. Secretary of the Air

Force*, 231 F.Supp.2d 323, 326 (D.D.C. 2002).  Further, because a motion to dismiss for lack of

subject matter jurisdiction focuses on a court's power to hear a claim, this Court has recognized that

it has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional

authority." *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.

2001); *see also Isenbarger*, 463 F.Supp.2d at 18.  Petitioner has failed to establish that subject matter

jurisdiction lies with this Court.

      A.    <u>Petitioner has failed to establish that this Court has subject matter jurisdiction based
upon diversity of citizenship.</u>

In his Petition to Confirm Arbitration Award, petitioner claims that this Court has subject

matter jurisdiction to hear this case based upon diversity of citizenship.  Without any clarification,

petitioner simply asserts that the amount in controversy exceeds $75,000 and refers to the arbitration

panel's stipulated award attached as his Exhibit 1.  The stipulated award, however, makes no

mention of a monetary award.  In fact, the only monetary amount referenced in the stipulated award

is the monetary damages alleged in the underlying arbitration proceeding which are not at issue here.

The only controversy that exists in this case is whether all references to an arbitration proceeding

involving petitioner should be expunged from the CRD system.

In an expungement case very similar to this case, the District Court for the Northern District

of Illinois recently addressed the issue of diversity of citizenship.  *See Robert Craig Shirley v. Paul*

*Balsamello, et al.*, No. 06-cv–03414 (N.D. Ill. April 26, 2007) (copy of decision attached as Exh. 6 hereto).[6] In *Shirley*, complainant Balsamello alleged that petitioner Shirley, and Shirley's employer RBC Dain Rauscher Inc., mishandled his securities account. The matter went to arbitration where the arbitration panel found RBC Dain Rauscher liable for failure to supervise Shirley's actions but did not find Shirley liable. The arbitration panel assessed damages of $226,794 against RBC Dain Rauscher, and recommended the expungement of all reference to the arbitration from Shirley's CRD records; no damages were assessed against Shirley. Shirley then filed with the District Court an application to confirm the NASD arbitration award. The Securities Department of the Illinois Secretary of State filed a motion to intervene for purposes of opposing Shirley's application.

In addressing whether subject matter jurisdiction existed based upon diversity of citizenship, the Court in *Shirley* held that diversity jurisdiction did not exist because the amount in controversy in the confirmation proceeding did not exceed $75,000. Focusing on the fact that RBC Dain Rauscher was not a party to the confirmation action and the complainant Balsamello declined to appear in the action, the Court determined that the monetary award assessed against RBC Dain Rauscher, and for that matter the underlying alleged damages, was not at issue in the confirmation action.

As in the *Shirley* case, the amount in controversy in this case should not be determined by the amount of damages alleged in the underlying arbitration. Petitioner Karsner did not pay any damages as part of the settlement of the underlying arbitration proceeding. Instead, the payment of $92,500 was made by petitioner's former employer, Legacy Financial Services; neither Legacy nor

---

[6] In a decision issued on or about October 12, 2007, the District Court for the Northern District of Illinois denied a motion for reconsideration filed by petitioner Shirley. A copy of that order is attached as Exh. 7 hereto.).

the amount of that settlement payment will be affected by the Court's decision. Likewise, Respondent Hatchett, to whom the payment was made, long ago agreed in the settlement agreement to never file a lawsuit asserting any claim or demand that is within the scope of the settlement agreement and, in fact, has chosen not to participate in this proceeding. The amount of the monetary settlement, or the alleged damages for that matter, is not at issue and, more than likely, the $92,500 has already been paid by Legacy.[7] There simply is no monetary amount in controversy.

The only issue before this Court is the confirmation of the arbitration panel's recommendation that petitioner's arbitration be expunged from his CRD records. As indicated in the *Shirley* decision, "[i]t is not clear what monetary value, if any, an expungement recommendation has." *Shirley*, Exh. 6 at 1. The monetary value of the expungement recommendation was not asserted in Karsner's petition for confirmation. That silence is fatal to an assertion of jurisdiction.

B.      Subject matter jurisdiction does not exist based upon federal question.

Although not raised in Karsner's petition for confirmation, subject matter jurisdiction also does not exist based upon federal question. As noted in *Shirley*, the Federal Arbitration Act ("FAA") does not provide a basis for federal subject matter jurisdiction. *See Shirley*, Exh. 6; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983).

Petitioner has failed to establish that this Court has subject matter jurisdiction to hear this case, thus, the Petition to Confirm Arbitration Award should be dismissed.

II.     Expungement of the arbitration from Petitioner's CRD records would contravene the public policy purpose behind the Maryland Securities Act and the Maryland Public Records Laws.

Denial of the petition for expungement, and retention in the CRD system of the truthful facts

---

[7] NASD Code of Arbitration Procedure Rule 10330(h) requires that all monetary awards shall be paid within 30 days of receipt of the award by the party.

relevant to this arbitration proceeding and the underlying complaint, is in the public interest and necessary to the Securities Commissioner's fulfillment of her duties under the Maryland Securities Act.

A.    Denial of expungement in this case serves the public interest by furthering full disclosure of information material to investors.

The goal of expungement is to erase from the CRD record – from regulatory history, as it were – any record of the event expunged. Where an arbitration panel, after a full hearing, has decided on the basis of the law and the facts that the individual securities professional named was not involved in the transactions at issue, or where the panel affirmatively finds that the claim is false or clearly erroneous, then there might be no record that would be material to a potential investor or to a regulator reviewing that professional's credentials. In that case expungement might protect the professional from the specter of a wrongful allegation.

Where, however, an arbitration is settled pursuant to a confidential agreement involving the payment of funds to the complainant, and a stipulated award is entered without the holding of a hearing or a review by the panel of the law and facts forming the basis for the arbitration claim, then expungement is contrary to the public interest and would impede the regulator's right to enforce the securities laws within her jurisdiction. Expungement especially is inappropriate in cases where the complaint is dismissed without any hearing on the merits. That is the case here. There was no affirmative finding after an evidentiary hearing by the arbitration panel that the arbitration might be eligible for expungement. This settlement, like myriad others that Karsner has negotiated, provides for a payment of money in exchange for an agreement to expunge CRD records. The information of a complaint and its resolution is material both to the investor when they select professionals to handle their investment funds, and to the Securities Commissioner in carrying out her regulatory

duties. The public interest, through the maintenance of public records necessary to effective enforcement of state and federal securities laws, is best served by denying expungement.

> B.  Denial of expungement and preservation in the CRD disciplinary record of these facts is necessary for the Securities Commissioner to administer the Maryland Securities Act for the protection of investors.

> 1.  The record is necessary for registration purposes.

To conduct securities business in Maryland, an individual is required to apply for registration with the Maryland Securities Division as an agent by filing a Form U4 via CRD. Md. Code Ann., Corps. and Ass'ns, §§11-401 and 11-405. The Form U4 requires the disclosure of certain information including customer complaints and arbitrations.

Under Maryland law, an individual has an obligation to keep the information contained in his/her Form U4 accurate and complete. If any information contained in an individual's Form U4 becomes inaccurate or incomplete, the individual is required to file an amended Form U4, via CRD, updating or correcting the incorrect or incomplete information. *Id.*, §11-411.

The Securities Commissioner makes a decision whether to register or discipline an individual based upon the information contained in his/her Form U4. Expunging the record of the complaint and arbitration from the CRD will remove the information from the Securities Commissioner's review (indeed, from the consideration of every state securities administrator), thereby impairing her ability to perform her statutory obligation to fully evaluate the fitness of potential registrants.

The Securities Commissioner, like every state regulator, needs to be able to identify licensees who are subjects of customer complaints in order to spot any patterns of improper conduct and unexplained customer losses or dissatisfaction. Reliance on information in the CRD is especially important when an applicant, licensed in another state, seeks licensure in Maryland. Such an

individual would not be on the Maryland databases, and is not known to the Securities Commissioner. Absent a complete record, the Securities Commissioner might accept the application of someone who has a checkered disciplinary history but whose customer complaints have been expunged. Such a person then would be permitted to solicit Maryland clients who likewise would have no knowledge of the history of customer complaints. The Securities Commissioner has a right, indeed an obligation, to reject the application of such professionals, or to condition the registration upon certain supervisory or monitoring procedures designed for investor protection. Otherwise, the Commissioner must await a new cycle of customer complaints before moving to limit or revoke such registration.

Furthermore, the reporting of such incidents to the Commissioner, albeit on a uniform CRD form, is a requirement of State law precisely because that information is necessary to the Commissioner in the exercise of her duties to protect Maryland investors.

2.    <u>The record is necessary for investigative purposes.</u>

Karsner's CRD records disclose the existence of a significant number of customer complaints and/or arbitrations filed against Karsner. Including the case at hand, there are at least 32 customer complaints and/or arbitrations involving Karsner, some involving stipulated awards with expungement provisions. *See* list attached as Exh. B to Frank Barlow affidavit, Exh. 5. The allegations underlying the complaints and arbitrations involve unsuitable investments, misrepresentation, and mismanagement of client funds. The majority of the complaints and arbitrations have been settled with the payment of monetary compensation; in total, an amount exceeding $1.1 million has been paid to resolve the complaints and arbitrations. Karsner now seeks to expunge any record of at least fourteen of the thirty-two customer complaints and/or arbitrations

and, upon information and belief, may be in the process of seeking expungements for a number of other complaints and arbitrations.

The Securities Commissioner needs to be able to identify those individuals with histories of customer complaints or arbitrations. The Securities Commissioner may base an investigation on a pattern of customer complaints or arbitration filings to determine if any enforcement action is warranted. In fact, Karsner is the perfect example of a situation in which the Securities Commissioner has initiated an investigation based upon a pattern of recommendations to his clients. As a result of that investigation, the Securities Commissioner has issued an Order to Show Cause in which she alleges that Karsner may have sold unsuitable investments and in other respects violated the Maryland Securities Act. *See* Exh. C attached to Frank Barlow affidavit, Exh 5. The expungement of Karsner's customer complaints or arbitrations from his CRD record will prevent the Securities Commissioner from considering relevant information, and impair her statutory obligation to investigate violations of the Maryland Securities Act.

In addition, the Securities Commissioner needs to be able to identify the broker-dealer firms that regularly hire brokers with histories of customer complaints, as perhaps warranting closer review or examination of the sufficiency of supervision. The Securities Commissioner may base an investigation on a pattern of customer arbitration filings.

C.   <u>Denial of expungement and preservation in the CRD disciplinary record of these facts is necessary for the Securities Commissioner to comply with Maryland's public record laws.</u>

As the principal executive officer of the Maryland Securities Division, the Securities Commissioner is the "official custodian" of the Division's records and, as such, is responsible for keeping the records of the Division. Md. Code Ann., State Gov't, §10-611 (2004); Md. Code Ann.,

Corps. and Ass'ns, §11-201.  Under Maryland law, a public record is defined to include any documentary material that is received by a governmental unit or instrumentality in connection with the transaction of public business.  State Gov't, §10-611.  That record may take any form including, but not limited to, a computerized record such as the records maintained on the CRD system.  *Id.* The Securities Commissioner also is responsible for making those records available to the general public.  *Id.*, §10-612.

As discussed above, to conduct securities business in Maryland, an individual is required to apply for registration with the Maryland Securities Division as an agent by filing, via CRD, a Form U4 with the Securities Commissioner.  That Form U4 requires the disclosure of certain registration and disciplinary information, including customer complaints and arbitrations, which forms the basis of the individual's application with the Securities Commissioner and factors into the Securities Commissioner's decision whether to register that individual.  Under Maryland's public records laws, the majority of the information contained on that Form U4, with the exception of social security number and, at times, personal residential information, is a public record.  Therefore, expungement of the arbitration will make it impossible for the Securities Commissioner to comply with the public policy purposes behind Maryland's public records laws.

III.    The arbitration panel did not award expungement
        but merely "recommended" expungement.

The arbitration panel did not order but simply "recommended" the expungement of all reference to the arbitration from petitioner's CRD record:   "[t]he Panel recommends the expungement of all reference to the above-captioned arbitration from Respondent Karsner's registration records maintained by the NASD Central Registration Depository. . ."  In fact, an arbitration panel does not have the authority to order the expungement of a record from CRD.

FINRA will expunge a CRD record only upon an order of expungement issued by a court of competent jurisdiction. Consequently, the panel's recommendation is not a final award that is ripe for confirmation under §9 of the FAA. Instead, it is left to a court reviewing a petition to confirm an expungement recommendation to make its own de novo determination of whether expungement is appropriate based upon the facts and circumstances of each case.

IV.    The arbitration panel misapplied Rule 2130 in recommending expungement.

NASD Rule 2130 establishes the procedures for securities professionals to obtain expungement of customer dispute information from the CRD system. *See* NASD Notice to Members 04-16 at 2 (April 12, 2004) ("NTM 04-16"), attached as Exh. 8; *see also* Rule 2130, attachment A to Exh. 8. Rule 2130 sets forth three criteria, at least one of which must be satisfied before expungement may be recommended by an arbitration panel:

1.    the claim, allegation or information is factually impossible or clearly erroneous;

2.    the registered person was not involved in the alleged investment-related sales practice violation, forgery, theft, misappropriation, or conversation of funds; or

3.    the claim, allegation, or information is false.

*See* Rule 2130; NTM 04-16 at 3.

The NASD will honor an expungement directive only when both an arbitration panel and a court have <u>affirmatively</u> found that one of the three criteria have been met. *See* NTM 04-16 at 3.

If parties settle an arbitration, such as in the case here, the parties may jointly ask the arbitration panel to issue a stipulated award that includes <u>affirmative</u> findings and expungement relief that is based upon one of the three criteria set forth under Rule 2130. *See* NTM 04-16 at 4. The securities professional must then seek a court order of expungement.

A securities professional seeking a court order of expungement must name the NASD as a party to the court proceeding unless the NASD waives the requirement that it be named. To obtain a waiver, a request for a waiver must be submitted to the NASD. A waiver is available only if, after reviewing the basis for expungement relief, the NASD determines that the expungement relief is based upon an affirmative finding that the expungement meets one of the criteria set forth under Rule 2130. *Id.*

Karsner submitted a waiver request to the NASD, but that request was denied. Denial was appropriate in this case because there was no affirmative finding by the arbitration panel that any one of the three criteria under Rule 2130 was met. The arbitration panel simply adopted the following criteria agreed to by the parties to the arbitration as part of their settlement negotiations:

1. The claims, allegations or information contained in the Statement of Claim and Amended Statement of Claim are factually impossible or clearly erroneous, and

2. The claims, allegations or information is false.

There was no evidentiary hearing on the merits or Karsner's request for expungement, or a substantive review by the panel of the law and facts forming the basis for the arbitration claim. Instead, the panel apparently based its recommendation of expungement upon the joint motion for a stipulated award submitted by the parties. There was no basis for the panel to find that the claims were factually impossible or clearly erroneous or that the claims were false. Rule 2130's requirement of an affirmative finding was not met.

Moreover, the panel's "findings" appear to be contradictory to the facts of the case. The panel found that the claims against Karsner were "clearly erroneous" which is the first of the three Rule 2130 criteria. The administrative history of Rule 2130 indicates that the first standard of

"factually impossible or clearly erroneous" was intended to apply to cases where "the person named in a proceeding did not work for the firm or worked in a different office and was not in error" or where the wrong individual was named by a customer or due to a clerical error.  *See* NASD Notice to Members 01-65 at 6 (October 2001) ("NTM 01-65"), attached as Exh. 9.  Such is not the case here.  Karsner clearly worked for Legacy during the times relevant to the allegations set forth in the statement of claim, and Karsner effected the securities transactions giving rise to the statement of claim.  Thus, the arbitration panel should not have found that the claims against Karsner were "clearly erroneous."

There was no affirmative finding by the arbitration panel that one of the three criteria under Rule 2130 was met.  Under the circumstances, expungement is not appropriate.

V.      The Securities Commissioner should not be bound by the stipulated award.

The Securities Commissioner was not a party to the underlying arbitration proceeding and did not agree to arbitrate the retention or destruction of her CRD records.  In Equal Employment Opportunity Commission v Waffle House, Inc., 534 US 279 (2002), the Supreme Court held that an agency enforcing a statute is not subject to a private arbitration agreement:

> No one asserts that the EEOC is a party to the contract, or that it agreed to arbitrate its claims.  It goes without saying that a contract cannot bind a nonparty.  Accordingly, the proarbitration policy goals of the FAA do not require the agency to relinquish its statutory authority if it has not agreed to do so.

*Id.* at 293.

The State's records relating to Karsner's registration in the State, likewise, should not be subject to the arbitration panel's recommendation of expungement.

<u>CONCLUSION</u>

WHEREFORE, for the reasons set forth above, the Securities Commissioner requests that the Petition to Confirm Arbitration Award be dismissed or, alternatively, that the Petition be denied. The Securities Commissioner also requests that a hearing be set in this matter.

Respectfully submitted,

Douglas F. Gansler
Attorney General of Maryland

_____/s/_____
Kelvin M. Blake
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-7783

_____/s/_____
Lucy Cardwell
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
March 10, 2008                    410/576-6337

## CRD AGREEMENT

THIS AGREEMENT is made and entered into as of the second day of January, 1993, by and between the National Association of Securities Dealers, Inc. ("NASD"), 1735 K Street, N.W., Washington, D.C. 20006, and the North American Securities Administrators Association, Inc. ("NASAA"), One Massachusetts Avenue, N.W., Washington, D.C. 20001.

### WITNESSETH:

**WHEREAS,** state securities regulators have the regulatory authority under the laws of the United States and the state governments to license Broker-dealers, Agents and other securities professionals who operate within or from their jurisdictions; and

**WHEREAS,** NASAA and NASD (the "parties") entered into an agreement to create the Central Registration Depository (the "CRD"), which began operations in 1981, for the purpose of converting multiple paper-based Licensing and regulatory processes onto a single national computer system that facilitates state, self-regulatory organization and federal regulation of securities professionals (the "1980 Agreement"); and

**WHEREAS,** the parties wish to restate and replace that 1980 Agreement, as amended from time to time, with a new agreement to reflect the new relationship between the parties and the redevelopment of the CRD as specified in this agreement together with all Exhibits to be agreed upon by the parties and attached hereto and incorporated herein (the "CRD Agreement"); and

**WHEREAS,** through the development of the CRD, the parties have established a facility for the timely collection of Licensing fees required to be paid to state governments for the Licensing of Broker-dealers, Agents and other securities professionals and established a process to account for and distribute state Licensing fees to each participating government agency; and

**WHEREAS,** the parties acknowledge that, by virtue of the process established by the CRD for the sharing of Licensing information and the collection of Licensing fees to be paid to the state governments and the proper accounting for and distribution of those fees, state governments are third party beneficiaries of this CRD Agreement; and

**WHEREAS,** the parties are committed to the establishment of uniform procedures, definitions, and interpretations through cooperative efforts to promote observance of federal and

## Exhibit 1

4

investment adviser or investment adviser representative license, at such time, if any, when investment advisers and/or investment adviser representatives are included on the CRD.

2.04   *CRD Access Configuration (or CAC)* means the computer processors, software, firmware, leased lines facilities, network access ports, network routing facilities and such other data communications equipment as may be installed and maintained by the NASD for the purpose of connecting CRD Workstations and Printers to the central CRD system. The CAC permits connected CRD Workstations to transmit CRD transactions and receive responses and disseminated data and report files from the central CRD system.

2.05   *CRD Data* means the data filed with and maintained by CRD.

2.06   *CRD Printer* means an output device used by state staff to print out central CRD system-generated activity reports, rosters and database query responses. CRD printers are connected to the central CRD system via the CAC.

2.07   *CRD State* means any of the states of the United States, the District of Columbia, Puerto Rico and any of the United States territories and possessions, Mexico, and any of the provinces and territories of Canada that elects to implement its Licensing function through the CRD, provided that access to the central CRD system and software and hardware maintenance can be made available at reasonable cost, as determined by the parties, and is permissible pursuant to applicable government regulations.

2.08   *CRD Workstation* means a computer display device used by state staff to interactively access the central CRD system application. CRD workstations are connected to the central CRD system via the CAC.

## CRD AGREEMENT AMENDMENT

THIS AMENDMENT is made and entered into as of the _13th_ day of _December,_ 1996, by and between the National Association of Securities Dealers, Inc. ("NASD"), 1735 K Street, N.W., Washington, D.C. 20006, and the North American Securities Administrators Association, Inc. ("NASAA"), One Massachusetts Avenue, N.W., Washington, D.C. 20001.

In consideration of the mutual promises of the parties, and the mutual agreements, covenants, and conditions hereinafter contained, it is hereby agreed as follows:

1.    The CRD Agreement entered into as of the second day of January, 1993, which terminated June 30, 1994, is hereby reinstated as of June 30, 1994, in all respects.

2.    The Initial Exhibits described at _Section 2.12_ of the Agreement, and attached to this Amendment, are hereby accepted by the parties.

3.    The Agreement is further amended as follows:

a.    The text of Section 2.04 is amended by the addition of the following sentence:

Initial CAC specifications and material changes to CAC specifications shall be approved by the Steering Committee.

b.    The following two sentences are added to Section 2.11:

In the event of any conflict among the Exhibits between any two statements, the more specific statement shall prevail. Any disagreement in identifying the more specific statement shall be resolved by the Steering Committee.

c.    The text of Section 2.16 is amended to replace the word "Kansas" with the words "Washington, D.C."

d.    The text of Section 3.05(b) is deleted in its entirety and replaced by the following:

The Steering Committee shall comprise persons appointed by NASAA and by NASD. Each party may name designees of the appointed persons. Each party shall designate one Steering Committee member as the party's delegate, who will, in voting matters, cast that party's vote.

e.    The text of Section 3.10 (a) is deleted in its entirety and replaced by the following:

**Exhibit 2**

The data on CRD Uniform Forms filed with the CRD shall be deemed to have been filed with each CRD State in which the applicant seeks to be licensed and with the NASD and shall be the joint property of the applicant, NASD, and those CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange Commission). The compilation constituting the CRD database as a whole shall be the property of NASD.

f.   The first sentence of Section 3.10(b) is deleted in its entirety and replaced by the following:

With the exception of paper forms sent to NASD for processing through the NASD's Internal Processing or Emergency Services Units, NASD shall maintain the original of any form not required to be filed electronically for a minimum of three (3) years from the date of filing.

g.   The second sentence of Section 3.14 is deleted in its entirety. The last sentence of the Section is deleted in its entirety and replaced by the following:

The Steering Committee shall approve all applications for substitute CACs and CAC attachments. NASD shall have sole authority for giving operational approval, which will not be withheld unreasonably.

h.   A new section 3.17 is added as follows:

NASD shall provide to NASAA access to CRD documentation related to this Agreement, provided reasonable advance notice has been given.

4.   In the event of a conflict between any term of the CRD Agreement and any term in this Amendment, the term in this Amendment shall prevail.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their duly authorized representatives.

NATIONAL ASSOCIATION OF
SECURITIES DEALERS, INC.

BY: _____
        (signature)
NAME: Frank J Formica
            (print or type)
TITLE: Vice-President
            (print or type)
DATE: 12/18/96
            (print or type)

NORTH AMERICAN SECURITIES
ADMINISTRATORS ASSOCIATION, INC.

BY: _____
        (signature)
NAME: MARK GRIFFIN
            (print or type)
TITLE: President & Chair
            (print or type)
DATE: 12/13/96

| NASD OGC | |
| --- | --- |
| NAME: | Rae |
| DATE: | 12/10/96 |

EXHIBIT 3

**ORIGINAL**

IN ARBITRATION BEFORE THE
NATIONAL ASSOCIATION OF SECURITIES DEALERS

TERRESSA M. HATCHETT

                Claimant,

vs.

LEGACY FINANCIAL SERVICES, INC.
         and
      JOSEPH KARSNER

              Respondents.

_____/

**ARBITRATION NO: 04-06007**

**AMENDED STATEMENT OF CLAIM**

_____
William B. Young, Jr. Esq.
HOOPER & WEISS, L.L.C.
815 North Garland Avenue
Orlando FL  32801
(407) 849-0167

1

## STATEMENT OF FACTS

Respondent, Legacy Financial Services, Inc., (hereafter "Legacy Financial Services, Inc."), at all times relevant to the action was a brokerage firm licensed to do business in the State of California. Respondent, Joseph Karsner (hereafter "Respondent") during specific times relevant to the action, performed in the capacity of Claimant's broker/investment adviser and as an agent for Respondent Firm, acting within the scope of his employment.

Claimant, Terressa Hatchett, (hereafter "Claimant") by and through her attorneys, Hooper & Weiss, L.L.C., as set forth in her Amended Statement of Claim alleges as follows:

## PARTIES

Terressa M. Hatchett: Ms. Hatchett is 57 years old and resides in Surfside Beach, South Carolina. She is a high school graduate and has completed some college coursework. Ms. Hatchett worked a total of thirty-one years at Bell Atlantic and AT&T, from May 1967 to June 1998. After, her retirement from Bell Atlantic in 1998, she established an account with John Hancock and Joseph R. Karsner.

Joseph R. Karsner, IV, (CRD#1001341): Respondent Karsner is, and was at all times relevant hereto an NASD-licensed, General Securities Representative ("registered representative") employed with Legacy Financial Services.

Legacy Financial Services, Inc. (CRD#38697): Respondent Legacy Financial Services Inc., is an NASD-member broker-dealer and investment advisory firm that offers its clients various investment and insurance products and services. The Legacy Financial Services, Inc., Supervising Branch office is located at 1179 North McDowell Blvd, Petaluma, California 94954.

## FACTUAL BACKGROUND

From 1967 to 1998, Terressa Hatchett was employed as a secretary and property manager for Bell Atlantic & AT&T. At the conclusion of her 31st year of service, Ms. Hatchett was

offered an early retirement package. AT&T agreed to pay Ms. Hatchett a lump sum of approximately $428,000.00 as compensation for accepting early retirement. In addition, Ms. Hatchett received approximately $177,635.00 from her employee savings and ESOP plans. After careful review of her finances, Ms. Hatchett felt that she had saved enough money to comfortably retire and live a modest lifestyle.

Ms. Hatchett had no prior investment experience and was therefore a novice as to the inner workings of the stock market. Accordingly, she felt she needed the services of an experienced stockbroker. Mr. Karsner, an agent with John Hancock at the time, had connections with the local phone companies and utilized those connections to set up meetings with employees to convince them to take early retirement and invest their buyouts with him. After several meetings with Mr. Karsner, Ms. Hatchett decided to take early retirement and entrusted her life's savings to Joseph Karsner.

Respondent Karsner completed all the forms and handled all aspects of the transaction that transferred Ms. Hatchett's retirement funds from AT&T to Mr. Karsner's management. Ms. Hatchett trusted Mr. Karsner with her entire retirement nest egg because of his close association with Bell Atlantic. Mr. Karsner showed her examples of the investment performance he achieved for other clients and convinced Ms. Hatchett that with proper diversification she would be able to draw $1,800.00 (before taxes) a month from her account without causing significant depreciation of her principal. The facts will show that not only did Mr. Karsner significantly deplete Ms. Hatchett's principal, he fully invested Ms. Hatchett's funds thereby subjecting the accounts to further expense each time fund shares were liquidated to provide Ms. Hatchett with her income distribution.

In August 1998, Ms. Hatchett opened her accounts with the $428,180.16 she received from her Bell Atlantic buyout and savings plans. See, Exhibit "A." In October 1998 she rolled her savings plan over to Mr. Karsner's management for a total investment of 605,815.61. See

Exhibit "B." Then, in mid 1999, Respondent Karsner decided to change broker-dealers, moving from John Hancock Financial Services to Legacy Financial Services. See Exhibit "C." During the transition, the first instance of Mr. Karsner's breach of fiduciary duty took place. On or about March 6, 2000, Mr. Karsner requested that one of Ms. Hatchett's John Hancock accounts be transferred to the American Skandia Advisor Funds Janus Mid-Cap fund. However, Mr. Karsner failed to get approval from John Hancock for the transfer prior to leaving their employment. John Hancock informed him since he was no longer its agent, he no longer had authorization over the accounts held at John Hancock. By Mr. Karsner's own admission, he was not aware of the status of the transfer request. Unknown to Mr. Karsner, over the next couple of weeks, John Hancock decided to process the transfers and began moving funds to Janus. Unfortunately for Ms. Hatchett, by the time Mr. Karsner regained control of the account it had declined by approximately 40%. The information was provided to Ms. Hatchett by way of Mr. Karsner's correspondence to her, dated August 31, 2001. Realizing he had liability exposure for the mismanagement of his client's assets, in his letter Mr. Karsner went so far as to suggest that he would pursue legal action against John Hancock.

In late 1999, Ms. Hatchett authorized the transfer of a portion of her assets from John Hancock Funds to American Skandia Advisor Funds. Also, in late 1999, Ms. Hatchett authorized the transfer of her remaining funds from John Hancock to OppenheimerFunds. When Mr. Karsner notified Ms. Hatchett of the broker-dealer switch, he assured Ms. Hatchett that nothing would change except the names of the funds in which she was invested. Further, respondent Karsner assured Ms. Hatchett she would still be able to withdraw $4,000.00 a month from her retirement accounts. Respondent Karsner advised Ms. Hatchett to transfer to American Skandia Advisor Funds and Oppenheimer Funds so she could obtain a better return on her investments. See Exhibit "D." Mr. Karsner completed the transfer forms, authorizing the transfers from John Hancock to American Skandia and Oppenheimer, citing better rate of return

4

as both his and Ms. Hatchett's reason for the transfer.  Apparently Mr. Karsner wanted to effectuate a self-fulfilling prophecy. Mr. Karsner took the funds previously allocated between large-cap value, regional financial industries and strategic bond funds at John Hancock and over the next few months reallocated the redemptions into the American Skandia Advisor Funds Janus Capital Growth Fund, Janus Overseas Growth, Oppenheimer Mid-Cap Fund, Oppenheimer Main St. Growth & Income and Oppenheimer Capital Appreciation. See Exhibits "E" and "F." Mr. Karsner assured Ms. Hatchett that with the funds reasonably reallocated, she would realize a better rate of return due to the track record of the fund mangers and holdings within those funds. Ms. Hatchett trusted and relied on Respondent Karsner's advice.  Unfortunately for Ms. Hatchett, this was far from a reasonable allocation.  The new funds, for the most part, are characterized as aggressive growth funds with above average risk.  For instance, although, the Oppenheimer Main Street Growth & Income fund is considered a balanced fund, at that time over 95% of the holdings were equities.  Not surprisingly, these funds were decimated in the market downturn.  To further compound the damage, there was significant overlap in the fund holdings, primarily in the technology sector. For example, on January 31, 2001, the Oppenheimer MidCap Fund and the Janus Capital Growth Fund and the Oppenheimer Main Street Growth and Income funds had 72.8%, 52.5% and 25.7% of the funds assets invested in the technology sector, respectively. See Exhibit "G." Further, in January 2003, Mr. Karsner advised Ms. Hatchett to redeem a portion of her American Skandia Advisor Funds, to replenish her distribution account, resulting in a $600.00 surrender charge. See Exhibit "H."

From early 1999 through the spring of 2002, Ms. Hatchett contacted Respondent Karsner to discuss the losses in her account.  Respondent Karsner always reassured Ms. Hatchett that her accounts were properly diversified.  Further, in the letters accompanying Mr. Karsner's quarterly performance updates, Mr. Karsner reminded Ms. Hatchett that she must have patience and maintain a long-term investment horizon.  Also, Mr. Karsner advised Ms. Hatchett that even

though her shares had gone down in price, she would not lose money unless she sold them.  See Exhibit "I."  Ms. Hatchett heeded Mr. Karsner's advice and, over a five-year period, her accounts dropped from her original investment of $605,815.61 to approximately $142,200.00 when Ms. Hatchett transferred her accounts from Mr. Karsner's control.  Respondent Karsner had managed to lose over $264,000.00 of Ms. Hatchett's retirement nest egg (after considering withdrawals).  See, Exhibit "J."

It is clear that had Respondent Karsner left the funds invested in the John Hancock funds, Ms. Hatchett would not have lost a significant amount of her investment assets.  In reviewing the statements, Respondent Karsner never suggested changing strategies despite the concern expressed by Ms. Hatchett.  Over the entire life of the account, Respondent Karsner failed to make any changes that would have minimized Ms. Hatchett's risk for losses.

Ironically, Respondent Karsner blames only the outside forces for the significant losses in Ms. Hatchett's portfolio.  Knowing that Ms. Hatchett was not a sophisticated investor, and depended on the money to supplement her retirement income, Respondent Karsner not only recommended investments which were clearly unsuitable but also subjected the accounts to unnecessary losses and expense in order to further his own career ambitions.  Ms. Hatchett's losses are the result of Respondent Karsner and Respondent Legacy Financial Services, Inc.'s failure to manage and properly diversify her account.  Legacy Financial Services' conduct was improper and inexcusable.  Respondents' actions (and inactions) were more than mere negligence.  Legacy Financial Service stood by during the fund transfer problems with John Hancock and did nothing to effectively remedy the situation.  Meanwhile, Ms. Hatchett's account lost 40% of its value.  Legacy Financial Services' only concern was ensuring that the funds were transferred to them.  Once the funds were in-house, Legacy stood idly by and permitted Respondent Karsner to make clearly unsuitable investments with the funds.  Respondents' intentionally placed Ms. Hatchett at risk for the greater good of Respondents'

6

retail business and the fees, commissions, profits and bonuses that Respondents derived there from.

Respondent Joseph Karsner's conduct was improper and inexcusable, but the egregious failure of Respondent Legacy Financial Services to take appropriate action is also improper and inexcusable. In light of the obvious and egregious misconduct and supervisory and compliance failures, Claimant respectfully submits to the Panel that an award of punitive damages against the Respondents is entirely merited. The Respondent's continue to operate under the false pretense of "A proven retirement solution" (as advertised on their website).

## CAUSES OF ACTION

### COUNT I
### (NEGLIGENCE)

The Claimant re-alleges any and all of the allegations set forth above as if fully rewritten herein by reference.

The conduct of Respondents constituted negligence, in that they, in connection with the purchase and sale of investments, owed to Claimant a duty of due care in connection therewith, were required to execute for the Claimant her transactions in a suitable manner, comporting with the instructions and investment needs and profile of said Claimant: and engaged in acts, practices and business, which operated as a grossly negligent, careless and/or reckless, disregard for such duties which directly and proximately resulted in substantial financial losses to the Claimant.

### COUNT II
### (BREACH OF CONTRACT)

The Claimant re-alleges any and all of the allegations set forth above as if fully rewritten herein by reference. The conduct of Respondents constituted breach of contract, in that they, in connection with the purchase and sale of investments, agreed to execute for the Claimant purchases and sales that comported with the instructions and investment needs of said Claimant; and engaged in acts, practices and courses of business, which operated as a breach of

7

such agreement which directly and proximately resulted in substantial financial losses to the Claimant.

### COUNT III
### (BREACH OF FIDUCIARY DUTY)

The Claimant re-alleges any and all of the allegations set forth above as if fully rewritten herein by reference.

The conduct of Respondents constitute breach of fiduciary duty, in that they, in connection with the purchase and sale of investments, owed to the Claimant a fiduciary duty, loyalty and due care; in connection therewith were required to execute for the Claimant her transactions in a way that comported with the instructions and investment needs of said Claimant; and engaged in acts, practices and courses of business which operated as a negligent, careless and/or reckless disregard for such duties, which directly and proximately resulted in substantial financial losses to the Claimant.

### COUNT IV
### (RESPONDEAT SUPERIOR)

The Claimant, re-alleges any and all of the allegations set forth above as if fully rewritten herein by reference.

The conduct of Respondent and other unidentified employees and/or agents of Respondent Firm was performed within the scope and course of their employment in that they, individually and/or collectively, directly and/or indirectly, performed services on behalf of the Respondent Firm; Respondent Firm directly and/or indirectly induced the acts set forth above; all the services performed by said employees were performed in the scope and course of their employment with Respondent Firm; therefore, Respondent Firm is jointly and severally liable for and to the same extent as its employees.

### COUNT V
### (VIOLATION OF NASD CONDUCT RULE)

The Claimant re-alleges any and all of the allegations set forth above as if fully rewritten

herein by reference.

## RULE 2110

The conduct of the Respondents constituted a willful and/or wanton and/or intentional violation of Rule 2110 of the Conduct Rules of the NASD in that it had the responsibility to observe high standards of commercial honor and just and equitable principles of trade; and engaged in acts, practices and courses of business which operated as a breach of such responsibilities.

## COUNT VI
### (FAILURE TO SUPERVISE)

The Claimant re-alleges any and all of the allegations set forth above as if fully rewritten herein by reference.

Respondent Firm and its later to be identified branch manager failed to properly supervise the professional activities of Respondent and as a direct and proximate result of such failure, the Claimant has suffered substantial financial losses.

## COUNT VII
### (UNSUITABILITY)

A suitability violation occurs when an investment made for an investor by a broker is inconsistent with the investor's objectives and the broker knows or should know that such investment is inappropriate.[1] Unsuitability can take many forms. As with most other securities violations, whether or not a suitability violation has occurred is a contextual problem. An unsuitability claim may be successful even if, at the time of the investment, an unsophisticated investor seemingly ratified the strategy. The suitability of an investment is determined "upon the basis of the facts, if any, disclosed by such customers as to her other security holdings, and as to her financial situation and needs."[2]

The most common suitability claims arise either when the customer does not understand risk of loss involved in a particular investment; the customer does not have the financial

---

[1]    Zaretsky vs. E. F. Hutton & Co., 509 F.Supp. 68 (S.D.N.Y. 1981).

[2]    McQuesten vs. Advest, Inc.,[1988-1989 Transfer Binder] Fed. Sec. L. Rep.(CCH) §94,011  (D.Mass.1988).

9

resources to bear the potential risk of the investment; or the customer states particular investment objectives and the broker acts to the contrary, which was clearly the case with Ms. Hatchett.

## COUNT VIII
### (OMISSIONS/MISREPRESENTATION)

The Claimant re-alleges any and all of the allegations set forth above as if fully rewritten herein by reference.

Respondent's failure to disclose his change in employment from John Hancock to Legacy Financial Services and Respondent's inability to control and monitor the accounts, during the transition period, resulted in substantial losses in the Claimant's accounts. Further, Respondent's intentional failure to disclose the risk of the new investments at Legacy Financial Services and the Respondent Firm's direct financial benefit derived from the sale of said investments describe actions of omission and misrepresentation constituting willful, wanton, intentional, outrageous and destructive behavior that was pervasive and a concerted effort with Respondent Firm's reckless disregard for the supervision of its broker directly and proximately resulting in substantial financial losses to the Claimant.

## COUNT IX
### (FRAUDULENT INDUCEMENT)

Materiality: The misrepresentations and omissions of Respondent Legacy Financial Services and its investment representative, Joseph Karsner, concerning the Claimant's accounts and the high risk manner in which they were handled were material facts because, if the truth had been known, Claimant would not have allowed Respondents to manage the accounts in the manner that they did. Legacy Financial Services, Inc. had a duty to make full and fair disclosure of all material facts to Ms. Hatchett, who were reposing faith and confidence in Respondents. Respondents had a duty to deal with Claimant in good faith and to refrain from self dealing due to the fiduciary relationship that existed.

Knowledge: Legacy Financial Services, Inc., in connection with the misrepresentations and omissions concerning the management of Claimant's accounts, either (A) knew of the falsity thereof or (B) was without knowledge of the falsity since the misrepresentations were made in an absolute, unqualified and positive manner or (C) under the circumstances should have known of

the falsity of such misrepresentations or omissions because Respondents' employee, Mr. Karsner, maintained a special position in relationship to Claimant which required Legacy Financial Services to know of the falsity of the misrepresentations or omissions.

Inducement: Respondent's representative, Joseph Karsner, intended that Claimant's would act upon the misrepresentations and omissions by investing in the securities and following his recommendations.

Reliance: Ms. Hatchett relied upon the material misrepresentations and omissions of Respondents by following their recommendations and placing her trust and confidence in Ms. Hatchett and Legacy Financial Services, Inc. to properly manage her accounts, and has been damaged by such acts.

## Count X
### (COMMON LAW FRAUD)

Respondents committed common law fraud. Claimant Terressa Hatchett relied on the misrepresentations and assurances from the Respondents Joseph Karsner and Legacy Financial Services, Inc. It is evident from the course of conduct taken by the Respondents that they intended to induce the Claimant to purchase these unsuitable mutual funds in order to generate fees from the mutual funds' upfront sales charges (loads). These misrepresentations and omissions were the direct and proximate cause of the Claimant's losses.

The elements of fraud are as follows:

1. A misrepresentation or material omission
2. Communication of that to the recipient
3. An intention by the maker that the recipient will thereby be induced to act
4. Justifiable reliance by the recipient upon the misrepresentation, and
5. Damages to the recipient as a proximate result

In this case, agents of the Respondent completely misrepresented to the Claimant the safety of the strategies, such as reallocating all of Claimant's retirement savings from a balanced portfolio at John Hancock to the aggressive growth equity mutual funds sold through Legacy Financial Services.

## COUNT XI
## (FRAUDULENT CONCEALMENT)

The Claimant re-alleges any and all of the allegations set forth above as if fully rewritten herein by reference.

The conduct of the Respondents constituted fraudulent concealment in that:

1.  Respondents owed a duty to Claimant to disclose materials facts relative to Claimant's account;

2.  Respondents failed disclose and/or concealed those material facts relative to Claimant's account;

3.  Respondents intended to defraud and/or deceive the Claimant regarding the status of Claimant's account;

4.  Claimant acted with justifiable reliance on the concealment; and

5.  The concealment directly and proximately resulted in damages to Claimant.

<The Remainder of this page was intentionally left blank>

## RELIEF REQUESTED

In view of the preceding and pursuant to Counts I through XI, Claimant requests that the members of the Arbitration Panel, to be appointed therein, render an award of compensatory damages in her favor and against Respondents jointly and severally in the amount of $264,000.00. Pursuant to Count VIII, Claimant also prays for punitive damages plus attorney fees (ORC sec. 1343.03), costs, interest, and any other remedy the Honorable Panel deems is just and equitable. (See NASD Rule 3110(f) of the Conduct Rules, which states, "No initial agreement [between a member and a customer] shall include any condition which ... limits the ability of a party to file any claim in arbitration or limits the ability of the arbitrator to make **any** award.")

Respectfully submitted,

Signed: _____ Date: 3/29/05
William B. Young, Jr., Esq.
HOOPER & WEISS, L.L.C.
815 North Garland Avenue
Orlando FL  32801
(407) 849-0167

Attorneys for Claimant

13

## EXHIBIT 4

### SETTLEMENT AGREEMENT, RELEASE, AND COVENANT NOT TO SUE

THIS SETTLEMENT AGREEMENT, RELEASE, AND COVENANT NOT TO SUE ("Settlement Agreement") is entered into by and among TERRESSA HATCHETT individually ("Hatchett"), as the holder of, as a beneficiary of, and in all other capacities related to or arising from her investment funds and her relationship with JOSEPH R. KARSNER, IV ("Karsner"), and LEGACY FINANCIAL SERVICES ("Legacy"), (collectively the "Respondent Parties").

WHEREAS, Hatchett initiated an arbitration with the National Association of Securities Dealers, Inc. (the "NASD") entitled *Terressa Hatchett v. Joseph Karsner et al.*, NASD Case No. 04-06007 (the "Arbitration"), asserting claims against Karsner and Legacy arising out of the investment of Hatchett's funds.

WHEREAS, the Parties wish to resolve and settle all current and future disputes among them to avoid the cost, burden, and uncertainty of continuing to litigate such disputes;

NOW THEREFORE, Hatchett, for and in consideration of the promises contained herein and an agreement of no liability on the part of the Respondent Parties, which Hatchett agrees constitutes good, valuable and sufficient consideration, and intending to be legally bound hereby, agrees as follows:

1.    Settlement Payment by Karsner-Legacy.

As consideration for Hatchett's agreement to be bound by the terms and conditions of this Settlement Agreement, Karsner and Legacy agree to make a total payment for the benefit of Hatchett in the amount of $92,500 (ninety-two thousand five hundred dollars) (the "Karsner-Legacy Settlement Payment"). Additionally, Respondents will pay mediation fees, for the October 31, 2006 mediation. The Karsner-Legacy Settlement payment shall be accomplished through a check or checks which shall be made payable as directed by Hatchett through her counsel and shall be treated

Initials T m H

as lost earnings, and not as a contribution provided to Hatchett's investment accounts. Because the Karsner-Legacy Settlement Payment represents lost earnings, neither Karsner nor Legacy shall report this payment to the Internal Revenue Service (the "IRS") as a taxable event.

    2.    <u>Release and Covenant Not to Sue by Hatchett</u>.

In consideration for the Karsner-Legacy Settlement payment, which Hatchett acknowledges to be good, valuable and sufficient consideration, Hatchett agrees to the following Release and Covenant Not to Sue:

    A.    <u>Release</u>.

Except to enforce this Settlement Agreement, Hatchett, individually, and in all other capacities related to or arising from Hatchett's investments and on behalf of her family, past, present, and future heirs, beneficiaries, devisees, executors, administrators, trustees, attorneys, personal representatives, agents, predecessors, successors and assigns hereby releases, remise, and forever discharges Karsner, Joseph Karsner & Associates, and Legacy and all their respective predecessors, successors, heirs, assigns, parents, holding companies, shareholders, general or limited partners, subsidiaries, affiliates, branches, divisions, past, present, and future agents, servants, employees, general agents, representatives, officers, directors, attorneys, trustees, registered representatives, brokers, independent contractors, fiduciaries, insurers, and assigns (collectively referred to hereinafter as the "Releasees") of and from all debts, obligations, reckonings, promises, covenants, agreements, contracts, controversies, suits, actions, arbitrations, causes of action, judgments, damages, claims or demands, costs, expert or attorneys' fees, in law or in equity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, which Hatchett ever had, may have had or now has against Releasees, or any of them, arising from or related in any way to any act, incident, events, or omission occurring on or before the date on which Hatchett signs this Settlement Agreement. This release, waiver and discharge of claims includes, but is not limited to, all claims that were or could have been asserted in the Arbitration by Hatchett against Releasees, or any of them; that arise from or are

Initials TmH

related in any way to Hatchett's investments and/or retirement accounts; that arise from or are related in any way to any purchases, transfers, withdrawals, allocations or other transactions, that arise from or are related in any way to the Respondent Parties' other business entities; that arise from or are related in any way to Legacy's supervision of Karsner; or that otherwise arise from or are related in any way to Hatchett's investments or any brokerage or other accounts in which Hatchett ever held or now holds an actual or beneficial interest.

        B.    <u>Covenant Not to Sue</u>.

Except to enforce this Settlement Agreement, Hatchett agrees never to file or make, or permit to be filed or made on her behalf, any lawsuit, arbitration, charge, complaint, or other claim asserting any claim or demand against the Releasees, or any of them, that is within the scope of this Settlement Agreement. This Settlement Agreement may and shall be pled by the Releasees, or any of them, as a full and complete defense to, and may be used as a basis for an injunction against and the immediate dismissal of any action, suit, arbitration, or other proceeding that may be instituted, prosecuted, or maintained against the Releasees, or any of them, in breach thereof: If Hatchett files or makes, or permits to be filed or trade on her behalf, a lawsuit, arbitration, charge, complaint, or other claim asserting any claim or demand against the Releasees, including testimony in any other proceeding, which is within the scope of this Settlement Agreement, whether or not Hatchett's claim(s) is/are valid, in addition to any other rights and remedies that may be available, such claim shall immediately be dismissed with prejudice, the provisions of this Settlement Agreement shall remain in full force and effect, and Hatchett shall be liable to the Releasees, or any of them, for all costs, expenses, and attorneys' fees incurred in defending against such lawsuit, arbitration, charge, complaint, or other claim.

        3.    <u>Representation of Full Authority to Enter Into Release</u>.

Hatchett represents and warrants that she is the sole holder of the accounts and investments at issue including all investment accounts. Hatchett further represents and warrants that, no other

Initials TMH

person, trustee, beneficiary or entity has any interest in Hatchett's investment accounts or is empowered to take any action on behalf of any interest in Hatchett's investment accounts. Hatchett further represents that she has the full authority and capacity to enter into this Settlement Agreement individually and in all other capacities related to or arising from her investment accounts.

4.    Withdrawal of the Arbitration by Hatchett.

Hatchett shall file with the NASD Arbitration Department a formal withdrawal of the Arbitration, with prejudice and with each party to bear their own costs and attorney's fees, within seven (7) days after her counsel's receipt of a fully-executed Settlement Agreement.

5.    Waiver of All Claims Against Releasees.

This is a full and final Settlement Agreement and it applies to all past, present and future known and unknown claims and damages that Hatchett may ever assert against the Releasees, or any of them, arising from or related to any act, incident, event or omission occurring on or before the date of Hatchett's execution of this Settlement Agreement. Hatchett assumes full responsibility for any injury, damages, losses or liability of any kind or nature whatsoever, that she has incurred or may hereafter incur from any act, event, incident or omission of the Releasees, or any of them, that occurred on or before the date of Hatchett's execution of this Settlement Agreement.

6.    Compromise of Disputed Claims.

Hatchett understands and agrees that this Settlement Agreement is a compromise of a dispute and that this Settlement Agreement has been entered into solely to relieve all Parties of the burden, expense and uncertainty of further litigation.

7.    Confidentiality.

Hatchett agrees that the terms and conditions of this Settlement Agreement are confidential and also agrees not to disclose the terms or conditions of this Settlement Agreement, including all matters related in any way to any aspect of this arbitration and/or settlement and/or relationship, to any non-party or in any other proceeding, including testimony, unless Karsner and Legacy agree to such

Initials TMH

disclosure in advance and in writing, provided that the Parties may, without such permission, make such disclosure to their legal and financial advisors, to the appropriate tax authorities, to a self regulatory organization such as the NASD or the Securities and Exchange Commission (the "SEC"), as compelled by a duly issued court order or subpoena, or as otherwise required by law. In the event inquiry is made by any non-party regarding the existence, terms or conditions of this Settlement Agreement, Hatchett (or any other person to whom disclosure has been made) shall limit any response to a statement, either verbatim or in substance, that the matter has been resolved by a confidential settlement agreement between the Parties. This confidentiality provision does not prohibit the Respondent Parties from disclosing the terms or conditions of the settlement to any self-regulatory organization, court, regulatory agency, or to Legacy's past or present representatives, agents, employees, general agents, insurers, brokers, registered representatives, officers, directors, shareholders, attorneys, creditors, assigns, predecessors, successors or affiliates, or as part of any due diligence disclosures.

8.    Non-Disparagement.

Hatchett agrees not to disparage, slander or libel any of the Releasees, or any of the Releasees' products or services, in any communications, whether orally or in writing or in testimony in any future proceeding.

9.    No Assignment of Claims or Benefits.

Subject to the terms and conditions of this Settlement Agreement, Hatchett represents and warrants that she has not sold, assigned, conveyed or otherwise transferred, on or prior to the date of this Settlement Agreement, any interest in the claims, causes of action, or demands which she had, may now have, or may in the future claim to have against Releasees, or any of them. Hatchett further agrees that she shall not ever sell, assist, convey or otherwise transfer any such claim, cause of action or demand, or any right, or benefits to which she is entitled pursuant to this Settlement Agreement.

Initials TMH

10.    Severability.

Except as otherwise specified below, should any portion of this Settlement Agreement be found void and unenforceable for any reason by a duly-appointed NASD arbitration panel or by a court of competent jurisdiction (collectively referred to hereinafter as the "Adjudicator"), the Parties jointly request that such Adjudicator attempt to limit or otherwise modify such portion so as to make it enforceable, and if such portion cannot be modified to be enforceable, the unenforceable portion shall be deemed severed from the remaining portions of this Settlement Agreement, which shall otherwise remain in full force and effect, if any portion of this Settlement Agreement is found to be void or unenforceable for any reason in regard to any one or more persons, entities, or subject matters, such portions shall remain in full force and effect with respect to all other persons, entities, and subject matters.  However, the obligation of Hatchett to provide a binding release and covenant not to sue shall not be severed from Karsner's obligation to make the Karsner-Legacy Settlement Payment.

11.    Choice of Law Choice.

This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Maryland, without regard to its conflicts of laws principles.  Any dispute, claim or controversy arising from or related to this Settlement Agreement, or to an alleged breach thereof, shall be fully and finally resolved by an arbitration pursuant to the NASD Code of Arbitration Procedure.  The terms and conditions of this Settlement Agreement shall not be modified or discharged, in whole or in part, except through a written agreement signed by the Parties.

12.    Integration.

The Parties agree that this Settlement Agreement constitutes the full and complete understanding between them with respect to the subject matter hereof and that no Party is relying; on any representations, whether oral or written, that are not set forth in this Settlement Agreement. Hatchett understands and acknowledges that none of the Releasees has provided tax advice of any

kind whatsoever with respect to this Settlement Agreement, that there has been no withholding of taxes from any amount paid or received hereunder, and that any tax liability of any kind whatsoever arising from any amount paid or received hereunder is her sole responsibility.

13.    Miscellaneous.

The WHEREAS and NOW THEREFORE clauses set forth on the first page of this Settlement Agreement are incorporated as part of this Settlement Agreement. The headings in this Settlement Agreement are for the convenience of the Parties only, and do not modify the terms and conditions of this Settlement Agreement.

14.    Understanding and Authority.

The Parties understand and agree that all terms and conditions of this Settlement Agreement are contractual and are not a mere recital, and represent and warrant that they are competent to covenant and agree as herein provided.

15.    Opportunity to Consult with Counsel.

Hatchett has read the contents of this Settlement Agreement, has received sufficient opportunity to consult with counsel as to the contents hereof, and sign this Settlement Agreement as her own free act. Hatchett has carefully read this Settlement Agreement in its entirety, fully understands and agrees to its terms and conditions, and intends and agrees that it is final and binding.

16.    Indemnification.

Hatchett agrees to indemnify the Released Parties from all claims and demands for damages (both to persons and/or property), costs (including attorney's fees and the costs of any litigation or other proceeding), loss of services, expenses, and compensation, on account of, or in any way growing out of, this incident and its past, present, or future results. Hatchett further agrees to take all actions that may be necessary to carry out the obligations hereunder, including waiving or releasing of all or any part of a claim or judgment Hatchett may have against any other party or

Initials T M H

potential party, if such waiver or release may be necessary to protect or relieve the Released Parties from liability to such party on account of Hatchett's claim or judgment against such party. Hatchett is solely responsible for all liens, claims, demands, or obligations or any kind whatsoever against the proceeds of this settlement, including, but not limited to any claim or lien for outstanding medical expenses incurred in connection with this incident.

    17.    <u>Expungement</u>.

    The parties have likewise agreed that stipulated award will be filed with the NASD arbitration panel in this matter, requesting an expungement of any reference to this case on Respondents' Central Registration Depository ("CRD"), to be filed by Respondents in a court of competent jurisdiction.

**[SIGNATURE TO FOLLOW ON NEXT PAGE]**

Initials TMH

IN WITNESS WHEREOF, Hatchett, intending to be legally bound hereby, executes this Settlement Agreement before a notary public, on the respective date indicated below.

TERRESSA HATCHETT

_Terressa Hatchett_ [SEAL]

STATE OF MARYLAND        )
COUNTY/CITY OF _Baltimore_ )

On this 31st day of October, 2006 appeared TERRESSA HATCHETT, known to me (or satisfactorily proven) to be the person whose name is set forth in the foregoing Settlement Agreement and she acknowledged that she executed the same voluntarily, of her own free will.

_Kimberly R. Carroll_
Notary Public

My Commission Expires: _3/17/08_

804077

Initials TMH

EXHIBIT 5

## AFFIDAVIT OF FRANK G. BARLOW

I, FRANK G. BARLOW, make this affidavit under penalties of perjury:

1.      I am a resident of Baltimore County, Maryland and am over twenty-one years of age. I make this affidavit based on my personal knowledge.

2.      I am an investigator with the Maryland Securities Division ("Division").

3.      I have reviewed documents from the Central Registration Depository ("CRD") to identify the records that Joseph R. Karsner, IV seeks to expunge in this matter. I have printed, and attach as Exhibit A, the CRD records disclosing an arbitration complaint filed by Terressa Hatchett, in NASD arbitration case 04-06007.

4.      I have also reviewed documents from the CRD for current and archived disclosure information on other complaints and arbitrations that have been filed against Joseph R. Karsner, IV. I attach as Exhibit B a schedule summarizing the disclosure information for the arbitration complaints filed against Karsner.

5.      On March 19, 2007, the Maryland Securities Commissioner issued an Order to Show Cause against Joseph R. Karsner, IV, Joe Karsner & Associates and Legacy Financial Services alleging violations of the Maryland Securities Act, including violations of the anti-fraud and investment adviser registration provisions. I attach the order as Exhibit C.


Dated: March 10, 2008                          __/s/_____
                                               Franklin G. Barlow

15. Is arbitration/reparation pending? ⦿ **Yes** ○ **No**

16. If the arbitration is not pending, what was the disposition?

17. Disposition Date (MM/DD/YYYY):

   ○ **Exact**   ○ **Explanation**
   If not exact, provide explanation:

18. Amount of Monetary Compensation (award, settlement, reparation    $
    amount):

19. Individual Contribution Amount:        $

**If the matter involves a civil litigation, complete items 20-27.**

20. Court that case was filed in (include name of Federal, Military, State or Foreign Court, Location of
    Court - City or County <u>and</u> State or Country, Docket/Case number).

21. Date notice/process was served (MM/DD/YYYY):

   ○ **Exact**   ○ **Explanation**
   If not exact, provide explanation:

22. Is the civil litigation pending? ○ **Yes** ○ **No**

23. If the civil litigation is not pending, what was the disposition?

24. Disposition Date (MM/DD/YYYY):

   ○ **Exact**   ○ **Explanation**
   If not exact, provide explanation:

25. Amount of Monetary Compensation (judgment, restitution,          $
    settlement amount):

26. Individual Contribution Amount:        $

27. If the action is currently on appeal enter date appeal filed (MM/DD/YYYY):

   ○ **Exact**   ○ **Explanation**
   If not exact, provide explanation:

28. Comment (Optional). You may use this field to provide a brief summary of the circumstances leading
    to the customer complaint, arbitration/CFTC reparation and/or civil litigation as well as the current
    status or final disposition(s). Your information must fit within the space provided.

**U5 - AMENDMENT**
**11/07/2006**
**LEGACY FINANCIAL SERVICES, INC. (38697)**

Rev. Form U5 (10/2005)

**CUSTOMER COMPLAINT/Arbitration/Civil Litigation DRP**

This Disclosure Reporting Page is an ⊙ **INITIAL OR** ○ **AMENDED** response to report details for affirmative responses to **Questions 7(E)(1), 7(E)(2) and 7(E)(3)** on Form U5;

## Check question(s) you are responding to:

### Customer Complaint/Arbitration/Civil Litigation

☐ **7(E)(1)(a)**　☐ **7(E)(1)(b)**　☑ **7(E)(1)(c)**　☐ **7(E)(2)**　☐ **7(E)(3)(a)**　☐ **7(E)(3)(b)**

One event may result in more than one affirmative answer to the above items. Use only one DRP to report details related to one customer complaint/arbitration/civil litigation. Use a separate DRP for each customer complaint/arbitration/civil litigation.

DRP Instructions:

- In all matters (i.e., customer complaints, arbitrations/CFTC reparations, civil litigations), complete items 1-6.
- If the matter involves only a customer complaint, also complete items 7-12, as appropriate.
- If the customer complaint has evolved into an arbitration/CFTC reparation or civil litigation, amend the existing DRP by completing items 9 and 10.
- If the matter involves an arbitration or CFTC reparation, complete items 13-19, as appropriate.
- If the matter involves a civil litigation, complete items 20-27.
- Item 28 is an optional field and applies to all event types (i.e., customer complaint, arbitration/CFTC reparation/civil litigation).

Complete items 1-6 for all events.

| | |
|---|---|
| 1. | Customer Name(s):<br>TERRESSA HATCHET |
| 2. | Customer(s) State of Residence:<br>Maryland<br>Other state(s) of residence/detail: |
| 3. | Employing *Firm* when activities occurred which led to the complaint:<br>LEGACY FINACIAL SERVICES, INC. |
| 4. | Allegation(s) and a brief summary of events related to the allegation(s) including dates when activities leading to the allegation(s) occurred:<br>CLIENT ALLEGES THAT MR. KARSNER MISHANDLED HER ACCOUNT. CLIENT ALLEGES THAT LEGACY FINANCIAL SERVICES FAILED TO SUPERVISE. |
| 5. | Principal Product Type:<br>Mutual Fund(s)<br>Other Product Types: |
| 6. | Alleged Compensatory Damage Amount:　　$ 264,000.00 |

**If the matter involves only a customer complaint, complete items 7-12, as appropriate.**

| | |
|---|---|
| 7. | Date Customer Complaint was received (MM/DD/YYYY):<br><br>08/30/2004 ⊙ **Exact** ○ **Explanation**<br>If not exact, provide explanation: |
| 8. | Is the customer complaint pending? ○ **Yes** ⊙ **No** |

**If the customer complaint has evolved into an arbitration/CFTC reparation or civil litigation, amend the existing DRP by completing items 9 and 10.**

| | |
|---|---|
| 9. | If the customer complaint is not pending, provide status:<br>If status is settlement, complete items 11 and 12;<br>If status is arbitration/reparation, complete items 13-19;<br>If status is litigation, complete items 20-27. |

| ☐ Closed/No Action | ☐ Withdrawn | ☐ Denied |
| ☐ Settled | ☑ Arbitration/Reparation | ☐ Litigation |

**10. Status Date (MM/DD/YYYY):**

08/30/2004  ⦿ **Exact**   ○ **Explanation**

If not exact, provide explanation:

**11. Settlement amount (if settled without arbitration, litigation or reparation):**                     $

**12. Individual Contribution Amount:**          $

**If the matter involves an arbitration or CFTC reparation, complete items 13–19, as appropriate.**

**13. Arbitration/Reparation claim filed with (FINRA, AAA, NYSE, CBOE, CFTC, etc.) and Docket/Case Number:**
NASD ARBITRATION #04-06007

**14. Date notice/process was served (MM/DD/YYYY):**

08/30/2004  ⦿ **Exact**   ○ **Explanation**

If not exact, provide explanation:

**15. Is the arbitration/reparation pending?** ○ **Yes**   ⦿ **No**

**16. If the arbitration/reparation is not pending, what was the disposition?**
Settled

**17. Disposition Date (MM/DD/YYYY):**

11/01/2006  ⦿ **Exact**   ○ **Explanation**

If not exact, provide explanation:

**18. Amount of Monetary Compensation (award, settlement, reparation amount):**     $ 92,500.00

**19. Individual Contribution Amount:**          $ 0.00

**If the matter involves a civil litigation, complete items 20–27.**

**20. Court that case was filed in (include name of Federal, Military, State or Foreign Court, Location of Court - City or County and State or Country, Docket/Case number).**

**21. Date notice/process was served (MM/DD/YYYY):**

○ **Exact**   ○ **Explanation**

If not exact, provide explanation:

**22. Is the civil litigation pending?** ○ **Yes**   ○ **No**

**23. If the civil litigation is not pending, what was the disposition?**

**24. Disposition Date (MM/DD/YYYY):**

○ **Exact**   ○ **Explanation**

If not exact, provide explanation:

25. Amount of Monetary Compensation (judgment, restitution, settlement   $
    amount):

26. Individual Contribution Amount:          $

27. If the action is currently on appeal enter date appeal filed (MM/DD/YYYY):

     ○ **Exact**  ○ **Explanation**

    If not exact, provide explanation:

28. Comment (Optional). You may use this field to provide a brief summary of the circumstances leading
    to the customer complaint, arbitration/CFTC reparation and/or civil litigation as well as the current
    status or final disposition(s). Your information must fit within the space provided.

# EXHIBIT B

Joseph Karsner CRD Entries

| Complainant | Date of court filing | Date of award | $ Resolution | $damages sought | Allegations and Comments | State of residence |
|---|---|---|---|---|---|---|
| Lothian, Pamela NASD 04-07347 | 2/12/07 | 1/23/06 | $47,000 | $104,638 | Mismanged funds. Expungement. | MD |
| Simpson, Larry 04-05824 | 2/21/07 | 1/6/06 | $16,000 | $124,000 | Misrepresentations. Expungement. | MD |
| L, Douglas 05-04816 | | 3/12/07 | $36,000 | $200,000 | unsuitable investments | PA |
| T, Cheryl 04-07344 | | 2/13/06 | $35,000 | $80,000 | unsuitable investments | PA |
| P, Anthony 04-08295 | | 6/14/06 | $22,500 | $136,500 | unsuitable investments | MD |
| L, Mary 04-08457 | | 3/7/06 | dismissed | $88,000 | unsuitable investments | MD |
| H, Mattie 04-08341 | | 9/7/06 | $75,000 | $188,000 | unsuitable investments | MD |
| D, Ronald 05-00275 | | 9/7/06 | $75,000 | $218,000 | unsuitable investment advice | MD |
| M, Denise 04-07359 | | 11/2/06 | $31,000 | $64,239 | unsuitable investments | OH |
| C, Robert 04-06068 | | 8/7/06 | $22,500 | $134,383.87 | misrepresentation, fraudulent inducement | MD |
| E, Carolyn 06-02026 | | 1/8/07 | settled, amount unknown | $500,000 | unsuitable investments. Settled and complaint withdrawn, claims dismissed; no payment. | VA |
| M, William 05-04984 | | 3/7/07 | $27,000 | $250,500 | unsuitable investments, misrepresentations | PA |
| J, Warren 05-00940 | | 10/25/06 | $24,000 | $90,352 | unsuitable investments | VA |
| H, Virgie 04-08296 | | 6/22/06 | $15,000 | $28,240 | unsuitable investments | MD |

| | | | | | | |
|---|---|---|---|---|---|---|
| H, Mary<br>04-0736 | | 6/16/06 | $29,000 | $88,000 | mismanagement of funds. | FL |
| L, Shirley<br>04-06796 | | 9/11/06 | $31,000 | $66,029 | misrepresentations | NC |
| B, Beverly<br>04-06795 | | 6/16/06 | $35,000 | $184,000 | misrepresentations | MD |
| W, Robert<br>04-06266 | | 6/22/06 | $30,000 | $105,500 | misrepresentations | VA |
| B, Donna<br>04-06404 | | 6/16/06 | $25,000 | $80,000 | misrepresentations & unsuitability | MD |
| H, Terressa<br>04-06007 | | 11/1/06 | $92,500 | $264,000 | mishandled acct; failure to supervise | MD |
| Catalano, John<br>04-05933 | 3/15/07 | 2/13/06 | $15,000 | $134,000 | high risk accts. $15,000 contingent on stip to expungement. If no stip award granting expungement, $9,999. | MD |
| P, James<br>04-05943 | | 6/12/06 | $25,500 | $198,000 | high risk accts. unsuitable investments | MD |
| H, Joann<br>04-07343 | | 4/14/06 | $25,000 | $52,524 | mismanaged money unsuitable investments | MD |
| G, Diane<br>04-07345 | | 6/22/06 | $16,500 | $52,843 (letter) $$36,400 (arb.) | mismanaged money | MD |
| J, Kathleen<br>04-08561 | | 7/25/06 | $17,500 | $30,000 (letter) $54,523 (arb.) | mismanaged money | MD |
| T, Eleanor<br>03-03410 | | 5/12/05 | denied (archived) | $186,753.26 | unsuitable investments, misrepresentations | VA |
| R, Roland & Linda<br>04-06039 | | 11/3/05 | $265,000 | $500,000 | misrepresentation, mismanaged accts, violations of Act. Karsner contributed $50,000. | MD |

2

| P, Michael 04-06176DC | | 9/12/05 | dismissed (archived) | $30,000 | unsuitability and misrepresentation | MD |
|---|---|---|---|---|---|---|
| E, Elizabeth 01-05011 | | 12/23/02 | $60,000 | $80,000 | improper management of account causing adverse tax consequences. Karsner contributed $5,000. | MD |
| B, Eva 05-00627 | | 7/22/05 | dismissed (archived) | $70,000 | unsuitable investments | WA |
| C, Douglas 02-07048 | | 2/11/04 | $105,000 (award) | $278,000 | misrepresentation and fraud. Karsner contributed $5,000. | MD |
| T, Joseph 04-05940 | | | pending | $119,000 | misappropriation in high risk investments | MD |
| Total | | | $1,198,000 | | | |

EXHIBIT C

ADMINISTRATIVE PROCEEDING
BEFORE THE
MARYLAND SECURITIES COMMISSIONER

IN THE MATTER OF:                    *

JOSEPH R. KARSNER, IV,               *       File No. 2002-0391

JOE KARSNER & ASSOCIATES, LLC        *

     and                            *

LEGACY FINANCIAL SERVICES, INC.,     *

     Respondents.                   *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

### ORDER TO SHOW CAUSE

WHEREAS, the Maryland Securities Commissioner (the "Commissioner"), pursuant to

the authority granted by Section 11-701 of the Maryland Securities Act, Corporations and

Associations Article, Title 11, Annotated Code of Maryland (1999 Repl. Vol. & 2006 Supp.) (the

"Securities Act") initiated an investigation into the activities of Joseph R. Karsner, IV

("Karsner"), a registered representative of Legacy Financial Services, Inc. ("Legacy"), and of

Karsner's sole proprietorship Joe Karsner & Associates, LLC ("JK & A"); and

WHEREAS, in the course of its investigation of Karsner, the Maryland Securities

Division ("Division") pursued an investigation of Legacy's supervisory practices; and

WHEREAS, on the basis of that investigation the Commissioner has determined that

respondent Karsner and JK & A may have sold unsuitable investments to his clients and in other

respects violated the Securities Act, and that respondent Legacy may have failed adequately to

supervise Karsner; and

NOW, THEREFORE, the Commissioner hereby orders respondents to show cause: why respondents should not be barred from engaging in the securities and investment advisory business in this State; why a civil monetary penalty should not be entered against each respondent; why a final order should not be entered ordering respondents to cease and desist from further violations of the Securities Act; and why respondents' registrations as broker-dealer and broker-dealer agent should not be suspended or revoked.

The Commissioner alleges the following as a basis for this Order:

## I. JURISDICTION

_____1.       The Commissioner has jurisdiction in this proceeding pursuant to Section 11-701.1 of the Securities Act.

## II. RESPONDENTS

2.       Karsner (CRD # 1001341) is a Maryland resident and maintains a place of business at 325 Gambrills Road, Suite B, Gambrills, Maryland 21054.  Karsner became a registered representative of Legacy on April 2, 1999, but was terminated on January 5, 2006.  He was registered through Signator Investors, Inc. (a.k.a. John Hancock Distributors, Inc.), an affiliate of John Hancock Life Insurance Company (collectively "Hancock"), between November 1981 and April 1999.  He has passed the Series 6 exam and, therefore, may be licensed to sell mutual funds, but has never passed the Series 7 exam that would permit him to become a general securities representative.  He is not registered as an investment adviser representative, but is a licensed insurance agent in Maryland.  He is not currently registered to sell securities in any jurisdiction.

3.       Joe Karsner & Associates, LLC is a Maryland limited liability company formed in

2

April 1999. Its principal office is located at 325 Gambrills Road, Suite B, Gambrills, Maryland 21054.

4.    Legacy (CRD # 38697) is a California corporation organized in 1995. It is headquartered at 2090 Marina Avenue, Box 6030, Petaluma, CA 94955-6030. Legacy has been registered as a broker-dealer with the National Association of Securities Dealers, Inc. ("NASD") since December 1995 and in Maryland since January 1996.

### III. STATEMENT OF FACTS

Karsner's Business Practices

5.    Karsner operated a branch office of Legacy between September 23, 2002 and January 5, 2006, when he was terminated. Between April 2, 1999 and September 23, 2002, his office was an offsite location of Legacy.

6.    Karsner described his business "Joe Karsner and Associates" as a "retirement planning and investment organization that offers a number of investment vehicles to structure a portfolio that will meet your particular financial needs." He explained on his website provenretirement.com that he has "over 22 years experience in the retirement/investment/ insurance financial planning field."

7.    Karsner held out to the public as an investment adviser. His website used to describe Karsner as a "financial advisor." While he was affiliated with Legacy, the website stated that he "manages over $250 million in retirement accounts." It described Karsner's Proven Retirement Solution's twelve-step, three stage process, including the first stage in which he helped clients assess their current circumstances and set financial goals; the second stage in which he developed a retirement plan that would fit clients' particular situations; and the third

3

stage in which he implemented the retirement plan with investment products that would help achieve the clients' life-long goals.

8.      Karsner emphasized to his clients his close and continuing relationship. In effect, he assumed a continuing fiduciary duty to his clients. He regularly updated clients on the status of their accounts by sending them investment summaries. He also sent letters providing his analysis of the financial markets. He reiterated in these letters his continuing responsibility for his clients with such assurances as "my business has been built soley [sic] on the premise of establishing and maintaining long-term relationships with each and every one of you," "I will continue to work hard in getting you the returns you deserve," and "call us if you would like to set up an appointment to review your accounts or reassess your financial needs. I remain committed to taking care of you the way you deserve."

9.      Karsner's website posting explained that "under the guidance of our Broker/Dealer, Legacy Financial in Petaluma, CA, Joe Karsner and Associates is able to offer superior financial products and services." According to the website, Karsner had several others working with the firm of Joe Karsner and Associates.

10.     Up until at least May 23, 2003, Karsner described Rita Hampton ("Hampton") (CRD #2999338) as one of his Legacy staff members who "has worked in the investment/insurance business for over 17 years." Hampton, however, was not a registered representative of Legacy at that time. She was registered through Lifemark Securities Corp. ("Lifemark") from January 1998 until April 2002 and through Atlas Brokerage Company ("Atlas") from April 2002 until December 2002 and again from February 2003 until October 2003. She did not become registered in Maryland through Legacy until February 3, 2004. She

4

used business cards showing her affiliation with Joe Karsner & Associates providing "Investments & Insurance for Retirement Planning" and serving as a vice president, but not identifying any broker-dealer.

11.    While Hampton was registered first through Lifemark and then Atlas, she routinely assisted Karsner with his Legacy securities clients by accompanying Karsner to meet with clients and talking with them on the telephone. Sometimes, Hampton met with Legacy securities clients alone. For example, Shirley Locklair met *only* with Hampton, but signed a Legacy new account form ("NAF") and received statements from Karsner. Karsner included on client statements insurance products from companies where Hampton, but not Karsner, had appointments. Karsner advised his clients to talk with Hampton if they had questions. Hampton also wrote some Legacy clients concerning their Legacy investments.

12.    With the assistance of Hampton and the rest of his staff, Karsner handled more than eleven hundred clients as of June 2003. He earned more than $3.3 million in commissions between April 2,1999 and June 5, 2003.

13.    Legacy paid Karsner a $125,000 signing bonus when he joined the firm. In exchange, Karsner agreed to provide Legacy with written confirmation from Hancock of its intention to transfer all customers and their invested capital to Legacy.

14.    When Karsner moved from Hancock to Legacy, Legacy arranged for a mass transfer of Karsner's clients. Clients did not individually request or authorize this transfer. Rather, the transfer was handled between the firms in about April 1999. On June 1, 1999, when Karsner expected the transfer to be complete, he wrote clients informing them that their accounts were being transferred to his new firm and asking them to advise him if a Hancock representative

should get in touch with them.

15.     Many of Karsner's clients are employees and former employees of the "telephone company," whether AT&T, Bell Atlantic or Verizon. Karsner holds or held seminars, sometimes on telephone company premises, targeting telephone company employees planning for retirement. He typically advised persons attending his seminars who were eligible for retirement to take a lump sum distribution rather than a guaranteed monthly pension because the lump sum distribution could provide for income as well as growth. He recommended that retirees invest the lump sum in a portfolio of mutual funds, variable annuities and other insurance products, and assured potential clients that they would be able to live off the investment income from their lump sum distribution for the rest of their lives.

16.     Karsner routinely gave seminar participants a packet of materials that would help them calculate the payments they could expect to obtain from their retirement portfolio. The materials contained a formula for calculating sustainable annual withdrawals, depending upon the size of the retirement distribution, the individual's age, life expectancy and estimated annual investment return. The packet included a selection of investment returns ranging from a low of 6% to a high of 12%. In the specific example that Karsner generally gave seminar participants, however, the estimated annual investment return was 8%. In some cases, Karsner handed out materials in which he guaranteed 12% return on variable annuities, 7% return on fixed annuities and 4.5% return in a money market account. The seminar materials contain no other discussion of the risks associated with the estimated return.

17.     When clients told Karsner how much income they needed or wanted to withdraw per month, he routinely assured them that he could provide that income. He did not discuss the

6

risks associated with obtaining higher levels of monthly income and assured them that they would be able to live on their principal and income until they died. In reliance on Karsner's reassurances, many of the seminar participants retired while still in their 50s, expecting to be able to live on the regular monthly income drawn from their retirement accounts managed by Karsner.

18.     Karsner explained the tax consequences of his retirement advice. He told his clients that if they withdrew regular income from their retirement accounts before the age of 59 ½ and complied with the provisions of Section 72(t) of the Internal Revenue Code, they would not suffer tax penalties. IRC Section 72(t) provides that a taxpayer must pay a 10% penalty for any distributions taken from a qualified retirement plan before the age of 59 ½ unless the distributions are part of a series of substantially equal periodic payments. Clients who relied upon IRC Section 72(t) were locked into their monthly withdrawals until the IRS modified the rules in October 2002 to allow for a one-time change to the distribution method.

19.     Internal Revenue Rulings implementing IRC Section 72(t) provide that the interest rate used to calculate the maximum permissible periodic payment be no more than 120% of the federal mid-term rate determined in accordance in § 1274(d). During the period after Karsner moved his business to Legacy, that rate could not exceed 6.35%. Karsner's sample calculation for the periodic payment, however, used a rate of 8%.

20.     Karsner generally advised his clients to purchase several mutual funds and to reserve a part of their portfolio in a money market account that could be used to fund regular monthly withdrawals, satisfying the requirements of IRC Section 72(t).

21.     Most of his clients were unsophisticated in financial matters and relied upon Karsner to make diversified investments in their accounts which would be safe and secure.

While Karsner was with Hancock, his client accounts were generally fairly conservatively invested in a diversified portfolio of mutual funds, including such funds as growth and income, large cap growth, bank and bond funds, and variable annuities with diversified mutual fund sub-accounts.

22.    When Karsner transferred from Hancock to Legacy in April 1999 and his clients were transferred to Legacy through a mass transfer, Karsner was unable to service the client accounts through Legacy because the accounts held proprietary Hancock products. It took some time for Karsner to meet with his approximately 1000 clients after his move. As he met with them, he advised his clients to sell the Hancock products and purchase products through Legacy.

23.    Karsner pursued a much riskier investment strategy after he joined Legacy. Karsner followed investment strategies that resulted in significant portions of client assets at Legacy being invested in technology, telecommunications, internet and small or medium cap growth funds. As a result, clients' portfolios were invested in far riskier funds than they had been at Hancock.

24.    For example, in March 2000, Karsner instructed Hancock to change the mutual funds held in the sub-accounts of over 350 variable annuity clients from a diversified portfolio to a single sub-account holding a mid-cap fund. He did not consult with clients before directing this transfer and did not have discretionary authority over the accounts.

25.    Karsner switched many other clients from Hancock mutual funds to Oppenheimer or American Skandia/Janus funds after he moved to Legacy. When he met with clients to make these recommendations, he also had the clients sign Legacy new account forms, often changing the investment objectives and risk tolerance from their Hancock forms to coincide with the

8

characteristics of the riskier portfolios.

26.    Many of the mutual funds that Karsner recommended to his clients declined very substantially with the burst of the tech bubble beginning in the spring of 2000, frequently by significantly more than the S & P 500 because of their investments in risky securities and concentration in small to mid-cap firms and technology stock.

27.    After his clients' portfolios had substantially declined, Karsner sometimes advised clients to sell their homes, take in tenants, go back to work or stop drawing income. Indeed, many clients have been forced to return to work. This advice was in sharp contrast to his advice when they first came to him with their retirement funds and he assured them that they could live off the proceeds for the rest of their lives.

28.    Because Karsner's clients are generally retired from the telephone company and often were taking regular income withdrawals pursuant to IRC Section 72(t), they were locked into taking withdrawals even if the withdrawals came out of principal rather than stock appreciation and investment income. As a result of following Karsner's investment advice, the retirement portfolios for many of these clients have been decimated. For example, Roland and Linda R. invested about $840,000, withdrew about $242,400, and ended with about $302,000 as of August 2003, for an approximately 50% loss of their net investment.

29.    When clients questioned Karsner about the decline in their portfolios, he advised them not to sell because their losses were simply paper losses and they still held the shares. Even as their account balances were dwindling, Karsner sent letters to clients attributing the decline to September 11 and telling them to hold onto their funds because they were invested for the long run. In recognition of his bad investment advice, however, Karsner told clients that he would

9

rebalance their portfolios after fund prices returned to target levels. For example, he wrote one client that, when fund prices reached target levels, he would place half his Janus Capital Growth shares into American Century Strategic Balanced Fund, half the Oppenheimer MidCap Fund into Quest Balanced Value Fund and half the Neuberger Berman MidCap Fund into Pimco Total Return Bond Fund.

30.    Many of the mutual funds purchased on Karsner's advice were unsuitable. His strategy of investing in risky growth and small or mid cap funds was often devastating to retirees without a source of employment income. The bitter result was often that clients lost a substantial part or even the entire value of their retirement portfolios.

31.    NAFs are designed to provide guidance to a broker-dealer and its representatives for deciding which investments to recommend to customers. Legacy's NAFs require background financial information that "must be completed for all accounts." One section requests the client's net assets and income; a second asks the client to check all applicable investment objectives; and a third asks whether the client's risk tolerance is high, medium or low. Hancock's NAF contains a similar list of possible investment objectives, including safety of principal. The NAF should form the basis for Karsner's recommendations to his clients and allow Legacy to review those recommendations for suitability.

32.    Many of Karsner's clients have multiple NAFs with inconsistent objectives or risk tolerance. Sometimes, clients have more than one NAF with different objectives or risk tolerance on the same day.

33.    Karsner appears to have completed the NAF sections showing the clients' risk tolerance and investment objectives. Many clients claim that they never discussed with him their

10

willingness to expose their retirement funds to risk. Sometimes, the risk tolerance or investment objectives section of the NAF is blank. Where there are two NAFs on the same date, with one partly blank, it appears that Karsner may have completed the form after the client signed. Other times, the client signatures appear to have been forged or copied.

34.    Karsner had a practice of having his clients sign a new account form for each new investment product. In effect, he made sure that the investment objectives and risk tolerance in the new account form were consistent with the investment product that he sold, rather than with the client's overall investment objectives and risk tolerance.

35.    Many client NAFs have not been approved or signed by a Legacy supervisor. It appears that, even when a supervisor signed the form, Legacy did not question why Karsner's clients signed so many NAFs within a short period of time or even on the same day, why the clients' risk profiles and investment objectives changed, and whether the risk profiles were appropriate for clients' retirement funds.

36.    Many investment applications completed when clients switched from one mutual fund to another are, also, incomplete. Clients did not always sign the applications or initial required items of disclosure. Often, sections were completed by typewriter before the client saw the application.

37.    Karsner routinely told his clients that they paid no fees because of the large volume of his business. Seminar materials state "no sales charges on either front or back end." When clients sold interests in mutual funds, however, they sometimes incurred contingent deferred sales charges on the sale of their Class B mutual funds.

38.    Karsner reimbursed some clients when they incurred unexpected fees. For

11

example, he reimbursed clients for various "administrative" fees, sales commissions or deferred sales charges. He reimbursed Elizabeth E. about $8,000 for unanticipated taxes, Helen and John A. for $2,500 in taxes resulting from an unauthorized transaction, and Vergie H. $23,000 for an unauthorized transaction. Karsner warned these clients not to talk with anyone else about the reimbursements.

Legacy's Supervisory Procedures

39.    Larry Qvistgaard, Vice President and Chief Compliance Officer of Legacy, supervised Karsner. According to CRD, he supervised Karsner's branch office until it officially closed on March 3, 2006. During the period April 2, 1999 through June 2002, Qvistgaard supervised approximately 103 registered representatives who had approximately 4,124 clients. Karsner alone had more than 1,000 clients. Qvistgaard had about 159 clients of his own.

40.    Qvistgaard, who served both as Chief Compliance Officer and as line supervisor for over 100 representatives, could not adequately supervise those for whom he was responsible while simultaneously ensuring that Legacy's supervisory procedures were adequate and properly implemented.

41.    According to Legacy, Karsner's office was not subject to an annual audit because it is a branch office. Legacy's Compliance Manual required that branch offices be audited at least every three years, but may be subject to more frequent inspections should the Office of Supervisory Jurisdiction become aware of anything that would warrant an inspection. Non-branch offices must be inspected as required by state law.

42.    Legacy has an obligation to monitor the securities-related activities of its agents and to detect and prevent regulatory and compliance problems of its associated persons, whether

12

the persons are working at branch or unregistered offices. In order to fulfill these obligations,

Legacy must conduct periodic examinations of its agents' offices depending on such factors as

the nature and volume of business conducted at the office and the nature and extent of contact

with customers.

43.     The NASD Notice to Members 98-38 advises its members that it does not

distinguish between branch offices and unregistered offices in its evaluation of the adequacy of

compliance examinations and notes that a pre-announced compliance examination only once a

year was inadequate to satisfy supervisory obligations of broker-dealer Royal Alliance.

44.     It appears that Legacy's first inspection of Karsner's office took place on

December 3, 2001, more than two years after Karsner started with Legacy and before his office

became a branch office. At that time, Qvistgaard conducted a two-hour audit of Karsner's office.

The audit showed that Karsner conducted no seminars, although he had a history of soliciting

clients through seminars, and made no deposits to client accounts, although Elizabeth E. filed a

complaint before September 1, 2001, in which she alleged that Karsner had reimbursed her for

the tax consequences of an improper trade. The audit also stated that outgoing correspondence

was sent to Legacy's compliance department, although correspondence from Karsner to his

clients shows that Hampton engaged in securities activities on behalf of Legacy without being

registered through Legacy. The audit did not comment on the role played by Hampton in Joe

Karsner & Associates, although Linda M. had complained in May 2001 about transactions

allegedly executed by Hampton when she had dealt only with Karsner.

45.     Even though there had been numerous customer complaints and an active

investigation by the Securities Division, Legacy did not audit Karsner's office again until July 1,

2003. The audit was announced. At that time, the auditor identified Qvistgaard as OSJ Manager and Karsner's office as a non-branch office, in spite of a branch office designation on CRD. The auditor noted that Karsner solicits customers through seminars and stated that Legacy has approved all Karsner's correspondence, seminar material and website. He also stated that Karsner had made no deposits to client accounts, but inconsistently noted the settlement of Elizabeth E.'s claim alleging that Karsner reimbursed her for taxes and rebated fees to other clients. The audit did not comment on any review of Karsner's bank records or on the role played by Hampton in Joe Karsner & Associates.

46.     Legacy did not maintain books and records that were adequate to properly supervise Karsner. It did not have records of the clients' portfolios brought over to Legacy from Hancock and could not determine whether there was a change in the riskiness of the portfolios when Karsner switched the clients from their proprietary Hancock products into other mutual funds. It did not maintain any computerized records of client portfolios or other records providing a statement of client accounts after Karsner switched the mutual fund holdings. Therefore, it could not evaluate the suitability of client investments. It had only the disclosure documents that Karsner completed and clients were supposed to sign when they purchased mutual funds. Often these forms were incomplete, unreviewed by supervisors and unsigned by the clients.

47.     Legacy's Compliance and Procedures Manual and OSJ Branch Office Policy and Procedures Manual prohibit various of Karsner's sales practices. For example, they require that:

a.     NAFs be completed in their entirety;

b.     Mutual fund applications be complete;

14

    c.     Registered representatives recommend switching of mutual fund families only in rare circumstances where there has been a clear change in the customer's investment objective and the investment objective of the new investment clearly meets the changed investment objective.

    d.     Registered representatives not guarantee the future value of any security;

    e.     All correspondence or other materials mailed or handed out at seminars to customers be approved;

    f.     Registered representatives not make gifts in excess of $100 to any customer; and

    g.     When a registered representative changes his broker-dealer registration to Legacy, the client complete and sign a change of broker-dealer form and the form be forwarded to Legacy together with a NAF.

    48.     Legacy's OSJ Branch Office Policy and Procedures Manual spells out supervisory procedures that Legacy has not met or for which proof of implementation has not been provided to the Securities Division:

    a.     NAFs must be reviewed for completeness;

    b.     NAFs must be signed by the OSJ Branch Manager;

    c.     Mutual fund applications must be reviewed for completeness;

    d.     All office personnel in a small office must be fingerprinted;

    e.     All correspondence by a registered representative must be approved;

    f.     All seminar material used by a registered representative must be approved;

    g.     A registered representative's personal bank disbursements must be reviewed to determine whether there have been checks payable to customers;

h.     All mutual fund liquidations must be reviewed to determine whether subsequent investments are suitable and whether appropriate disclosures, including switching letters, have been made; and

i.     All clients must complete and sign a change of broker-dealer form when a registered representative changes his broker-dealer registration to Legacy.

49.     Legacy was on notice at least since 2001 that Karsner worked with Hampton on securities matters and yet Legacy did not supervise her. Karsner client Linda M. complained that Karsner sold her an annuity but that paperwork reflecting the transaction was executed by Hampton, whom the client did not know. In addition, in a letter dated December 17, 2001, Legacy's Compliance Director recognized that client Shirley L. "met with Rita Hampton, an associate of Joe Karsner, to discuss your investments because you saw a decrease in your investment." Yet Legacy took no action to ensure that Hampton stopped conducting business on behalf of Legacy or to supervise Hampton until February 2004, when Legacy hired Hampton as an agent.

50.     Legacy was on notice since no later than December 2001, that clients sometimes had multiple NAFs on the same date with contradictory objectives. In a letter dated December 14, 2001, Legacy's Compliance Director wrote Denise M. that she had two NAFs signed in March 2000, one showing high risk tolerance with investment objectives of long term growth and capital appreciation and the other showing medium risk tolerance and investment objectives of long term growth, capital appreciation and income. Yet Legacy did not question the appropriateness of these NAFs.

51.     Legacy ignored red flags relating to Karsner's sales practices, including multiple,

16

inconsistent and incomplete NAFs; incomplete mutual fund applications; website advertisements in which Karsner holds out as an investment adviser; and indications on Karsner's website, in correspondence, and in complaints that Karsner works with a person not registered through Legacy. Even when client complaints raised serious concerns and red flags about Karsner's sales practices, Legacy denied the complaints out of hand and failed to react to or correct the challenged practices.

52.    Legacy's failure to respond adequately to red flags and customer complaints has caused Legacy to violate the "know your customer" rule in that it failed to learn the essential facts relative to those customers and ensure that their investments were suitable.

53.    Legacy has either not responded or responded only after repeated letters to requests from the Division, including requests for client account records, copies of Karsner's seminar materials, its review of the sale of Class A and Class B mutual funds, and explanations concerning Legacy's supervisory practices and procedures.

## COUNT I
**(Acting as an Unregistered Investment Adviser or Investment Adviser Representative)**
**(Joe Karsner & Associates and Karsner)**

WHEREAS, an investment adviser means a person who, for compensation:

(1)    engages in the business of advising others, either directly or through publications or writing, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities; or

(2)    1.    provides or offers to provide, directly or indirectly, financial and investment counseling or advice, on a group or individual basis;

2.    gathers information relating to investments, establishes financial goals and objectives, processes and analyses the information gathered, and recommends a financial plan; or

17

3.    holds out as an investment adviser in any way, including indicating by advertisement, card, or letterhead, or in any other manner indicates that the person is, a financial or investment "planner", "counselor", "consultant", or any other similar type of adviser or consultant; and

WHEREAS, an investment adviser representative includes an individual who has a place of business in this State and is employed by or associated with a federal covered adviser and who

(1)    makes any recommendations or otherwise renders investment advice to clients;

(2)    manages accounts or portfolios of clients;

(3)    determines which recommendation or investment advice should be given with respect to a particular client account; or

(4)    holds out as an investment adviser; and

WHEREAS, Section 11-401 of the Securities Act makes it unlawful for any person to transact business in this State as an investment adviser or investment adviser representative unless the person is registered as an investment adviser or investment adviser representative and certain exceptions are not applicable; and

WHEREAS, the exceptions to the requirement that an investment adviser or investment adviser representative be registered are not applicable in this matter; and

WHEREAS, JK & A acted as an investment adviser and Karsner acted as an investment adviser representative by managing client portfolios, making recommendations and providing investment advice with regard to those portfolios and holding out as an investment adviser or investment adviser representative; and

WHEREAS, JK & A and Karsner have never been registered in this State as an investment adviser or investment adviser representative,

NOW, THEREFORE, IT IS HEREBY ORDERED that JK & A and Karsner show cause

18

why a final order should not be entered that orders them to cease and desist from engaging in activities in violation of the Securities Act including Section 11-401, assesses a statutory penalty of up to $5,000 per violation, permanently bars them from the securities and investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged, and orders any other sanction or combination of sanctions as permitted under Section 11-701.1.

**COUNT II**
**(Fraud in Connection with the Offer or Sale of Securities, Section 11-301)**
**(Karsner)**

WHEREAS, Section 11-301 of the Securities Act makes it unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly to:

(1)     employ any device, scheme or artifice to defraud;

(2)     make any untrue statement of a material fact or omit to
        state a material fact necessary in order to make the
        statements made, in light of the circumstances under which
        they were made, not misleading; or

(3)     engage in any act, practice or course of business which operates or would
        operate as a fraud or deceit on any person; and

WHEREAS, Karsner omitted to state material facts, including but not limited to the following facts related to the sale of mutual funds:

(1)     That mutual funds he recommended to clients were risky;

(2)     That mutual funds he recommended to clients were unsuitable in light of the
        clients' investment objectives and risk tolerance; and

(3)     That clients may incur various sales charges; and

(4)     The basis for commissions he earned on the sale of mutual funds; and

WHEREAS, Karsner made material misrepresentations, including but not limited to the

19

following related to the sale of mutual funds:

    (1)    That clients could live off their retirement funds until they died and could earn a guaranteed 12% return on variable annuities, 7% return on fixed annuities and 4.5% return in a money market account;

    (2)    That clients would pay no front or back end load on the purchase or sale of mutual funds; and

    (3)    That clients do not pay his fees; and

WHEREAS, Karsner engaged in an act, practice or course of business which operates or operated as a fraud or deceit on his clients, including but not limited to:

    (1)    Transferring clients from Hancock to Legacy without their authorization;

    (2)    Switching clients from one portfolio of mutual funds to another portfolio in order to maintain control over the client's account after he moved to Legacy;

    (3)    Switching clients from one portfolio of mutual funds to another riskier portfolio;

    (4)    Completing multiple NAFs for clients without explaining to them the issues and changing their investment objectives and risk tolerance without adequate disclosure;

    (5)    Working on Legacy securities matters with a person who was not registered through Legacy; and

    (6)    Paying clients for costs they have incurred, including sales fees and commissions, unanticipated taxes and investment principal for unauthorized transactions,

NOW, THEREFORE, IT IS HEREBY ORDERED that Karsner show cause why a final order should not be entered that orders him to cease and desist from engaging in activities in violation of the Securities Act including Section 11-301, assesses a statutory penalty of up to $5,000 per violation, permanently bars him from the securities and investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged, and orders any other sanction or combination of sanctions as permitted under Section

20

11-701.1.

## COUNT III
### (Fraud in Investment Advisory Activities; Section 11-302)
### (Joe Karsner & Associates and Karsner)

WHEREAS, Section 11-302 of the Securities Act makes it unlawful for any person who

receives, directly or indirectly, any consideration from another person for advising the other

person as to the value of securities or their purchase or sale, or for acting as an investment

adviser or representative under Section 11-101(h) or (i) of the Securities Act to:

(1)     employ any device, scheme or artifice to defraud;

(2)     engage in any act, practice or course of business which operates or
        would operate as a fraud or deceit on the other person;

(3)     engage in dishonest or unethical practices as the Commissioner may define
        by rule; or

(4)     knowingly make any untrue statement of a material fact or omit to
        state a material fact necessary in order to make the statements
        made, in light of the circumstances under which they were made,
        not misleading; and

WHEREAS, the Securities Commissioner has defined by Rule .03B of the Code of

Maryland Regulations .02.02.05 ("COMAR") dishonest or unethical practices to include:

(1)     recommending to a client to whom investment services are provided the purchase,
        sale or exchange of any security without reasonable grounds to believe that the
        recommendation is suitable for the client on the basis of information furnished by
        the client after reasonable inquiry concerning the client's investment objectives,
        financial situation and needs, and any other information known or acquired by the
        investment adviser after reasonable examination of the client's financial records;

(2)     placing an order to purchase or sell a security for the account of a client without
        having obtained, in advance, the authority to do so;

(3)     lending money to a client;

(4)     misrepresenting to an advisory client or prospective advisory client the

qualifications of the investment adviser, or an investment adviser representative employed by or associated with the investment adviser, or misrepresenting the nature of the advisory services being offered or fees to be charged for that service or omitting to state a material fact necessary to make the statements made regarding qualifications, services, or fees, in light of the circumstances under which they are made, not misleading; or

(5) guaranteeing a client that a certain or specific result will be achieved, for example, gain or no loss, as a result of the advice that will be rendered; and

WHEREAS, JK & A and Karsner engaged in dishonest or unethical practices, employed a device, scheme or artifice to defraud and engaged in an act, practice or course of business which operates or would operate as a fraud or deceit on the other person by, among other matters:

(1) switching clients from one portfolio of mutual funds to another more risky portfolio and making investment recommendations to clients that were unsuitable;

(2) completing multiple NAFs for clients without explaining to them the issues and changing their investment objectives and risk tolerance without adequate disclosure;

(3) carrying out transactions without obtaining prior client authority;

(4) guaranteeing clients a specific result and promising clients that they could live off their investment income for the rest of their lives; and

(5) paying clients for costs they incurred, including sales fees and commissions, unanticipated taxes and investment principal for unauthorized transactions; and

WHEREAS, JK & A and Karsner omitted to state material facts, including but not limited to the riskiness of the mutual funds that he recommended; and

WHEREAS, JK & A and Karsner made untrue statements of a material fact, including but not limited to the promises that clients could live off their retirement funds until they died and could earn a guaranteed 12% return on variable annuities, 7% return on fixed annuities and 4.5% return in a money market account; and

WHEREAS, Karsner breached his fiduciary duty as an investment adviser representative

22

to act primarily for the benefit of his clients,

NOW, THEREFORE, IT IS HEREBY ORDERED that JK & A and Karsner show cause why a final order should not be entered that orders them to cease and desist from engaging in activities in violation of the Securities Act including Section 11-302, assesses a statutory penalty of up to $5,000 per violation, permanently bars respondents from the securities and investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged, and orders any other sanction or combination of sanctions as permitted under Section 11-701.1.

### COUNT IV
**(Revocation of Registration - Section 11-412)**
**(Respondents Karsner and Legacy)**

WHEREAS, Section 11-412 of the Securities Act provides that the Commissioner by order may deny, suspend, or revoke any registration if the Commissioner finds that the order is in the public interest and that the applicant or registrant or, in the case of a broker-dealer or investment adviser, any partner, officer, or director, any person occupying a similar status or performing similar functions, or any person directly or indirectly controlling the broker-dealer or investment adviser,

(a)(2)     has willfully violated or willfully failed to comply with any provisions of this title, a predecessor act, or any rule or order under this title or a predecessor act;

(a)(7)     has engaged in dishonest or unethical practices in the securities or investment advisory or any other financial services business;

(a)(9)     is not qualified on the basis of factors such as training, experience, and knowledge of the securities or investment advisory or any other financial services business; or

(a)(10)    has failed reasonably to supervise the broker-dealer's agents;

WHEREAS, Karsner willfully violated or willfully failed to comply with sections 11-301, 11-302, and 11-401 of the Securities Act as detailed in this Order;

WHEREAS, respondents engaged in dishonest and unethical practices, as set forth in this Order;

WHEREAS, Karsner is not qualified on the basis of factors such as training, experience, and knowledge of the investment advisory business; and

WHEREAS, Legacy did not maintain a supervisory system reasonably designed to supervise its representatives and failed to implement its procedures so as reasonably to supervise Karsner,

NOW, THEREFORE, IT IS HEREBY ORDERED that respondents Karsner and Legacy show cause why a final order should not be entered that revokes their broker-dealer and broker-dealer agent registrations and orders any other sanction or combination of sanctions against them as permitted under Sections 11-412 and 11-701.1 of the Securities Act.

## REQUIREMENT OF ANSWER AND
## NOTICE OF OPPORTUNITY FOR HEARING

IT IS FURTHER **ORDERED**, pursuant to Section 11-701.1 of the Securities Act and COMAR 02.02.06.06, that each respondent shall file with the Securities Commissioner a written Answer to this Order within fifteen days of service of the Order. The Answer shall admit or deny each factual allegation in the Order and shall set forth affirmative defenses, if any. A respondent without knowledge or information sufficient to form a belief as to the truth of an allegation shall so state.

The Answer also shall indicate whether the respondent requests a hearing. A hearing to

24

determine whether the Order should be vacated, modified, or entered as final will be scheduled in this matter if one is requested in writing.  Failure by any respondent to file a request for a hearing in this matter within fifteen days of receipt of the Order shall be deemed a waiver by that respondent of the right to such a hearing.

Failure to file an Answer, including a request for a hearing, shall result in entry of a final order:

(a)    directing that respondent permanently cease and desist from violation of the Securities Act; and

(b)    imposing a monetary penalty of up to $5,000 per violation of the Securities Act; and

(c)    barring that respondent from engaging in the securities or investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged; and

(d)    revoking that respondent's securities and investment advisory registrations.

**SO ORDERED:**

DATED:  March 19, 2007

_____/s/_____
Melanie Senter Lubin
Securities Commissioner

25

ADMINISTRATIVE PROCEEDING
BEFORE THE
MARYLAND SECURITIES COMMISSIONER

| | | |
|---|---|---|
| IN THE MATTER OF: | * | |
| JOSEPH R. KARSNER, IV, | * | File No. 2002-0391 |
| JOE KARSNER & ASSOCIATES, LLC | * | |
| and | * | |
| LEGACY FINANCIAL SERVICES, INC., | * | |
| Respondents. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF COMPLIANCE WITH SECTION 11-802(b)

I hereby certify that, in accordance with section 11-802(b) of the Maryland Securities Act,

Title 11, Corporations and Associations Article of the Annotated Code of Maryland, I have

effected service upon the respondents, Joseph R. Karsner, IV, Joe Karsner & Associates, LLC

and Legacy Financial Services, Inc. by serving the foregoing Order To Show Cause upon the

Securities Commissioner, and then by sending a copy of the Order and notice of service by

certified mail, return-receipt-requested, to the respondents at their last-known address.


Dated: March 19, 2007                           /s/
                                              Lucy A. Cardwell


Subscribed and sworn to before me
this 19th day of March, 2007


_____/s/_____
Notary Public
My Commission expires: _____

**EXHIBIT 6**

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 3414 | **DATE** | 4/26/2007 |
| **CASE TITLE** | Robert Craig Shirley vs. Paul Balsamello | | |

**DOCKET ENTRY TEXT**

For the reasons set forth in this Order, the Court dismisses this suit without prejudice for lack of subject matter jurisdiction and strikes as moot the Illinois Secretary of State, Securities Department's motions to intervene and dismiss [doc. nos. 17 & 20].

Docketing to mail notices.

| | Courtroom Deputy Initials: | LC/LM |
|---|---|---|

Robert Craig Shirley has filed an amended application to confirm an arbitration award entered by NASD Dispute Resolution, Inc. on June 24, 2005. The award resolved a complaint Paul Balsamello lodged against Shirley, and Shirley's employer RBC Dain Rauscher Inc. ("RBC"), regarding their handling of Balsamello's brokerage account. Balsamello claimed that Shirley recommended unsuitable investments to him and churned his account, and RBC failed to supervise Shirley appropriately, causing Balsamello to lose more than $400,000.00.

The arbitrators: (1) "sustained the claim of failure to supervise against RBC . . . finding that the concentration of investments became unsuitable for Claimant and rejected the claims of fraud, omission of facts, churning, breach of fiduciary duty and misrepresentation"; (2) ordered "RBC . . . [to] pay to Paul Balsamello the sum of $226,794.00 . . . as compensatory damages"; and (3) "recommend[ed] the expungement of all reference to this claim from . . . Shirley's registration records maintained by the NASD Central Registration Depository." (Am. Application Confirm, Ex. B, Arb. Award 2-3.)

After the award was issued, Shirley filed this application to confirm it. His application is not contested by Balsamello or the NASD, neither of which has appeared in this case. The Illinois Secretary of State, Securities Department ("ISD"), however, opposes the application and has filed a motion to intervene in the suit and a motion to dismiss the amended application.

The first, and as it turns out, the only, issue to be addressed is subject matter jurisdiction. Shirley alleges that Court has both diversity jurisdiction over his amended application and jurisdiction by virtue of the Federal Arbitration Act ("FAA"). (Am. Application Confirm ¶ 4.) The FAA, however, does not provide a basis for federal subject matter jurisdiction. *See Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 395 (7th Cir. 2002).

Moreover, diversity jurisdiction exists only if the amount in controversy is more than $75,000.00. 28 U.S.C. § 1332. Shirley alleges that it is, but his allegation is belied both by the arbitration award itself and his amended application to confirm. As noted above, the arbitrators ordered RBC – not Shirley – to pay more than $200,000.00 in damages to Balsamello. RBC is not a party to this proceeding and Balsamello declined to appear in it. Thus, the monetary award is not at issue here. The only aspect of the award that is at issue is the arbitrators' "recommend[ation]" that Balsamello's complaint be expunged from Shirley's NASD records. It is not clear what monetary value, if any, an expungement recommendation has. What is clear, however, is that Shirley has not established that the amount-in-controversy element of diversity jurisdiction is met. *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 237 (7th Cir. 1995) ("[I]f the court's jurisdiction is challenged as a factual matter . . . [,] the party invoking the jurisdiction bears the burden of supporting its jurisdictional allegations by competent proof . . . . [,*i.e.,*] proof to a reasonable probability that jurisdiction exists." (quotations omitted)).

That leaves federal question jurisdiction, which "arises only when the complaint . . . establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Minor v. Prudential Secs., Inc.*, 94 F.3d 1103, 1105 (7th Cir. 1996) (quotation omitted). The cause of action in this case is created by the FAA, which does not create jurisdiction, and the parties' arbitration agreement, a creature of state law. Further, though federal claims were raised in the arbitration, Shirley's confirmation request does not implicate any federal law. His request depends solely on the language of the award. It does not, therefore, invoke the Court's federal question jurisdiction. *See Collins v. Blue Cross Blue Shield of Mich.*, 103 F.3d 35, 38 (6th Cir. 1996) (no federal question jurisdiction over request to confirm arbitration award because the right to seek confirmation, which was provided by the arbitration agreement, was "clearly a state law matter," though the underlying claims arose from a federal statute); *O'Leary v. Fanghella*, 866 F. Supp. 1119, 1120-21 (N.D. Ill.1994) (stating that a "suit for enforcement of [an arbitration] award" is "the equivalent of a contract claim," which does not implicate federal question jurisdiction).

Because Shirley has not established that the Court has subject matter jurisdiction over it, this suit is dismissed without prejudice. ISD's motions to intervene and dismiss are stricken as moot.

**EXHIBIT 7**

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 3414 | **DATE** | 10/12/2007 |
| **CASE TITLE** | Robert Craig Shirley vs. Paul Balsamello | | |

**DOCKET ENTRY TEXT**

For the reasons set forth in this Order, petitioner's motion to reconsider [doc. no. 33] is denied.

Docketing to mail notices.

| | Courtroom Deputy Initials: | LC/LM |
|---|---|---|

Petitioner seeks reconsideration pursuant to Federal Rule of Civil Procedure ("Rule") 59(e) of the Court's April 26, 2007 Order dismissing this suit for lack of subject matter jurisdiction.[1] A motion for reconsideration is appropriate when: (1) the Court has "misunderstood a party, . . . has made a decision outside the adversarial issues presented [to it] by the parties, or has made an error not of reasoning but of apprehension"; or (2) there has been "a significant change in the law or facts since the submission of the issue to the Court." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (quotation omitted). Plaintiff invokes the former ground, arguing that the Court misunderstood the nature of its motion to confirm. Specifically, plaintiff says that the Court failed to recognize that he sought to confirm the entire arbitration award, including the more than $200,000.00 in damages RBC Dain Rauscher was ordered to pay, not just the order of expungement. Thus, plaintiff contends, the Court erroneously concluded that diversity jurisdiction was lacking.

The Court's decision was not, however, based on a misunderstanding but on persuasive case law. Though the Seventh Circuit has yet to address the issue, other federal courts have concluded that the amount in controversy for purposes of diversity jurisdiction is "the value of the award itself to the petitioner." *N. Am. Thought Combine v. Kelly*, 249 F. Supp. 2d 283, 285 (S.D.N.Y. 2003); *see Baltrin v. Alaron Trading Corp.*, 128 F.3d 1466, 1472 & n.16 (11th Cir. 1997) (holding that diversity jurisdiction did not exist over motion to vacate arbitration award, which was under the jurisdictional amount, because petitioners sought only to "eliminate the . . . award" and did not "request an award modification that would provide [*them*] with money"); *Wise v. Marriot Int'l*, No. 06 Civ. 11439 (LAP), 2007 WL 2200704, at *4 (S.D.N.Y. July 30, 2007) (stating that amount in controversy is "the amount by which the petitioner will benefit if the Court grants the requested relief"). The only benefit petitioner could conceivably receive from this proceeding is enforcement of the expungement recommendation. Because, as the Court noted in its first Order, petitioner did not establish that such a recommendation has any monetary value, let alone one in excess of $75,000.00, he cannot invoke the Court's diversity jurisdiction.

Petitioner also contends that the Court erred in concluding that federal question jurisdiction is lacking. Because the S.E.C. approved the NASD rule regarding expungement, petitioner says his motion falls under the Securities and Exchange Act of 1934, which gives federal courts "exclusive jurisdiction of violations of . . . the rules and regulations" promulgated under the Act. 15 U.S.C. § 78aa. Petitioner does not contend, however, that the expungement recommendation violates the NASD's expungement rule. Morever, even if it did, "the NASD is a private organization, not an arm of the government," and neither a breach of nor compliance with NASD rules "give[s] rise to federal question jurisdiction." *Ford v. Hamilton*, 29 F.3d 255, 259 (6th Cir. 1994).

In short, petitioner has provided no basis for the Court to reconsider its dismissal order. His motion is, therefore, denied.

---

[1] Contrary to defendant's assertion, plaintiff's motion, which was filed fourteen calendar days, but ten business days, after judgment was entered on April 27, 2007, is timely. *See Borrero v. City of Chi.*, 456 F.3d 698, 701 (7th Cir. 2006) (stating that a Rule 59(e) motion "must be filed within 10 days of the entry of judgment"); Fed. R. Civ. P. 6(a) ("When the period of time . . . allowed [for filing] is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.").

**EXHIBIT 8**

# Notice to Members

MARCH 2004



Legal & Compliance

Registered Representatives

Senior Management



Arbitration

Central Registration Depository (CRD®)

Customer Dispute Information

Dispute Resolution

Expungement

Rule 2130

**INFORMATIONAL**

# Expungement

## NASD Adopts Rule 2130 Regarding Expungement of Customer Dispute Information From The Central Registration Depository; **Effective Date: April 12, 2004**

### Executive Summary

On December 16, 2003, the Securities and Exchange Commission (SEC) approved new Rule 2130 concerning the expungement of customer dispute information from the Central Registration Depository (CRD® or the CRD system).[1] As further discussed below, Rule 2130 will apply to any request made to a court of competent jurisdiction to expunge customer dispute information from the CRD system that has its basis in an arbitration or civil lawsuit filed on or after April 12, 2004. All requests to expunge customer dispute information from the CRD system arising from arbitrations or civil lawsuits filed before April 12, 2004, including any settlements arising therefrom, will continue to be subject to the terms of the moratorium in effect as of January 19, 1999, as discussed in *Notice to Members 99-09* (February 1999).

The text of Rule 2130 is provided in Attachment A.

### Questions/Further Information

Questions concerning this *Notice* may be directed to Richard E. Pullano, Associate Vice President/Chief Counsel, Registration and Disclosure, at (240) 386-4821; Jean I. Feeney, Vice President and Chief Counsel, NASD Dispute Resolution, at (202) 728-6959; or Shirley H. Weiss, Associate General Counsel, Office of General Counsel, Regulatory Policy and Oversight, at (202) 728-8844. Technical and procedural questions may be directed to Ann E. Bushey, Director, Registration and Disclosure, at (240) 386-4724. In addition, questions and answers concerning the application of Rule 2130 soon will be available from NASD's Registration and Disclosure Department at *http://www.nasdr.com/3400_filing_online.asp*.



## Background

Rule 2130 establishes procedures for expunging customer dispute information from the CRD system. For purposes of Rule 2130, "customer dispute information" includes customer complaints, arbitration claims, and court filings made by customers, and the arbitration awards or court judgments that may result from those claims or filings. Customer dispute information generally contains allegations that a member or one or more of its associated persons has violated securities laws, rules, or regulations.

The CRD system is an online registration and licensing system for the U.S. securities industry, state and federal regulators, and self-regulatory organizations (SROs). The CRD system contains broker/dealer information filed on Forms BD and BDW and information on associated persons filed on Forms U4 and U5. The CRD system also contains information filed by regulators via Form U6. The CRD system contains administrative information (e.g., personal, organizational, employment history, registration, and other information) and disclosure information (e.g., criminal matters, regulatory disciplinary actions, civil judicial actions, and information relating to customer disputes) filed on these forms.

NASD operates the CRD system pursuant to policies developed jointly with the North American Securities Administrators Association (NASAA). NASD works with the SEC, NASAA, other members of the regulatory community, and member firms to establish policies and procedures reasonably designed to ensure that information submitted to and maintained on the CRD system is accurate and complete. These procedures, among other things, cover expungement of information from the CRD system in narrowly defined circumstances.

In January 1999, after consultation with NASAA, NASD imposed a moratorium on arbitrator-ordered expungements of customer dispute information from the CRD system. Under the moratorium, NASD would expunge such information from the CRD system only when a directive contained in an arbitration award rendered in a dispute between a public customer and a firm or its associated persons was confirmed by a court of competent jurisdiction. After imposing the moratorium, NASD began considering how to craft an approach to expungement that would allow NASD, in its capacity as an SRO and as operator of the CRD system, effectively to challenge expungement directives that might diminish or impair the integrity of the system and to ensure the maintenance of essential information for regulators and investors.[2] NASD concluded that such an approach necessarily required a balancing of three competing interests: (1) the interests of NASD, the states, and other regulators in retaining broad access to customer dispute information to fulfill their regulatory responsibilities and investor protection obligations; (2) the interests of the brokerage community and others in a fair process that recognizes their stake in protecting their reputations and permits expungement from the CRD system when appropriate; and (3) the interests of investors in having access to accurate and meaningful information about brokers with whom they conduct, or may conduct, business.[3]

In crafting Rule 2130, NASD was guided by these competing interests and the investor protection, data integrity and fairness principles that these interests represent. Underlying Rule 2130 is NASD's commitment to maintaining a CRD system that provides public investors and regulators access to accurate information about firms and brokers and maintains the integrity of the arbitration process. Although public investors, broker/dealers and their associated persons, and regulators may have competing interests, all of these groups share a common interest in a CRD system that contains accurate and meaningful information.

NASD believes that Rule 2130 accomplishes that goal. Rule 2130 will protect regulators' and investors' ability to obtain meaningful data about the members and associated persons with whom they do, or plan to do, business by permitting customer dispute information to be expunged from the CRD system only when arbitrators and a court have affirmatively found that: (1) the claim, allegation, or information is factually impossible or clearly erroneous; (2) the registered person was not involved in the alleged investment-related sales practice violation, forgery, theft, misappropriation, or conversion of funds; or (3) the claim, allegation, or information is false.

## Expungement Procedures Under Rule 2130

Rule 2130 establishes procedures for members and associated persons to obtain expungement of customer dispute information. For purposes of Rule 2130, "customer dispute information" includes customer complaints, arbitration claims, and court filings made by customers, and the arbitration awards or court judgments that may result from those claims or filings. Customer dispute information generally contains allegations that a member or one or more of its associated persons has violated securities laws, rules, or regulations.

Rule 2130 continues the requirement started with the January 1999 moratorium that a court of competent jurisdiction must order or confirm all expungement directives before NASD will expunge customer dispute information from the CRD system. Under Rule 2130, members and associated persons seeking to expunge from the CRD system information arising from disputes with customers must obtain an order from a court of competent jurisdiction directing such expungement or confirming an arbitration award containing expungement relief.[4]

A respondent seeking expungement relief in an arbitration would ask for expungement in his or her prayer for relief. In the event the arbitrators dismiss the claim against the respondent, the arbitrators would then decide whether to grant expungement on the basis of one or more of the standards in Rule 2130; *i.e.*, the expungement relief is based on an **affirmative** arbitral finding that: (1) the claim, allegation, or information is factually impossible or clearly erroneous; (2) the registered person was not involved in the alleged investment-related sales practice violation, forgery, theft, misappropriation, or conversion of funds; or (3) the claim, allegation, or information is false. The award would state whether expungement is granted, and if so, on what basis.

If the parties settle the arbitration, they may jointly ask the arbitration panel for a stipulated award and request that the panel make affirmative findings and order expungement based on one or more of the standards in Rule 2130. The arbitrators would determine whether to grant expungement relief and, if so, state in the award the basis on which the expungement relief was granted. The arbitrators may require the submission of documents or a brief evidentiary hearing to gather the information necessary to make such findings.

The next step would be to obtain a court order. Members and associated persons seeking a court order to expunge **must** name NASD as an additional party and serve NASD with all appropriate documents unless NASD waives that requirement. To obtain NASD's waiver, the party seeking expungement would send the necessary documents (*i.e.*, the waiver request and the arbitration award containing the expungement directive and finding indicating the basis on which the expungement was granted) to NASD at the following address:

Rule 2130 - Expungement Notice/Waiver Request
NASD Registration and Disclosure Department - 2nd Floor
9509 Key West Ave.
Rockville, MD 20850

Upon receipt of a request for a waiver, NASD staff will notify the States where the individual is registered or seeking registration of the expungement notice/waiver request. NASD staff will then examine the basis on which the fact finder ordered expungement to determine whether the expungement was based on one or more of the standards in Rule 2130. NASD will waive the obligation to be named as a party if NASD determines that the expungement relief is based on an affirmative finding that the expungement meets one or more of the standards in the rule.[5] Therefore, parties may save time and expense by sending the arbitration award to NASD staff prior to naming NASD as a party, thereby giving NASD the opportunity to waive its right to be named as a party.

If NASD staff determines that the expungement was not based on one or more of the standards in Rule 2130, it will advise the parties that NASD will not waive the requirement to be named as a party in the court confirmation process. The parties would then name NASD as a party, and NASD would oppose the expungement. Parties may serve NASD by serving "CT Corporation" in the jurisdiction in which the lawsuit is being filed.

Persons who have been sued in court may seek expungement relief from the court; however, they will not be able to avail themselves of the rule's waiver provision and will be required to name NASD as a party.[6] NASD will determine whether to oppose the expungement based on the ground(s) on which the person is seeking the expungement.

## Endnotes

1 SEC Order Granting Approval of Proposed Rule Change and Amendment No. 1, Thereto, and Notice of Filing and Order Granting Accelerated Approval to Amendment No. 2, Thereto, Relating to Proposed NASD Rule 2130 Concerning the Expungement of Customer Dispute Information From the Central Registration Depository System, 68 Fed. Reg. 74667 (Dec. 24, 2003) Exchange Act Release No. 48933 (File No. SR-NASD-2000-168 (Dec. 16, 2003), 68 Fed. Reg. 74667 (Dec. 24, 2003).

2 NASD sought comment on possible approaches to addressing arbitrator-ordered expungements of information from the CRD system in 1999 (*Notice to Members 99-54*) and 2001 (*Notice to Members 01-65*).

3 Although public investors do not have access to the CRD system, the information in that system is available to investors through NASD BrokerCheck and individual state disclosure programs.

4 Consistent with the 1999 moratorium, NASD may continue to expunge, without a court order, arbitration awards rendered in disputes between registered representatives and firms that contain expungement directives in which the arbitration panel states that expungement relief is being granted because of the defamatory nature of the information.

5 In addition to the three standards discussed above, NASD, in its sole discretion and under extraordinary circumstances, also may waive the obligation to name NASD as a party if it determines that:

- the expungement relief and accompanying findings on which it is based are meritorious; and

- the expungement would have no material adverse effect on investor protection, the integrity of the CRD system, or regulatory requirements.

6 Although a judge may make the affirmative finding required under Rule 2130, NASD expects that arbitrators will consider the overwhelming majority of expungement requests.

©2004 NASD. All rights reserved. *Notices to Members* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

## ATTACHMENT A

New rule language is underlined.

\* \* \* \* \*

### 2130.  Obtaining an Order of Expungement of Customer Dispute Information from the Central Registration Depository (CRD System)

(a) Members or associated persons seeking to expunge information from the CRD system arising from disputes with [public] customers must obtain an order from a court of competent jurisdiction directing such expungement or confirming an arbitration award containing expungement relief.

(b) Members or associated persons petitioning a court for expungement relief or seeking judicial confirmation of an arbitration award containing expungement relief must name NASD as an additional party and serve NASD with all appropriate documents unless this requirement is waived pursuant to subparagraph (1) or (2) below.

(1) Upon request, NASD may waive the obligation to name NASD as a party if NASD determines that the expungement relief is based on affirmative judicial or arbitral findings that:

(A) the claim, allegation, or information is factually impossible or clearly erroneous;

(B) the registered person was not involved in the alleged investment-related sales practice violation, forgery, theft, misappropriation, or conversion of funds; or

(C) the claim, allegation, or information is false.

(2) If the expungement relief is based on judicial or arbitral findings other than those described above, NASD, in its sole discretion and under extraordinary circumstances, also may waive the obligation to name NASD as a party if it determines that:

(A) the expungement relief and accompanying findings on which it is based are meritorious; and

(B) the expungement would have no material adverse effect on investor protection, the integrity of the CRD system, or regulatory requirements.

(c) For purposes of this rule, the terms "sales practice violation," "investment-related," and "involved" shall have the meanings set forth in the Uniform Application for Securities Industry Registration of Transfer ("Form U4") in effect at the time of issuance of the subject expungement order.

# NASD Notice to Members 01-65—Request For Comment

ACTION REQUESTED BY
NOVEMBER 24, 2001

# Expungement

NASD Seeks Comment On Proposed Rules And Policies Relating To Expungement Of Information From The Central Registration Depository

## SUGGESTED ROUTING

*The Suggested Routing function is meant to aid the reader of this document. Each NASD member firm should consider the appropriate distribution in the context of its own organizational structure.*

- Executive Representatives
- Legal & Compliance
- Operations
- Registration
- Senior Management

## KEY TOPICS

- Central Registration Depository System
- Expungement

## Executive Summary

The National Association of Securities Dealers, Inc. (NASD®) requests comment on the establishment of certain criteria that must be met, and procedures that must be followed, before NASD Regulation would expunge certain information from the Central Registration Depository (CRD®) system pursuant to an expungement order. By way of background, information generally is expunged from the CRD system pursuant to a specific statutory requirement or a court order. While this practice is appropriate in most cases, NASD Regulation believes that refinements to this policy are necessary to address the expungement of customer dispute information (*e.g.*, customer complaints or arbitration claims). With respect to customer dispute information, NASD Regulation believes that additional safeguards and procedures in the expungement process are necessary to ensure that investor protection interests are served before the extraordinary relief of expungement is granted.

Accordingly, NASD specifically seeks comment on whether it should generally limit expungement of customer dispute information from the CRD system to cases where an expungement order is based on a finding by a fact finder (*i.e.*, either an arbitrator or a court) that (1) the subject matter of a claim or information in the system involves a case of factual impossibility or "clear error" (*e.g.*, the associated person named in the proceeding did not work for the firm, or worked in a different office, and was named in error); (2) the claim in question is without legal merit; or (3) the information contained in the CRD system is determined to be defamatory in nature.

NASD also seeks comment on (1) specific procedures that would be required to be followed depending on whether the finding that is made results from a contested proceeding (*e.g.*, an arbitration hearing or judicial proceeding) or from a settled matter (*e.g.*, a stipulated award rendered in an arbitration forum or judicial proceedings based on a settlement); (2) the adoption of a rule amending the Code of Arbitration Procedure to require a finding in an arbitration award of one or more of the expungement criteria discussed in this *Notice*; and (3) the adoption of a rule or Interpretive Material that clearly articulates NASD Regulation's authority to pursue disciplinary action against a member that or associated person who seeks to have information about an arbitration claim expunged after there has been an award rendered against that member or associated person by the arbitrators or seeks to expunge any arbitration award that does not contain an expungement order and a finding of at least one of the criteria set forth in this *Notice*.

## Action Requested

NASD encourages all interested parties to comment on the proposal. Comments must be received by November 24, 2001. Members and interested persons can submit their comments using the following methods:

- mailing in the checklist (Attachment A)
- mailing in written comments
- e-mailing written comments to *pubcom@nasd.com*
- submitting comments using the online form at the NASDR Web Site (*www.nasdr.com*)

# NASD Notice to Members 01-65—Request For Comment

If you decide to submit comments using both the checklist and one of the other methods listed above, please indicate that in your submissions. The checklist and/or written comments should be mailed to:

Barbara Z. Sweeney
Office of the Corporate Secretary
National Association of Securities Dealers, Inc.
1735 K Street, NW
Washington, DC 20006-1500

**Important Note:** The only comments that will be considered are those submitted in writing or by e-mail.

Before becoming effective, any rule change developed as a result of comments received must be adopted by the NASD Regulation and/or NASD Dispute Resolution Board of Directors, may be reviewed by the NASD Board of Governors, and must be approved by the Securities and Exchange Commission (SEC) following public comment.

## Questions/Further Information

As noted above, written comments should be submitted to Barbara Z. Sweeney. Questions concerning this NASD Notice to Members— Request For Comment may be directed to Richard E. Pullano, Chief Counsel, CRD/Public Disclosure, NASD Regulation, at (240) 386-4821; or to Shirley H. Weiss, Office of General Counsel, NASD Regulation, at (202) 728-8844.

## Background

The CRD system is the registration and licensing system for the United States securities industry and its state and federal regulators and self-regulatory organizations.[1]

NASD Regulation and the North American Securities Administrators Association (NASAA) jointly administer the CRD system.[2] All broker/dealers registered with the SEC are required to file their registration forms (Form BD and Form BDW) through the CRD system. Such broker/dealers also are required to file the registration forms of any of their associated persons who are NASD-registered through the CRD system (Form U-4 and Form U-5). These registration forms require comprehensive reporting of administrative information (personal, organizational, employment, registration, and other information) and disclosure information (information about criminal, regulatory, and financial matters, including information relating to customer disputes). This final category of "customer dispute information" includes customer complaints, arbitration claims, court filings made by customers, and the arbitration awards or court judgments that may result from those claims. This category of information contains allegations that a member or one or more of its associated persons has engaged in some type of misconduct.

Regulators use the registration information, and other information contained in the CRD system,[3] to assist them in fulfilling their regulatory responsibilities, including making determinations about registration and licensing of firms and associated persons. Member firms use the CRD system to help them meet their registration, licensing, and certain other compliance obligations. Much of the information reported to the CRD system is made publicly available, either by NASD Regulation through its Public Disclosure Program (PDP) or

by the SEC and individual state securities administrators pursuant to applicable law.

In operating the CRD system, NASD Regulation has followed procedures designed to ensure that the information in the system is accurate and complete. In establishing these procedures, NASD Regulation is guided by its mission of protecting investors and by CRD policy established with NASAA and the SEC. As the operator of the system with primary responsibility for maintaining its integrity, NASD Regulation also has an obligation to consider compelling issues involving personal privacy and fundamental fairness. Accordingly, NASD Regulation, working with the SEC, NASAA, other members of the regulatory community, and member firms, has endeavored to establish procedures reasonably designed to ensure that information submitted to and maintained on the CRD system is accurate and complete. These procedures, among other things, cover expungement of information from the CRD system in narrowly defined circumstances. Expungement is a remedy provided by federal and state law in certain circumstances that usually is effected through a court order.

Since the inception of the CRD system in 1981, court-ordered expungements generally have been honored. Arbitrator-ordered expungements that met certain requirements also were honored until January 1999. In January 1999, after consultation with NASAA, NASD Regulation imposed a moratorium on arbitrator-ordered expungements from the CRD system. Under the moratorium, which is still in effect, NASD Regulation will not expunge information from the CRD system

# NASD Notice to Members 01-65—Request For Comment

based on a directive contained in an arbitration award rendered in a dispute between a public customer and a firm or its associated persons, unless that award has been confirmed by a court of competent jurisdiction.[4]

In July 1999, NASD issued *NASD Notice to Members 99-54* seeking comment on issues related specifically to arbitrator-ordered expungements. NASD sought comment on possible approaches that would address the interests of parties in arbitration in having arbitrators' expungement orders given some meaningful effect while still addressing state record-retention requirements and other issues. Among other things, *NASD Notice to Members 99-54* sought comment on whether NASD Regulation should establish specific standards that would have to be met before NASD Regulation would honor an expungement that was ordered by an arbitrator. The comments received in response to *NASD Notice to Members 99-54* were mixed, although most commenters were in favor of allowing arbitrator-ordered expungements, particularly if arbitrators had the benefit of standards to guide them in making such determinations. On the other hand, many commenters opposed allowing arbitrators to direct expungement because of concerns about arbitrator authority or training and state law issues, among other reasons.

## Discussion

Federal and state laws provide for expungement relief under very limited circumstances. In addition, persons may be granted an expungement remedy in a civil action (as a form of equitable relief) when, for example, harm is done to their reputations, or based on other equitable grounds.

Expungement of information from the CRD system also is appropriate in certain circumstances where it is not expressly required by applicable law or by a court order in a legal proceeding to which NASD Regulation is a party.

Expungement of information from the CRD system is an extraordinary remedy, however, that clearly is not appropriate in all circumstances. In addition, there is a potential for inappropriate use of the expungement process, particularly where parties have agreed to expunge customer dispute information as a part of a settlement. Both the investing public and regulators have interests in maintaining customer dispute information within the CRD system that may not be considered when two private parties agree to settle a civil suit or arbitration claim and to expunge information relating to that suit or arbitration claim from the CRD system.

Since the issuance of *NASD Notice to Members 99-54*, NASD Regulation has been considering how to craft an approach that would balance all of the competing interests associated with executing arbitrator-ordered expungements that include customer dispute information. Developing an approach has been a difficult undertaking, as it requires a balancing of at least three legitimate but sometimes competing interests. NASD Regulation, the states, and other regulators have an interest in retaining broad access to customer dispute information to fulfill their regulatory responsibilities; individuals in the brokerage community have an interest in securing a fair process that recognizes their stake in protecting their reputations and permits expungement from the

CRD system when appropriate; and investors have an interest in having access to information about brokers with whom they do business or may do business.[5] NASD Regulation also has been concerned about crafting an approach that does not have an overly broad chilling effect on the settlement process or inappropriately interfere with the arbitration process or arbitrators' authority to award appropriate remedies.

After considering the compelling interests at stake, NASD Regulation preliminarily has identified three bases that it believes warrant the extraordinary relief of expunging information from the CRD system. They include a finding that (1) factual impossibility or "clear error" exists (*e.g.*, the associated person named in the proceeding did not work for the firm, or worked in a different office, and was named in error); (2) the claim is without legal merit; or (3) the information on the CRD system is defamatory in nature.[6] As discussed in more detail below, NASD is seeking comment on whether interested parties agree that findings falling into one of these three categories are a sufficient basis for expungement of information from the CRD system and whether additional categories should be considered. With respect to the first category, NASD Regulation is specifically interested in hearing interested parties' views on whether the "factual impossibility" category is clear and broad enough, or whether the category also should address "clear error" situations (*e.g.*, when a customer or a regulator names one registered person at a firm, but intended to name another registered person). NASD Regulation also is interested in

# NASD Notice to Members 01-65—Request For Comment

commenters' views on what constitutes "clear error" or "factual impossibility."

NASD Regulation also generally believes that, before any customer dispute information is expunged, an independent fact finder should make a finding that expungement relief is warranted on one of these three bases. With respect to the second category (i.e., claims that are found to be "without legal merit"), NASD Regulation emphasizes that merely prevailing in an arbitration or court proceeding would not, by itself, justify expungement. A fact finder would be required to make a specific finding that a claim was factually impossible, without legal merit, or defamatory in nature before NASD Regulation would execute any expungement directive. With respect to the third category, NASD is interested in commenters' views on whether fact finders should be required to find that information in the CRD system is defamatory in nature, or whether a finding that information is false or defamatory in nature would be a sufficient basis to expunge. NASD Regulation discusses below its preliminary views on specific categories of information that may be subject to expungement requests and proposed approaches/ criteria for expunging that information from the CRD system.

## Expungement Of Customer-Initiated Complaints/ Arbitrations/Court Proceedings

Expungement of customer dispute information is an especially difficult area given the competing interests involved.

NASD Regulation recognizes that, in some cases, allegations of misconduct may be without merit or may falsely or mistakenly accuse associated persons of engaging in misconduct. Such allegations may unfairly tarnish the reputations of those associated persons and, as a result, associated persons increasingly are requesting expungement of the information as a form of equitable relief in connection with the resolution of these disputes. NASD Regulation also recognizes that some brokers and firms may inappropriately attempt to have meritorious or accurate information about their misconduct or alleged misconduct expunged from the CRD system.[7]

Most customer/broker disputes are resolved in arbitration or, alternatively, are settled by the parties without the involvement of a finder of fact. Typically, neither of these dispute resolution methods results in a record that explicitly identifies the rationale for granting expungement relief.[8] "Stipulated" (or consent) awards or settlements are a source of particular concern because typically there has been no hearing on the merits, no independent fact finder involved in the negotiations, and no rationale provided for the expungement. While there may be legitimate reasons for the expungement, those reasons generally are not provided in a stipulated award or settlement. Therefore, NASD Regulation is proposing that any approach dealing with the expungement of customer dispute information must address both expungement orders in arbitration awards after a hearing on the merits and "stipulated" or consent awards in which parties agree to expungement as part of the settlement and then present the settlement to the arbitrator for inclusion in an award.

## Awards After Hearing/Determination[9]

NASD Regulation believes that merely prevailing in an arbitration case is not, by itself, an appropriate ground for expunging the proceeding from the CRD system.[10]

Expungement is extraordinary relief that should be granted in limited circumstances only after a determination by an independent adjudicator that the matter in question meets at least one of the criteria established for expungement. As discussed above, NASD Regulation believes that the appropriate criteria for expunging customer dispute information may include a finding that: (1) factual impossibility or "clear error" exists (e.g., the associated person named in the proceeding did not work for the firm, or worked in a different office, and was named in error); (2) the claim is without legal merit; or (3) the information on the CRD system is defamatory in nature. NASD Regulation proposes to execute arbitrators' directives to expunge customer dispute information from the CRD system only if one of these three findings is made and is expressly contained in the arbitration award. As discussed in more detail below, NASD Regulation also would require that all such directives be confirmed by a court of competent jurisdiction, and that NASD Regulation be given notice of any request for judicial confirmation or order of expungement[11] prior to submission to the court.

NASD Regulation believes that adverse arbitration awards (i.e., arbitration awards against a firm or associated person) should not be expunged pursuant to a post-award settlement with the customer, even if that settlement

## NASD Notice to Members 01-65—Request For Comment

is approved by a court.[12] An adverse arbitration award represents a finding by independent arbitrators, after consideration of the merits, that a customer claim and allegations made therein are meritorious in full or in part, and justify an award to a customer. Such information is valuable to regulators, the investing public, and to other securities firms that may be potential employers of the subject of the award. NASD Regulation believes that this information should be in the CRD system, and that it may be a violation of Rule 2110 to seek expungement under these circumstances.

### Stipulated Awards

Because they originate as settlements between parties and generally do not involve independent fact finders in the entire process, "stipulated" or "consent" awards are especially difficult to address. As noted in NASD Notice to Members 99-54, pursuant to the Code of Ethics for Arbitrators in Commercial Disputes, arbitrators are not bound to sign a consent award unless the arbitrator is satisfied with the propriety of the terms of the settlement.[13] Nevertheless, concerns have been raised about the possibility of negotiated arrangements wherein a firm may agree to settle a claim filed by a customer against an associated person and the firm, provided the customer agrees to the inclusion of a directive to expunge all information about the claim from the associated person's CRD record. In some cases, a customer claim/allegation may have merit and, therefore, should be reported on the uniform registration forms, included in the CRD system for use by regulators and broker/dealers, and made

available to investors through NASD Regulation's PDP. Expungement may be inappropriate under these circumstances.[14]

NASD Regulation believes that it would be appropriate to include expungement relief in stipulated awards only in cases involving factual impossibility or in which a party was mistakenly named (the "clear error" criterion). In those cases, such persons should be able to avail themselves of the settlement opportunity outside of arbitration, and then request that an arbitrator issue an award that incorporates the stipulated settlement and includes expungement relief for certain named parties. NASD Regulation is not proposing to include the other two criteria (without legal merit or defamatory in nature) as grounds for expungement in stipulated awards because, in NASD Regulation's view, it is unlikely that claimants' counsel would agree to such findings as part of a settlement and because NASD Regulation believes that a fact finder's explicit determination that expungement is being ordered based on one of the three criteria discussed in this Notice is a necessary safeguard. NASD Regulation believes that settlements of customer complaints outside of the arbitration process that are reduced to stipulated court orders of expungement should be treated similarly. Accordingly, NASD Regulation proposes to execute expungement orders incorporating settlement agreements only if they are ordered by a court of competent jurisdiction and include a finding of factual impossibility or that the associated person whose information is to be expunged was named in clear error.[15]

### Court Confirmation Of Expungement Orders

Consistent with the practice announced in NASD Notice to Members 99-54, NASD Regulation proposes to continue to require that any arbitration award in a customer dispute containing an expungement order be confirmed by a court of competent jurisdiction before NASD Regulation will execute the order. This requirement also will apply to customer disputes settled outside of the arbitration process and submitted to a court as a stipulated order. NASD Regulation will review every such expungement order to determine whether the expungement criteria have been met. Accordingly, NASD Regulation proposes that any expungement rule would require parties seeking expungement pursuant to an arbitration award to name NASD Regulation as an additional party in the confirmation proceeding, and to serve NASD Regulation with the appropriate court papers.[16] If NASD Regulation determines that the expungement order meets the criteria set forth above, it will advise the court that it will not oppose expungement. On the other hand, if NASD Regulation determines that the expungement order does not meet the criteria, NASD Regulation will participate in the proceeding and oppose confirmation of the expungement portion of the arbitration award.[17] In addition, NASD Regulation will notify the states when NASD-registered firms or individuals provide notice to seek an expungement, and one or more states may choose to intervene in the confirmation or other judicial proceeding.

# NASD Notice to Members 01-65—Request For Comment

## Summary

NASD Regulation believes that there should be a way to remove information that is factually impossible, without legal merit, or defamatory in nature from the CRD system, but that any such removal should be made only after certain criteria are met and certain protocols are followed. Accordingly, NASD seeks comment on the following proposals that are intended to establish those criteria/protocols.

## Proposed Rules/Actions

### Adoption Of Customer Complaint/Arbitration Expungement Rule

NASD specifically seeks comment on the following proposal.

NASD Regulation will expunge customer dispute information from the CRD system only under the following conditions:

**I. Judicial or Arbitral Findings**

**A. By hearing on the merits:** Expungement resulting from a judicial or arbitral hearing on the merits must contain one of the following findings with respect to the person for whom expungement is ordered:

1. Factual impossibility/ "clear error"

2. Without legal merit

3. Defamatory in nature

**B. By stipulated award:** Expungement resulting from a stipulated award presented to an arbitrator for signature and containing an expungement order must contain a finding by the arbitrator(s) of factual

impossibility or clear error with respect to the associated person for whom expungement is ordered.

**C. Settlement of customer complaint without an award:** Customer complaints that are settled and reduced to a settlement agreement that contains an expungement order will be expunged by NASD Regulation only if the settlement is approved by a court of competent jurisdiction, and the document signed by the court contains a finding that the associated person whose information is to be expunged was named in clear error.

**II. Notice and Court Confirmation**

All arbitrator-ordered expungements of customer dispute information must be confirmed by a court of competent jurisdiction. NASD Regulation will not expunge customer dispute information from the CRD system pursuant to a court confirmation of an arbitration award, or other judicial proceeding or a settlement agreement unless it receives notice and a copy of the proposed expungement order prior to its submission to the court,[16] and is named as a party to the proceeding with respect to the expungement issue. NASD Regulation reserves the right to oppose confirmation of an arbitration award (or, in any other proceeding, to oppose the issuance of an expungement order) if it determines that the expungement order does not contain one or more of the criteria set forth in Section I above.

**III. Otherwise Required by Law or Court Order**

In addition, NASD Regulation will expunge customer dispute information if required to do so by applicable law or a lawful court order that is binding upon NASD Regulation. NASD Regulation would have to be named as a party to any judicial proceeding where an order to expunge such information from the CRD system is sought.

NASD Regulation proposes to make determinations about what constitutes factual impossibility and "clear error." As discussed above, examples of factual impossibility could include cases where it can be demonstrated that it was factually impossible for the associated person named in the proceeding to have committed the alleged misconduct (e.g., the associated person named in a proceeding did not work for the firm or worked in a different office and was named in error). Examples of "clear error" could include cases where a customer names one registered person at a firm, but intended to name another registered person or where a clerical or procedural error results in the naming of the wrong person). NASD specifically seeks comment on what circumstances or criteria should qualify for the "clear error" category.

# NASD Notice to Members 01-65—Request For Comment

## *Adoption Of A Rule Or Interpretive Material Articulating NASD Regulation's Authority For Violations Of Conduct Rule 2110*

NASD staff also seeks comment on whether to adopt a rule or Interpretive Material that would expressly articulate NASD Regulation's authority to pursue a disciplinary action (for violation of just and equitable principles of trade) against a member or an associated person who:

1. seeks to have information about an arbitration claim expunged after there has been an award rendered against that member by the arbitrators;[19] or

2. seeks to expunge any arbitration award that does not contain an expungement order and a finding of at least one of the criteria set forth above.

NASD Regulation's authority to pursue disciplinary actions against members for violations of Conduct Rule 2110 is quite broad and would encompass pursuing conduct that would undermine the regulatory function of fostering an effective dispute resolution system. Nevertheless, NASD comment on whether adopting an explicit rule or Interpretive Material may act as an additional deterrent to firms or associated persons who might inappropriately seek expungement relief.

## Endnotes

1   NASD Regulation and NASAA jointly developed the CRD concept, and they jointly set CRD policy.

2   NASAA is an association comprised of state and other securities regulators in the United States, as well as other securities regulators in North America. NASD Regulation was established in 1996 as a separate, independent subsidiary of the NASD. NASD Regulation has responsibility for the operation of the CRD system.

3   The CRD system also contains other administrative information (*e.g.*, registration status with various regulators, qualification examination results) and disclosure information reported by participating regulators and the Department of Justice.

4   *NASD Notice to Members 99-09* announced the imposition of the moratorium and specifically noted that, under the moratorium, NASD Regulation would continue to expunge information from the CRD system based on expungement directives rendered in disputes between associated persons and firms where arbitrators have awarded such relief based on the defamatory nature of the information at issue. NASD Regulation is not proposing any changes to that limited exception (which also was discussed in *NASD Notice to Members 99-54*) or to the general requirement that awards rendered in disputes between customers and firms or their associated persons that provide expungement relief be confirmed by a court of competent jurisdiction.

5   While defamation actions brought by member firms are less likely to occur than actions brought by individuals, member firms also have an interest in protecting their reputations, and may seek appropriate relief against persons who make false statements about firms.

6   Generally, defamation requires a false statement about an individual that is published to a third party and harms the individual's reputation. Federal and state courts generally apply a standard of actual malice or reckless disregard for statements about public individuals,

and a negligence standard for statements about private individuals, for recovery on a defamation claim. The elements of defamation and the applicable standard of fault may vary among the states.

7   With respect to the "alleged misconduct" category, NASD Regulation recognizes that information in the CRD system includes allegations of misconduct that have not yet been proven. Nevertheless, such allegations may have regulatory value as an early indicator of problems or as part of a larger pattern that may also include similar acts of misconduct that were found to have merit. Regulators understand the distinction between allegations and findings of misconduct, and NASD Regulation provides information through its PDP to inform the public of that distinction. Specifically, NASD Regulation informs requestors that customer complaints and other disclosure events may include allegations that have not been verified or proven to be true and that requestors should not assume that they are true. Moreover, with respect to pending regulatory/disciplinary actions that have been reported, requestors are informed that such items may be contested and ultimately withdrawn, dismissed, or otherwise resolved in favor of the broker.

8   Arbitrators are not required to provide the reasoning for a particular decision or award and typically do not do so.

9   This category includes cases that were decided on the papers, without a hearing.

10  In this situation, the appropriate course of action is the filing of an amendment through the CRD system to report that the arbitration has been completed and that the party prevailed in the arbitration.

11  While the majority of court orders that NASD Regulation receives confirm an arbitrator-ordered expungement award, NASD Regulation also receives court orders that order the expungement of customer dispute information when the parties went directly to court (and not to arbitration).

---

# NASD Notice to Members 01-65—Request For Comment

12  NASD Regulation notes that an exception to this general policy would be where a court vacates an arbitration award and orders expungement as equitable relief.

13  See Canon V(D) of The Code of Ethics for Arbitrators in Commercial Disputes (reproduced on the NASD Dispute Resolution Web Site at www.nasdadr.com/ethics_code.asp).

14  NASD Regulation is aware of allegations that firms have pressed customer/claimants into accepting expungement as a condition of settlement of arbitration proceedings. While we believe that the proposed rules would address these concerns, NASD Regulation would consider this practice to be a possible violation of Rule 2110.

15  As discussed in more detail below, under the approach being contemplated in this NASD Notice to Members, a member would be required to provide NASD Regulation with notice that it was seeking expungement and would be required to make NASD Regulation a party to that proceeding. NASD Regulation would either advise a court that it did not oppose expungement relief or would participate in the proceeding and oppose the requested relief. NASD Regulation would, of course, abide by an expungement directive lawfully ordered by the courts after a hearing on the merits.

16  This requirement would also apply to any other judicial proceeding that could result in an order for the expungement of customer dispute information from the CRD system.

17  As noted above, NASD Regulation would, of course, abide by an expungement directive lawfully ordered by the courts after a hearing on the merits.

18  A party seeking expungement relief should give notice prior to either the judicial proceeding in which the relief is requested or the judicial proceeding seeking to confirm an arbitration award ordering expungement.

19  NASD Regulation does not seek to preclude a member or associated person from seeking to vacate an arbitration award under the limited bases delineated in an appropriate state or federal statute.

© 2001, National Association of Securities Dealers, Inc. (NASD). All rights reserved. Notices to Members attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

# IN  THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

| | | |
|---|---|---|
| **JOSEPH R. KARSNER, IV,** | * | |
| **Petitioner**, | * | NASD Case No.: 04-06007 |
| | | Civil Action No.: 1:2008-cv-00291-RJL |
| **v.** | * | |
| **TERRESSA HATCHETT and** | * | |
| **FINRA (formerly known as National** | | |
| **Association of Securities Dealers (NASD))** | * | |
| **Respondents**. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### ORDER DISMISSING OR DENYING PETITION
### TO CONFIRM ARBITRATION AWARD

Upon consideration of the motion filed by the Maryland Securities Commissioner in opposition to the Petition to Confirm Arbitration Award before the Court, the Court being fully apprised in the premises and good cause for granting that Motion having been shown, it is this __ __ day of _____ , 2008,

ORDERED, that the motion be and hereby is granted; and it is further

ORDERED, that the petition to confirm arbitration award be and is hereby DISMISSED or DENIED.

_____
Judge of the U.S. District Court
for the District of Columbia